*STACI Burk*
*2487 GILBERT RD. # 106-609*
*GILBERT AZ. 85295*
*480-343-4518*
*email. stacigriffinburk@yahoo.com*

**DISTRICT COURT OF ARIZONA**

**UNITED STATES DISTRICT COURT**

_X_ FILED    ___ LODGED
___ RECEIVED    ___ COPY

NOV 1 8 2022

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

---

**CV22-01967-PHX-DMF**

**COMPLAINT FOR DAMAGES**

STACI BURK,

Plaintiff,

vs.

SENATOR KELLY TOWNSEND, A SINGLE WOMAN IN HER PERSONAL CAPACITY ACTING UNDER "COLOR OF LAW" AS A GOVERNMENT OFFICIAL, AND DOES I-X.

Defendant.

Violation of Plaintiff's Fourth Amendment Rights 42 U.S.C §1983 (False Imprisonment and Unreasonable Search and Seizure)

Violation of Plaintiff's Fourteenth Amendment Rights 42 U.S.C §1983 (Due Process and Familial Relations);

Violation of Plaintiff's First Amendment Rights 42 U.S.C §1983

Assault and Battery

False Imprisonment

Intentional Infliction of Emotional Distress

Negligent Infliction of Emotional Distress

# COMPLAINT

Plaintiff Staci Burk hereby respectfully brings forth this Complaint against Defendant Senator Kelly Townsend, and alleges as follows;

## JURISDICTION AND VENUE

1. At all times relevant hereto, Plaintiff Burk resided in State of Arizona.

2. At all times relevant to this Complaint, and currently, Defendant Senator Kelly Townsend ("Defendant" hereafter) resides within the State of Arizona and is a current active member of the Arizona Legislature acting with a "cloak of authority" prior to 2020 as the Arizona House elections chair and following the 2020 election as Senator.

3. This Court has venue under 28 U.S.C. 1390 as the events giving rise to this Complaint primarily occurred in the State of Arizona under the geographical jurisdiction of this Court.

4. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. § 1331, because the case involves a federal question and complaint arising out of 42 U.S.C §1983.

5. Pursuant to 28 U.S.C. 1367, this Court has supplement jurisdiction over the State court claims as these claims arise out of the same transaction or occurrence and share a common nucleus of operative fact.

## PARTIES

6. Plaintiff Staci Burk is a private citizen.

7. Defendant Arizona Senator Kelly Townsend is a current Senator in the Arizona Legislature and prior to 2020, served two terms in the Arizona House.

3

8. To avoid conflicts regarding Counsel, Plaintiff places Defendants on notice of related Counsel who are likely to be called as fact witnesses. To avoid potential conflicts Defendants may wish to consider this information when retaining Counsel for this matter.[1]

## BACKGROUND AND HISTORY

QAnon ideology is dangerous. It is even more dangerous when State Legislators promote and amplify QAnon-like ideology and conspiracies in their role as leaders. Although Defendant denies affiliation with QAnon, for several years she has promoted QAnon ideology to her constituents as if it were fact. Defendant represented to Plaintiff that she had inside knowledge from various secret meetings in her role as a government official which Plaintiff believed. These representations caused Plaintiff and her family serious financial, emotional, and reputational harm, having a direct impact on Plaintiff's career and earning capacity.

Elected officials hold positions of sacred trust and swear an oath to uphold the Constitution and respect individual rights. Acting under "color of law," as a sitting member of the State Legislature, Defendant Townsend engaged in a series of acts which violated Plaintiff's individual rights, as well as engaged in tyrannical behavior resulting in substantial harm to Plaintiff and her family.

---

[1] Prior to Plaintiff's involvement, Defendant Townsend worked closely with Christina Bobb and after the election Doug Logan who was present with Powell, Flynn, and Keshel at Lin Wood's home in November and December 2020. Logans company CyberNinjas is represented by attorney **Jack Wilenchik**. In December 2020, Defendant attempted use and exploit Plaintiff with **Christina Bobb** and **Jack Wilenchik**, through Plaintiffs legal case, to gain access to voting machines (see Ex. ☞ ). Plaintiff also learned in 2022, that also during that time back in December 2020, Wilenchik worked directly with Defendant to prepare an alternate slate of electors to present to Congress. Although Defendant allegedly told attorney Cheseboro (who was working with Wilenchik), that she wanted to be sure there were legal cases pending at the time so that she would not be accused of treason, defendant seems to have knowingly withheld this important and relevant information from Plaintiff at the time. Meanwhile Defendant and her associates used fear to employ coercive control of Plaintiff restricting her liberty, first amendment, fourth amendment, and several other unconstitutional violations of Plaintiff's individual rights. As such, Wilenchik and Bobb are anticipated to be called as fact witnesses.

Defendant and Plaintiff knew each other dating back to Defendant's engagement and advocacy as a parent while Plaintiff served on the school board from 2011 to 2015.

In March 2020, at the beginning of the pandemic, Defendant contacted Plaintiff out of the blue with an intensity to her voice, warning Plaintiff that she had just got off a call with other national legislators, and things were about to get "really bad." Defendant told Plaintiff she should get prepared for the worst and buy bulk ammo because ammo was not going to be available, and she should prepare to defend herself from a foreign invasion and potential martial law. The call was quite alarming. She had never received such a call from a Legislator.

Plaintiff was unaware of how deeply involved in QAnon-related ideology Defendant had become. It was not until after Plaintiff had been held hostage, gaslit, and terrorized by Defendant and her associates using fear and terror as a means of coercive control pressing this dangerous ideology, that Plaintiff came to learn the seriousness of it and the great harm it caused.

But for Defendant's role in State government, access to government information and resources, and her intense, commanding demeanor at the time, Plaintiff would not have believed the baseless theories and lies Defendant pressed to the level and degree which she did, resulting in serious harm to Plaintiff, her family, and her reputation.

Prior to the 2020 pandemic, Plaintiff later learned Defendant Townsend promoted vaccines were communist.[2] Townsend and her associate former Senator Dave Farnsworth, along with John Shattuck (an associate of Joe Flynn and Jerry Sheridan –former top aide to Sheriff Joe Arpaio), assisted and organized a group of parents who believe that a child sex trafficking cabal

---

[2] https://www.washingtonpost.com/nation/2019/03/01/something-is-those-vaccines-lawmaker-says-mandatory-shots-are-communist-idea/

involving Democrat child welfare authorities remove kids from families to traffic them for money and sex.[3]

In addition to the child welfare parent group, Defendant and her 2020 running mate, Forest Moriarty, along with Defendant's close friend Michelle Dillard, and security detail Steve Daniels (co-leaders of the Arizona Patriot Party), organized a grassroots group called Purple for Parents.

Like what occurred on January 6, 2021, a few months later in May 2021, Defendant incited her associates to take over school board meetings, proudly boasting that they forced school board members to cower in fear and terror in the back of the building, forcing them to escape as they took over the meeting.[4] Plaintiff was not involved in, nor does she condone or support these activities in any way.

A month later, in June 2021, Patriot Party leader Steve Daniels, who was Defendant's security detail throughout 2020, including at the Stop the Steal rally on November 4, 2020, was arrested at a school board meeting.[4] Plaintiff did not know Steve Daniels before the 2020 election.

While these activities are well within Defendant's right to freedom of association and the first amendment. It is an unconstitutional violation of Defendant Townsend's oath and duty as a government official to knowingly, intentionally, and involuntarily pull Plaintiff into her political agenda to use, manipulate, and exploit Plaintiff, her name, image, and reputation as a pawn and scapegoat for Defendant's actions while shirking responsibility for such actions, in direct violation of Plaintiff's individual constitutional rights.

---

[4] https://www.youtube.com/watch?v=Kg617pBdYWs

Defendant's political agenda concerning election integrity and a proposed audit was planned and, in the works, as far back as 2017,[5] well before Plaintiff was brought in by Defendant, terrorized and scapegoated.

In early 2022, well after Plaintiff had repeatedly told Defendant she no longer wanted anything to do with the election-denying movement, Defendant continued pushing to Plaintiff outrageous allegations —including that a man, Scott Koch, (who attended Stop the Steal rallies with Defendant and was witnessed by others speaking directly to Defendant), owned a restaurant in Scottsdale and is part of a border-related cartel involved in child trafficking and the use of "adrenochrome," which she claims captures the screams of children under "fear and panic," then uses their blood for a sense of "euphoria and youth." (see Ex. _A_ ).

If this were true, the security team that Defendant helped usher into Plaintiff's home shortly after the election to allegedly protect her (whose company also allegedly provided security for Congressman Mark Kelly), and who are purportedly Trump supporters that believe the election was stolen, and who also did security for the November 2020 Giuliani Hyatt hearing which Defendant participated in is part of some secret child sex trafficking cabal.

*If Defendant Senator Townsend applied critical thinking or analysis to the research she did with her family member. In that case, it means her suspicion of Koch being involved in child trafficking and "harvesting adrenochrome" is an openly public supporter of Donald Trump, and associate of Sheriff Mark Lamb, (who is part of the Stop the Steal movement). Lamb, by his own admission, regularly associates with Koch's boss Shawn Wilson who was a former deputy and*

---

[5]https://www.facebook.com/kelly.townsend1776/posts/pfbid0wmRfTq3MBkof2q4NWug9p9uWdZKju5FMxYNfRbzv8eB3hW9v7yQNbkvkLwmjHcJSl

*facilitated Koch's involvement in the border work. Wilson also alleged he was part of Governor Doug Ducey's "Border Strike Force." This would mean that John Shattuck, (associate of Joe Flynn and Steve Bannon) who is also a friend of Sheriff Mark Lamb, and works closely with the parent group which Defendant has allegedly worked with, who believe their kids were removed by CPS and sex trafficked, are also directly associated and in contact with the perpetrators. This does not make any sense.*

It is time to stop this harmful rhetoric. These vulnerable constituents grieving the loss of their children are being manipulated into action and used as political action pawns leading them or exploiting their belief that Trump is saving them and their kids from a corrupt government fighting an international cartel trafficking their children, rather than humanely addressing the reason the children were removed from their home. This is nonsense and exploitation.

Defendant abused her power as a government official and caused Plaintiff and her and her family immense physical, emotional, and reputational harm through similar manipulation to gain access to information about election fraud and to knowingly create the appearance thereof.

***These are real people's lives being affected and destroyed by these crazy nonsensical stories and theories. This reign of terror Defendant has been actively engaging in must stop.***

Defendant has feared pushing back as Defendant has a history of passive-aggressive acts toward others and has engaged in such with Plaintiff. When a private citizen exercising his first amendment rights on social media criticized Defendant after she was caught on "hot mic" discussing retribution against fellow lawmakers that were not doing what she wanted, she admitted to vindictively contacting the man's employer.[6] This is tyrannical behavior on the part of a

---

[6] https://www.azcentral.com/story/news/politics/arizona/2019/05/29/rep-kelly-townsend-contacted-critic-patrick-mannion-employer-over-his-facebook-post/1239665001/

government officials and was not an isolated incident. This type of behavior was just the tip of the iceberg compared to how Defendant Townsend violated her oath acting against Plaintiff in direct violation of her civil rights.

Defendant has repeated incessant unproven conspiracy theories about the legitimacy of Obama as a sitting President as far back as 2012 when she sought out Donald Trump well before he ran for President to lobby a bill targeting Obama's citizenship.[7] Trump allegedly agreed to help Defendant.[8] Reportedly, after a lengthy investigation, the birther allegations could not be proven. Thus, Donald Trump put to bed publicly the birther conspiracy as he ran for President. Before he did so Defendant claims he called her and her associate to his office and according to Defendant, allegedly telling them he knew it was true but was going to put it to bed publicly anyway.[9]

Defendant told Plaintiff on several occasions, after the election in November 2020, that when she went to Trump's office to discuss the birther conspiracy, she observed Obama leave laughing and friendly shaking hands with Trump before Trump called her in to let her know about his planned public statement to put it to bed. Defendant felt Trump's public statement made her and her fellow birther conspiracy theorists "look bad," and alleged Trump knowingly lied to the public. These expressed concerns about Trump's integrity did not stop Defendant from rigorously pursuing his endorsement and support,[10] believing it to be vital for her anticipated Congressional

------------------------------------------------------

[7] https://www.azcentral.com/story/news/local/arizona-best-reads/2016/10/16/how-arizona-became-ground-zero-birthers/91924322/

[8] https://www.msnbc.com/msnbc/trumps-lies-costly-investigations-marred-arizona-decade-rcna2256

[9] https://www.nytimes.com/2016/09/17/us/politics/donald-trump-birther-obama.html

[10] https://www.businessinsider.com/kelly-townsend-wendy-rogers-nick-fuentes-trump-white-nationalism-arizona-2022-7

race.[11] Defendant was one of the longest-running Stop the Steal advocates in Arizona, according to her own statements and actions. Not only had she pushed the election fraud narrative well before the election, she sought to recapture Trump electors through legislation before January 6, 2021, an action allegedly blocked by House Speaker Rusty Bowers.[12] Defendant Townsend sent a letter to Vice President Mike Pence in late December 2020, via her "birther" conspiracy and Roger Stone associate Jerome Corsi, on behalf of Arizona Senate colleagues asking that Pence not accept Arizona Trump electors (see Ex. B ).

Upon information and belief, in 2017 just after Trump was elected, Defendant began repeated, incessant conspiracy theories attacking election integrity, including that the 2020 election would be stolen. Plaintiff did not know the degree to which she pursued this until 2022. In 2017, Defendant called the integrity of U.S. elections into question and touted publicly that voter information should be "turned over" for an audit.[13] In this position of power and public trust, Defendant Townsend took aim at the most sacred and essential place where citizens settle their political differences and use their voice –the ballot box.

Plaintiff recognized that this allegation was very serious. As a number of lies and deceptions were perpetrated directly to Plaintiff, then amplified, encouraged, and supported, by Defendant and her associates, Plaintiff fell for the lies and gaslighting. The next thing she knew,

---

[11] https://apnews.com/article/2022-midterm-elections-arizona-donald-trump-legislature-elections-49d432ac3fbdf426069f8f0781afb4ae

[12] https://azcapitoltimes.com/news/2021/01/05/gop-lawmaker-pushes-legislation-to-give-trump-az-win/

[13] https://www.facebook.com/kelly.townsend1776/posts/pfbid0wgHdpFFde968ta6ZM5LqRPAqgze8W2PkzdtZ6tsw5g6MrTQp7epYD43D6bhKY7QFI

she was literally suddenly immersed in, and physically held hostage by Defendant and her associates using fear and terror as a means of coercive control.

Once surrounded by the security team of law enforcement and military members with military grade ammunition, bullet-proof vests, etc. which were ushered in during what Defendant and her associates told Plaintiff was a life-threatening situation (because she knew information about election fraud), Plaintiff forming a "Stolkholm-like syndrome," took the issue of election fraud very seriously filing a court case, funding it nearly entirely on her own going into debt with the sole purpose of getting to the truth, only to find out in the end that she had been lied to, exploited, and manipulated by Defendant and her associates for a political objective. The entire experience was deeply traumatizing to Plaintiff and her family who are still deeply affected.

Defendant alleged in 2020, while "in the Giuliani meeting," she was the one who pushed for an audit while Finchem and others glommed on for the grift.[14] In 2022, at a public hearing, when audit subcontractor Jovan Pulitzer presented his "evidence" the election was stolen, Defendant boasted to the crowd at or around 50 minutes in, that she had been pushing the election integrity fight as far back as 2017.[15]

Since 2015, due to her physical condition and related limitations, Plaintiff has been regularly assessed and evaluated by the State of Arizona which considers her a vulnerable adult under A.R.S. 13-3623(F)(6), pursuant to the State of Arizona Adult Protective Services. Section 13-3623(F)(3) defines emotional abuse as "a pattern of ridiculing or demeaning

---

[14] https://soundcloud.com/staci-burk/kelly-townsend?si=010ab4c2c3594d1094d9764728a95885&utm_source=clipboard&utm_medium=text&utm_campaign=social_sharing

[15] https://rumble.com/v1a992g-the-truth-behind-arizonas-paper-ballots-jovan-pulitzers-bombshell-paper-ana.html?fbclid=IwAR3kbUBlf7oFLRGBEuxezgL2x7-Sl2jaOxdizAATdaECX5n6FWZr-MwA3uo

a vulnerable adult, making derogatory remarks to a vulnerable adult, verbally harassing

a vulnerable adult or threatening to inflict physical or emotional harm on

a vulnerable adult." State v. Giles, No. 2 CA-CR 2010-0059, 2011 Ariz. App. Unpub. LEXIS 44,

at *32 (Ct. App. Apr. 19, 2011).

    ***It is not a necessary element for violation of Section 13-3623(F)(3) that a person is***
***aware that the victim is a vulnerable adult.*** State v. Smith, No. 1 CA-CR 07-0937, 2009 Ariz.

App. Unpub. LEXIS 216 (Ct. App. Jan. 15, 2009). Here, defendant Townsend was fully aware of

Plaintiffs physical condition and other vulnerabilities as well as her trusting nature. Thus,

Defendant knew or should have known Plaintiff is a vulnerable adult under Arizona law and

conformed her actions accordingly. Defendant and her allies recognized Plaintiff's vulnerability

and exploited these vulnerabilities for their financial and political gain. Additionally, just

because an individual does not act to protect herself by complaining about abuse, neglect or

exploitation does not mean that person can protect herself. *Zlatos*, 211 Ariz. 519, ¶ 29, 123 P.3d

at 1163. "Exploitation may occur with the full participation of the victim, but it is no less

exploitation." *Id.* ¶ 30. State v. Giles, No. 2 CA-CR 2010-0059, 2011 Ariz. App. Unpub. LEXIS

44, at *14 (Ct. App. Apr. 19, 2011).

    However, even if Plaintiff were not a vulnerable adult, Defendant's actions still egregiously

violated her constitutional rights as an individual while acting in her role as a government official

under "color of law." Her actions are just more outrageous since Defendant knew Plaintiff was a

vulnerable adult.

    Plaintiff believed Defendant and her associate's misrepresentations and manipulations used

for political gain. Plaintiff believed the lies and manipulations because of the defendant's position

of power and status as a State Senator acting under "color of law" along with her associates,

quickly crowding into Plaintiff's world such that by all appearances, Plaintiff believed there had to be truth to it or a whole group including accomplished lawyers like Sidney Powell, her own local Sheriff Mark Lamb, Congressional and Sheriff candidates such as Jerry Sheridan, etc. would otherwise not be touting such beliefs if widespread election fraud were not true.

In November 2020, Defendant pressed Plaintiff to call Defendant's associate Gregg Phillips alleging she was in danger and needed help. Plaintiff trusted Defendant in her role acting under color of law. Plaintiff was unaware that Phillips alleged without evidence that noncitizen voters were a source of voter fraud in the 2016 election and that Defendant had also publicly made such claims well before the election. According to Phillips, he is a friend of both General Mike Flynn and Sidney Powell, and that Powell served in an advisory capacity on the Board for his organization, True the Vote.

According to Phillips, he was the source of Trump's voter fraud allegations in 2017 when he tweeted allegations that General Flynn believed and passed onto President Trump, which he then made public but offered no proof for his claims.[16]

Like Phillips, Defendant alleged without evidence, noncitizen voters may steal the election in 2020 as she sought out the Trump campaign in 2019 to bring to them her theories.[17] Defendant has produced no evidence that foreigners invaded the border or nor was there any evidence produced that foreign entities hacked machines to rig the 2020 election. However, Defendant did knowingly produce, coerce, instigate, and amplify conspiracy theories while manipulatively causing it to appear as if it were Plaintiff who did so. Not only did these lies and manipulations

---

[16] https://time.com/4651634/gregg-phillips-voter-fraud-donald-trump/

[17] https://www.youtube.com/watch?v=VvdoShSF7hA

13

harm many innocent Arizonans, but Defendant knowingly and intentionally used, manipulated, and exploited, Plaintiff to an end for her political goals in an outrageous and egregious abuse of power violating Plaintiff's constitutional rights.

In 2019, Defendant Townsend alleged publicly on social media that using her words, "illegals" were invading the border, coming into her district to vote illegally as noncitizens.[18] Immediately following the 2020 election, both Defendant and Sidney Powell publicly alleged foreign interference via noncitizens coming across the border.

Once there was an alleged event involving a man who worked at Swift aviation and allegedly played a "hoax" on his MAGA coworkers reporting that he observed illegal ballots being taken off a South Korean plane at Sky Harbor airport, Defendant and her associates pivoted seeming to use the South Korean plane story as "proof" of foreign interference instead of Defendant's "illegals" from the border coming into vote story. The Korean Air story was more gripping and the lies about witnesses being threatened while using Plaintiff as a theatre set piece played well into the show Defendant was working to create. By gaslighting Plaintiff that she was in danger and would be killed, it kept Plaintiff under coercive control and easier to influence and use to accomplish the Big Lie. It also ensured Defendant and her associates had a sympathetic "witness" they could exploit and use to generate a large revenue stream of financial donations necessary to "protect" such witnesses while Plaintiff was funding the debacle largely from her own pocket going into debt nearly $75,000 out of pocket for court fees, alternative accommodations necessary for her family and her safety, and attorney costs due to threats of arrest on false charges

---

[18] https://www.youtube.com/watch?v=X31MWIR33Bw

made by Defendant and her associates in retaliation because of her "flipping" publicly in the substack article which contained several inaccurate and completely false misrepresentations such as Plaintiff has no friends outside the election denying world and is an unreliable narrator. Stevenson had no basis upon which to make such representations other than relying on and repeating the misrepresentation and false light which Defendant Townsend and her associates projected through manipulation and exploitation.

Defendant Townsend knew Plaintiff was vulnerable, easily trusting, and that she could manipulate this trust, kindness, and helpfulness, as she had repeatedly done in the past. Defendant knew or should have known the Korean Air story advanced a "foreign interference" narrative she and her associates wanted to push while relieving Defendant and associate Gregg Phillips from the burden of continuing their "noncitizen" illegal voter's story she began perpetuating in 2017.

Defendant's associate Jim Penrose from Sidney Powell's team told Plaintiff in late December 2020 that Korean Air was all a made up "hoax" by a Democrat who hated his MAGA coworkers which was passed on by a Trump campaign fundraising chair to Project Veritas associate Ryan Hartwig.

The outlandish falsities and conflicting versions of the story, which Defendant coerced and encouraged along with her associate Liz Harris while working closely with Powell, Flynn, and associates, were not only also completely false and fabricated but were confusing, dizzying, and ultimately downright absurd.

Around the time Defendant's associate Jim Penrose pressed on Plaintiff wild stories that the whistleblower in Seattle was about to be kidnapped; thus, they had to get to her immediately if Plaintiff didn't give them her information to send a team right away, she would be kidnapped and killed, then later that he needed Plaintiff's phone to run forensics to find out how the Black

SUVs ambushed her, other team associates alleged he was a "plant," "mole," and possible FBI informant sabotaging the election integrity effort. Gregg Phillips claimed he tracked the South Korean plane from before the election and used his geotracking data to track where the guys went from the plane and how and where the ballots were inserted. John Shattuck (Flynn/Powell/Byrne associate) claimed he confirmed there were arrests in Seattle involving the South Korean plane and Plaintiff should not trust Penrose, Patrick Byrne posted an image of ballot printing machines in a China province which researchers associated with their team supported alleging this operation matched a location the South Korean plane had been just before the election in Hanoi. (See Ex. $C$). Also at this time, Jovan Pulitzer, an associate of General Flynn from the Eli Gold Board, as Flynn worked closely with Defendant throughout the audit, repeatedly alleged on podcasts that his kinematic artifact detecting could find "traces of bamboo" in ballots should the legislators allow him to test such ballots.[19]

Sidney Powell's assistant Carissa Keshel told Plaintiff they had a mole in the FedEx facility in Memphis who validated the information given to Plaintiff by Scott Koch who claimed he was a government official, and that his agents were directly involved in taking ballots from the South Korean plane and inserting them into FedEx to Las Vegas but then later recanted saying he made it all up.

Defendant allegedly encountered Koch at Stop the Steal rallies she attended, and according to a witness, she and Koch had direct contact well before the 2020 election.

Ryan Hartwig claimed he was at the airport with the plane and was later approached by a man on his street who threatened his life because of his involvement with Korean Air. Garrett

---

[19] https://www.youtube.com/watch?v=WMm7WM-xo9s

Zeigler, friend of Hartwig, in January 2021 publicly insinuated that the FBI was involved with the South Korean plane fraud and cover-up, later representing to a group Hartwig had formed to investigate Korean Air that he had inside knowledge from working directly in the White House. (See ex. **D**).

In Defendant's fevered quest, to uncover proof of conspiracies of election fraud and gain Trump's favor no matter how many people she had to harm to do it, Defendant caused immense harm to several people. Defendant has a long history of political fights with colleagues who have a bully pulpit at their disposal to defend themselves, such as inciting her associates tweeting Rusty Bowers home address in December 2020,[20] and later supporting a recall and solicitation of Farnsworth to challenge Bowers because of years of conflict ending in that he wouldn't call a session and support her bill to reclaim Trump electors, or attacking Attorney General Brnovich's office and threatening to defund and privatize his election integrity unit —which she helped form and staff with allies— because it did not perform as she wanted,[21] and inciting an attack on fellow Legislator Ugenti-Rita at a rally.[22] It is a whole separate matter, for her to unleash her power as a Senator and government official upon a private citizen, scapegoating and using the weight of her government authority to transgress that persons individual constitutional rights, which she allegedly has a documented history of doing.[23] This is exactly what she did to Plaintiff and her

---

[20] https://www.eastvalleytribune.com/news/gop-election-rift-engulfs-mesa-lawmakers/article_5b36c7e0-3e3b-11eb-9e91-232b09e884a4.html

[21] https://www.eastvalleytribune.com/news/gop-election-rift-engulfs-mesa-lawmakers/article_5b36c7e0-3e3b-11eb-9e91-232b09e884a4.html

[22] https://www.azmirror.com/2021/07/26/after-being-booed-at-trump-rally-ugenti-rita-criticizes-the-senates-election-audit/

[23] https://www.azcentral.com/story/opinion/op-ed/elviadiaz/2019/05/29/kelly-townsend-crossed-line-when-she-contacted-critics-employer/1280118001/

family. It is the epitome of a tyrannical leader the Founders warned about and for which the Bill of Rights was designed to protect. Defendant took an oath to uphold the Constitution as sacred, and she failed in these duties to honor Plaintiff's constitutional rights as an individual.

Defendant Townsend incited and emboldened her followers when she spoke at Stop the Steal rallies inciting the crowd to set out to prove election fraud by any means necessary. The result was a group of Defendant Townsend's associates and charges desperate to find and prove election fraud guised as a "security detail," (many were former FBI, law enforcement and/or ranking military contractors), whose naturally commanding and controlling presence and demeanor, exacerbated and triggered Plaintiff's adult children and Plaintiff due to their history of surviving substantial past domestic violence and stalking. By repeatedly telling her and her children, they were in constant danger of being killed, while running to every noise with military-grade weapons as if the group were constantly about to be killed, these individuals held Plaintiff, her family, and at times friends, hostage with debilitating fear in her home via false imprisonment.

Not only did the "security team" restrict Plaintiff's personal liberty through coercive control and fear, two members set up driveway alarms one member purchased, around the perimeter of her property so that when Plaintiff attempted to escape, it alerted the security team member who had the wireless alarm and who on at least two occasions stopped the Plaintiff from leaving. This same team member also pulled handcuffs from his backpack and set them on Plaintiff's kitchen counter telling her she did not want to have to force him to use them. Another 1AP team member, Mike Kenny told Plaintiff after she escaped twice and was coerced into returning, that his colleague failed in his duties on the job by allowing her to escape twice.

Reflecting in past tense, he told Plaintiff that is why he always parked in the driveway behind Plaintiff because she was not going to run anywhere (referring to her compromised and vulnerable physical condition, which included the use of oxygen).

The "security detail" interrogated, manipulated, and coerced Plaintiff into completing affidavits, legal documents, and social media posts feeding outlandish lies and false conspiracy theories, which their occupational histories as former FBI, law enforcement, and military officers, led Plaintiff to believe they, like Defendant Townsend were acting with "color of law" and authority as government officials. Members of the "security detail" told Plaintiff they were working for DOD (the government), under "non-official cover," which Plaintiff and her family were confused and believed because the group and Defendant were observed to have direct access to President Trump throughout their ordeal.

As the situation unfolded, Plaintiff, her family, and friends, concluded the election fraud allegations the group, including Defendant, purported as true, must be true. Otherwise, it made little sense to them that all of these people who came from positions of apparent law enforcement and/or military authority, as well as Trump lawyers and Defendant Townsend who is a Senator and formerly the Elections Committee Chair in the Arizona House, would seemingly not be reacting in such a panic and fevered frenzy surrounding Plaintiff and having clear access to the inside of government if it weren't true. Defendant's associate Powell and her team (which Defendant was a witness in their election fraud case and had regular contact with throughout), also alleged they had all sorts of extrinsic corroborating evidence which never materialized. This was a reasonable but mistaken belief. Plaintiff, her family, and friends were manipulated by those apparent lies.

*Based on eyewitnesses and records, days before Plaintiff learned of and shared with Defendant about the Seattle whistleblower as Defendant sought information about election fraud,* Defendant had been outside the Arizona Capitol at a Stop the Steal framed rally on November 4, 2020, admonishing the crowd to gather affidavits[24] and proof of election issues. Defendant Townsend, a Navy veteran, acting under "color of law" and with her "cloak of authority" gave commanding orders to the crowd as a government official. Many in the crowd were fellow veterans and law enforcement who took her admonitions seriously. Those soldiers set into action and several days later, with Defendant's direct and active participation and encouragement, aggressively descended on Plaintiff and her home using advanced military and police surveillance and interrogation skills because it was rumored at another rally several days later (which Defendant attended), that from the information Plaintiff shared with Defendant, Plaintiff had a "hot" lead that might prove election fraud.

Plaintiff's alleged "hot" lead came as Plaintiff asked Defendant Townsend for help reaching law enforcement or someone the whistleblower in Seattle reached out and wanted someone in authority to investigate what was happening at her workplace while she stayed anonymous after she could not reach authorities. The whistleblower wanted to remain anonymous because she believed her employer FedEx was knowingly turning a blind eye. Defendant's associates, including upon information and belief, Trump lawyer Rudy Guiliani, wanted access to her for an affidavit and potential witness for their legal challenges.

When the Seattle whistleblower said she did not want to come forward and put her name to an affidavit, Defendant Townsend told Plaintiff that both she and the whistleblower had "no

---

[24] https://www.youtube.com/watch?v=YQRjyw7HmeQ&t=15s

choice." Defendant told Plaintiff it was a "matter of national security," and she had to give her the woman's name. These events occurred in early to mid-November 2020. Plaintiff researched Defendants claims that "sharpies" interfered with the election and pressed back, sharing with Defendant and her associate that, according to authorities, they were finding no evidence of widespread election fraud. Defendant told Plaintiff this was false and asked if she had watched a video she suggested about Venezuela, which Plaintiff had not.

That same night, associates of Defendant at the Stop the Steal rally which she also reportedly attended, claimed to receive a "tip" about a South Korean plane and went to the airport to take video of the plane. The following day, a representative from the Trump campaign called Plaintiff and told her the plane they learned about was coincidentally going to the same location as Plaintiff's whistleblower (Seattle airport). When Plaintiff asked Defendant about this, Defendant urged her to contact her "security detail" Marko Trickovic, who she alleged had been at the airstrip with the plane. On or around November 29, 2020, Trickovic introduced Plaintiff via phone to David Jose who was also working with Josh Barnett. John Shattuck who was a friend of Joe Flynn and helped the campaign of Defendant's associate Jerry Sheridan (who had directly worked on the "birther" investigation as Arpaio's chief of staff), brought Josh Barnett to Plaintiff's hotel room when she told Shattuck she was leaving. Plainitff asserted at the time that the Guiliani hearing appeared to be a "dog and pony" show. Shattuck then asked if he could come up with Congressman Gosar which she agreed. However, unexpectedly Shattuck brought in a swarm of 8-10 associates of Defendant and others who Plaintiff later learned had been attending rallies with Defendant including Congressman Gosar, Josh Barnett, Jerry Sheridan, AnnVandersteel, Daniel Wood, Shawn Wilson, Michelle Malkin, and others pulling Plaintiff back into convincing her the election fraud allegations must be true as this slew of individuals through words and actions were adamant

it was. Upon information and belief, Josh Barnett and David Jose worked with Defendant and Rudy Guiliani collecting form affidavits from members at the rallies that were pre-written, and David Jose on or around December 15, 2020, Jose reached out demanding and pressuring Plaintiff that Giuliani wanted her to complete their affidavit, while a member of her "security detail" listened in on the conversation and told her "that guy knows what he's talking about" urging her to sign and complete Jose's presented affidavit. (see Ex. __E__). A member of her security detail who was in Washington D.C., then asked that she send the completed affidavit of treason to him "ASAP," for an important meeting.

Defendant used government overreach and tyranny with what Plaintiff and her family perceived was mob-style terrorizing by men armed with military-grade weapons telling her she would be killed repeatedly, which engaged her compliance and cooperation in their efforts out of pure survival instinct and fear for their safety. Defendant and members of the group knew Plaintiff had a history of surviving domestic violence. At the time, Plaintiff repeatedly communicated to Defendant and others that her PTSD was being triggered by the group's constant statements she and her family might be killed. A 1AP group member used similar terrifying tactics, alleging they had reliable "intel" from Jim Penrose, that the woman in Seattle was about to be kidnapped and killed, and it would be Plaintiff's fault if she did not give them access to the woman in Seattle. In both cases, the armed group of men repeatedly told both Plaintiff and the Seattle whistleblower they were in danger of being killed because they had information that could prove election fraud, until each agreed to comply with what they were asking, write an affidavit, and agree to testify. Triggered by her PTSD surrounded by controlling and demanding men with weapons, increasingly believed the allegations had to be trustworthy or so many people, including several FBI contractors, would not be taking it so seriously and reacting in such an intense and extreme way.

As an example, on or around December, former Los Angeles FBI supervisor Emmanuel Ladsous came to her home, validating Plaintiff for her efforts as a whistleblower, and searching her house for "bugs," which Plaintiff did not ask him to do. Plaintiff later learned 1AP and Powell's law firm had requested this. (see Ex. **F** ).

and two other retired FBI agents), seasoned law enforcement, military officers, etc., and would not be acting as if it were true and validating through words and actions it was true. Plaintiff, her family, and even her doctor, believed the lies because otherwise what was happening with all of these individuals descending on the home of Plaintiff and her family terrifying them didn't make sense.

The group after failing to gain as much information as they hoped for after holding the Seattle witness hostage in a hotel for days —even though they got an anonymous affidavit and agreement to testify from her— the group disappointed with the outcome, then turned on Plaintiff (because now she was a liability), aggressively interrogated Plaintiff telling her she had to be "deep state" knowing something about high ranking Democrats and sex trafficking, stole her data, and iPhone taking it to their election fraud command center just before January 6th, 2021, which had been formed at the Willard Hotel in D.C, accused her of being a "red sparrow" seducing one of the military SWAT officers in her home (completely false), and several other wild and nonsense lies. Shortly after this when January 6th went sideways, associates Plaintiff later learned Defendant Townsend was speaking and working directly with (besides General Flynn), continued to seek out and engage Plaintiff to gather information, manipulate, and exploit her to use her to achieve legal and political objectives while pressing her name and information out repeatedly in podcasts, shows, and media as the scapegoat. According to witnesses, Defendant Townsend told associates

they could manipulate and coerce Plaintiff telling them she will "do anything with a little cheerleading."

As Defendant Townsend, the 1AP team, and Powell's associates, "cheerled" Plaintiff to file legal cases and motions, while simultaneously terrifying her with constant running around carrying AK47s responding to every rabbit that alerted on the security cameras, and instances of persons dressed in black that did breach her property, or hide in the desert wash behind her home (which Plaintiff now reasonably believes was still part of the same group surveilling her home). Fully triggered in her PTSD and survival instincts after severe domestic violence, and terrified for her life, which Defendant knowing continued to exploit, Plaintiff engaged in doing whatever the group wanted and funded the entire case and litigation appealing to the U.S. Supreme Court out of her pocket, except for some copying, mailing, and transcript costs. When the Judge told Plaintiff he would grant "reasonable discovery," in her case, Defendant Townsend attempted to coerce Plaintiff into allowing Trump lawyers Christina Bobb and Jack Wilenchik to write subpoenas to get them access to voting machines (see Ex. **G** ). Plaintiff ignored the request and did not respond to Bobb or contact Wilenchik because it seemed odd that Trump lawyers would want to use Plaintiff's case to get access to machines and not their cases. Powell's team who Defendant was also working with and for who she was a named witness in their case, also sought access using Plaintiff's case asserting Doug Logan and Jim Penrose could give her subpoenas to use, which she ignored and did not contact them to do this for the similar reasons. (see Ex. **H** ).

Defendant Townsend and her associates knew Plaintiff was a trusting vulnerable adult they could knowingly exploit, manipulate, and use her generosity for political and financial gain, and did so. Defendant Townsend's outrageous tyrannical actions as a government official inciting,

instigating, and coercing her army of followers and associates caused substantial physical and emotional harm to Plaintiff and her family, as well as to her reputation and career.

On or around December 26th, 2020, weeks after Defendant and Mike Flynn, allegedly learned from their retired FBI associates speaking with Scott Koch the first week of December 2020, Powell and her team, via Carissa Keshel and others continued to convey to Plaintiff their team had lots of corroborating evidence that Koch was legitimate, and his statements were true. On or around December 24, 2020, Powell's assistant Keshel told Hartwig it was ok to go public with the story. Plaintiff had repeatedly said she did not want to go public until she was sure it was true. Not only did Keshel assert the story was true and they had corroborating evidence, but Hartwig sent Plaintiff a screen shot between he and Keshel from that day followed up by a phone call to Plaintiff indicating he talked to Powell's team and they want he and Plaintiff to go public on Stew Peters. Plaintiff refused to do the Stew Peters interview but did give Hartwig the Koch recording based on the attached screen shot from Powell's team. (see Ex. _I_). Once Hartwig pushed the episode public, Defendant Townsend amplified it on her Parler account and it received a million views before Parler was taken offline. (see Ex. _J_).

Defendant's associate Doug Logan, a paid government contractor for the Senate audit (which Defendant Townsend alleges was her idea), falsely blamed, scapegoated, and assailed Plaintiff and her reputation repeatedly publicly in the press, alleging they had no choice but to do the controversial "fraudit," but for Plaintiff convincing everyone crazy ideas of ballots and planes, when it was Defendant's associates out at the airstrip with the plane and Defendant Townsend who introduced Plaintiff to her security detail Marko Trickovic *after* they had already been at the airport with plane and the incident had already occurred.

Defendant Townsend conspired with others for plausible deniability to shirk accountability for her unscrupulous and long-planned behavior to justify an audit which she had been planning in her own words since 2017.

Townsend knowingly exploited Plaintiff, a vulnerable adult, for their own political and financial gain, causing her and her family physical and emotional harm as well as harm to her career and future earning capacity. At all times relevant, Defendant Townsend and her co-conspirators acted with apparent authority under "color of law" in their role as Senators for the State of Arizona, House Elections Chair, and government contractors.

As such, Plaintiff sets forth the following allegations;

## ALLEGATIONS

1. In 2017, Defendant Senator Kelly Townsend began espousing election fraud allegations and publicly called to "turn over" Arizona voter information for an audit. Plaintiff did not learn this until 2022 when Defendant reshared her 2017 post. (see Ex. __K__).

2. In 2018, upon information and belief, Defendant began working with a group including Liz Harris to dispute the 2018 midterm election results.

3. In 2019, Defendant Townsend sought out representatives and lawyers of President Donald Trump because of concern she had that there would be fraud in the 2020 election.[25]

4. Upon information and belief, at that time Defendant Townsend through her association with the Article V Movement, was in direct contact with attorneys Rob Natelson and John Eastman along with other associates of Defendant who were at the airstrip with the South Korean plane and took video.[26]

---

[25] https://youtu.be/VvdoShSF7hA

[26] https://youtube.com/shorts/-DCKY0OLcpU?feature=share

https://youtu.be/YQRjvw7HmeQ

26

5. In 2019, Defendant Townsend publicly posted "selfie" videos of her saying she believed "hundreds of illegals" were coming across the border to potentially vote illegally in her district for the upcoming 2020 election as non-citizen voters and that those votes could sway the 2020 election results. Plaintiff was not aware of these videos until 2022.

6. *Plaintiff did not participate in or attend any election-related rallies, group meetings, protests, etc, related to any of these conspiracies or fraud.*

7. *Defendant Townsend attended most if not all, of the Stop the Steal events held in Arizona.*

8. *Defendant knowingly used and exploited Plaintiff as cover and a scapegoat for her and her associate's activities.*

9. *Defendants associates insinuated Plaintiff would be killed or arrested on false charges for discussing what she knew (i.e. Ryan Hartwig told others because Plaintiff spoke to Hank Stevenson, who claims he worked with Sheriff Lamb, Garrett Zeigler, and County Attorney Kent Volkmer to have Plaintiff arrested on false charges for her speaking publicly; and member of her security detail Mike Kenny who was security for General Mike Flynn on January 5 and 6, 2021, (while discussing Koch's boss Shawn Wilson, of the security detail that was ushered in while Defendant Townsend was on the phone with Flynn associate John Shattuck), had been sued for wrongful death for killing two people, Kenny told Plaintiff that if anything "went public, anyone got sued, or anyone goes to jail," that could happen to her.*

10. On November 4, 2020, following the 2020 election, Defendant Kelly Townsend spoke at a Stop the Steal rally urging agitated supporters to complete affidavits to prove election fraud for Trump lawyers she was working with.

11. On November 6, 2020, Plaintiff was contacted by someone who knew Plaintiff had many politicians on her social media and was asked if she could help this whistleblower who worked at a Seattle FedEx facility reach the FBI or someone who could do something about the ballot fraud she believed she was witnessing.

12. Plaintiff attempted to contact the FBI several times via phone without success. **Note the FBI field offices were closed to walk-ins due to COVID.

---

https://rumble.com/vy8yz6-david-jose-and-josh-barnett-show-plan-to-get-audit-on-november-5-2020.html

13. Plaintiff reached out to Defendant Senator Kelly Townsend who held a role as House Elections committee chairperson in the Arizona Legislature for advice because they could not reach the FBI and local law enforcement for whistleblowers area said it was not their jurisdiction.

14. Defendant Townsend told Plaintiff she needed to get an affidavit from the whistleblower that Defendant would pass on to Trump lawyers.

15. The whistleblower refused to write an affidavit stating she wanted to remain anonymous. When Plaintiff told Defendant this, she said it was a "matter of national security" and whistleblower and Plaintiff "had no choice" but to provide her name. Defendant Townsend said she would contact her friend Sheriff Lamb (who is the Sheriff over Plaintiff's County) and the County Attorney to compel the information if she had to.

16. Plaintiff refused to provide Defendant the whistleblower's name and contact information, honoring her promise to the woman.

17. The following day on November 7, 2020, according to his website, a self-identified "citizen journalist" Ryan Hartwig, formerly associated with Project Veritas as Matt Gaetz whistleblower (who was at the Stop the Steal rally with Defendant). Hartwig claimed he somehow heard about Plaintiff and the information she had at the rally.

18. Hartwig asserted he received a "tip" from Trump campaign fundraising chair Christine Cothrun-Ong, about a plane at Sky Harbor airport allegedly carrying fake ballots, which he and other political associates of Defendant, including a man who was Defendants security detail at the rally, Marko Trickovic, went to the airport and took video of the plane trying to stop it allegedly with the assistance of Patrick Byrne, who also knew Defendants associate Josh Barnett, and Department of Homeland Security. (see attached **L**).

19. Defendant states she met her security detail Marko Trickovic at a MAGA school rally in 2019. Trickovic alleges he provided security for Townsend along with his childhood friend and Arizona Patriot Party leader Steve Daniels throughout 2020 at the rallies. Trickovic and Daniels both provided security for Defendant outside the Maricopa County Election Center at Stop the Steal rallies following the 2020 election.

20. On November 8, 2020, the day after the plane incident, Plaintiff received a call from a Trump campaign following up on a referral about the Seattle whistleblower. The representative told Plaintiff about the plane reportedly in Phoenix the night before allegedly carrying illegal ballots to Seattle (where her whistleblower was located).

21. Plaintiff asked Defendant if she heard about the plane.

22. Defendant told Plaintiff that her security Marko Trickovic was at the airport, saw the plane, and got video. Defendant gave Plaintiff Trickovic's number, and encouraged her to reach out to him, which Plaintiff did.

23. Trickovic, attending rallies as Defendant's security where she was inciting and agitating the base to go "vigilante style" to find proof of election fraud, shared with Plaintiff a video of the plane he had taken and told Plaintiff about FlightAware software which can be used to verify the plane's path.

24. Plaintiff looked up the tail number and confirmed the plane had gone to Seattle. Tricovic told Plaintiff he saw a post of ballot printing machines in China (allegedly posted by Patrick Byrne), and the South Korean plane had gone to that same area prior to the election. (see Ex. **M**).

25. Around this time, Plaintiff also had a paid election worker from the Maricopa County Election Center post to her social media page that she believed it was "absolutely possible the election was rigged." (see Ex. **N**).

26. Plaintiff reached out to the Seattle whistleblower and inquired if Trickovic's theory was possible (that the South Korean plane he had been involved with could have been the source of the ballots she had reported arriving by private vehicle). She reported it was possible. She was also concerned about the same canvas bags marked "ballots" coming from U.S.P.S. (see Ex. __**O**__).

27. The following day on November 9, 2020, Plaintiff had strange men show up surveilling her home and hacking into Plaintiff's network security cameras, which Plaintiff reported to the police.

28. During this time, Defendant every day at Stop the Steal rallies at the Arizona election center publicly and through private conversations, continued to incite and encourage her followers, who were generally former military, law enforcement, or militia members, to continue to go rogue vigilante style gathering information and evidence of election fraud.

29. ***Defendant told Plaintiff repeatedly she was in danger because she was holding onto valuable information about election fraud, and her life was in danger as people were seeking that information.***

30. Without asking Plaintiff directly, Defendant sought Plaintiff's physical address from according to private text messages provided to Plaintiff by Sommer Tolley, who Plaintiff later learned was attending rallies and communicating with Defendant Townsend. In their quest to seek out Plaintiff's information, Tolley located Plaintiff's address through research. (see Ex. __**P**__).

31. *Defendant was fully aware Plaintiff had a protected address and that it is a violation of ARS 41-165(D), for a government official to seek Plaintiff's physical address without consent of the Secretary of State's office. When Defendant had previously been to Plaintiff's home, Plaintiff asked that due to her address protection that she not store or keep her address on any of her devices which is why Defendant did not have it readily accessible.*

32. Over the next two weeks, several individuals associated with Defendant Townsend (many who were actively attending Stop the Steal rallies with her), including Tolley reached out to Plaintiff social engineered their way into Plaintiff's private life, promising protection from outside danger while covertly seeking Plaintiff's information about election fraud and the Seattle whistleblower.

33. As an example, Defendant's associate Tolley told Plaintiff she went to law school and could come help her study for law school and have someone to be with claiming she was in danger. Once in Plaintiff's home, said she knew a guy whom Tolley said was a member of the Koch family and was a government official working for the Department of Defense ("DOD"). Tolley said Koch somehow already knew about Plaintiff and the plane and wanted to talk to her, but that she hadn't told him anything. Tolley said Koch could offer security advice related to her safety and the camera hacking security incident.

34. Tolley then reached out to Koch, who came to Plaintiff's home stating he worked for DOD, was a government agent, and then identified one of the men caught on her security cameras hacking into her system, which police had not been able to do.

35. Plaintiff became alarmed that these two individuals she didn't know well were in her home and Koch knew the guy who tried to breach her security cameras, so she began secretly recording their conversation. During the conversation she engaged with Koch and agreed with some conspiratorial things he said to placate him because she had a serious and genuine concern and fear for her safety at that point.

36. Koch then surprisingly told Plaintiff "his agents" were directly involved in transporting illegal ballots from the plane at the airport. He asked about the video and evidence Plaintiff had of the plane.

37. *At the time Plaintiff was under the impression that Koch thought Plaintiff had video of him or his agents engaging in the crime of taking illegal ballots (from the plane when it landed, not the day Trickovic and Barnett were at the airstrip when it took off days later), and admitted to it because he thought Plaintiff had video proof of his guys involvement when the plane landed.*

38. Plaintiff told Defendant Townsend about the strange incident with Koch. Defendant reiterated again to Plaintiff that the election fraud happened, the election was stolen,

and reiterated Plaintiff was in danger because of the election fraud information she was withholding.

39. Defendant repeatedly stated she had inside knowledge the election was stolen.

40. At the time, Defendant Townsend did not say she had prior contact with Koch or knew who he was. In fact, she repeatedly pressed that Plaintiff should be going public with her story.

41. Almost a year later, a witness told Plaintiff that he personally observed Townsend approach Scott Koch and him at a summer 2020 rally well before the 2020 election. He stated Townsend addressed Koch by his first name saying "Hi Scott" when she walked up to the two of them. He said Scott told Defendant he they discussed Scott calling her later that day.

42. Defendant Townsend told Plaintiff she was at the election center with Steve Daniels as her security when she pointed out to Daniels two men behind the secure line while votes were being counted in violation of the rules. Daniels approached the men and confirmed they were Scott Koch and Shawn Wilson. Both Defendant and Daniels later told Defendant they were eyewitnesses to Koch and Wilson violating rules at the election center in a secure area where they were not supposed to be. Daniels wrote an affidavit under oath, and it was given to Plaintiff as evidence. (see Ex. __Q__ ).

43. On or around November 21, 2020, an attempted break-in occurred at Plaintiff's home, for which terrified Plaintiff called 911. Police responded as well as John Shattuck, an associate of Rudy Guiliani, Sheriff Mark Lamb (County Sheriff for Plaintiff's County), Joe Flynn, and Maricopa County Sheriff candidate Jerry Sheridan, SEE EX V.

44. Shattuck sought out Plaintiff stating his role is to help Americans who find themselves in "situations." ***Shattuck conversed privately on the phone outside with Defendant Townsend and while Plaintiff was still very shaken up from the incident, and Florence PD were still present, came back inside and ushered in a paramilitary "security detail" for Plaintiff's "protection."***

45. Defendant repeatedly told Plaintiff through words and actions that she was in severe danger and there was a high likelihood she could be killed by "deep state" or other weaponized law enforcement conducting a raid to silence her or bury evidence of election fraud.

46. ***Plaintiff believed Defendant's statements with greater weight because Defendant is a government official with greater access to those "in the know" about these things.***

47. Defendant knew Plaintiff's history as a survivor of stalking and domestic violence and knew or should have known that continually telling her she was in danger of being killed (as Defendant and her associates continually reinforced) would induce an exacerbation of her PTSD, which Plaintiff sent Defendant a text message in real-time telling her she was having a PTSD reaction to them constantly saying she was in danger but Defendant continued making these assertions.

48. ***Defendant also knew Plaintiff is physically compromised such that she cannot protect herself in the same way as an able-bodied adult and Plaintiff meets the legal criteria of a "vulnerable adult" under ARS 13-3623 who should be protected from manipulation and exploitation by a sitting State official and instead of doing so, promoted and encouraged it.***

49. By November 22, 2020, the security detail brought in by Defendant Townsend and John Shattuck, all former military and law enforcement, also reinforced that election fraud was real and that Plaintiff held key information critical to "saving the Country."

50. The "security detail," with their seeming years of government experience as police officers, continually told Plaintiff and her family how the "deep state" would come after her on false charges or kill her or them. It was highly traumatizing for Plaintiff and her family to hear seasoned, experienced, former law enforcement and military (representing themselves as government "DOD" or DOD contractors working under what they described as "nonofficial cover") making such statements to Plaintiff's and her children, especially given their history of surviving past domestic violence and stalking.

51. Upon information and belief, on November 22, 2020, Defendant Townsend communicated directly with Rudy Guiliani and other Trump lawyers about election fraud.

52. Also on this day, John Shattuck, told Plaintiff he was in direct contact with Rudy Guiliani, Jenna Ellis, Melissa Ortez, and an official from the U.S. Department of Justice Ken Klukowsky. Although Plaintiff was not aware of this at the time, it was this day that the Trump campaign issued a statement indicating Sidney Powell was no longer part of their legal team.

53. ***Upon information and belief, as reported by associates, Defendant allegedly told others that "all [Plaintiff] needs is cheerleading and she will do anything."***

54. Defendant's words and actions were the direct and proximate cause of herself and others exploiting Plaintiff, a vulnerable adult, in violation of her constitutional rights to achieve political goals.

55. On or around November 23, 2020, Defendant Townsend contacted Plaintiff, gave her House Speaker Rusty Bowers's phone number, urged her to call him and tell him the

story and what happened with Koch and the whistleblower and to "be sure and record it." Plaintiff did so. Bowers told her he was going to assist by notifying law enforcement. Plaintiff learned several months later from Speaker Bowers that he spoke with Representative Grantham and decided not to report it.

56. On or around November 28, 2020, Defendant Townsend asked Plaintiff to come to the Hyatt for a hearing she was a legislative panelist and Trump lawyer Rudy Guiliani would be presenting information and she wanted Plaintiff to testify. Plaintiff reminded Defendant she had not been out of the house but a small handful of times due to being high-risk for COVID and did not want to be around crowds. Defendant coerced Plaintiff saying she could get a room, Defendant would stay with her (which Plaintiff paid for), and could stay in the hotel room with the security team and only go down to testify. Plaintiff reluctantly agreed to go to the hotel.

57. Defendant urged Plaintiff that "going public" was her best protection from being killed or having the "deep state" come after her to silence her or destroy evidence of election fraud. During this time, there were repeated incidents of people surveilling Plaintiff's home, coming over the fence dressed in black, following Plaintiff (with her "security detail" present), and some false alarms.

58. Plaintiff came to believe the election fraud lies had to be true because otherwise, it didn't make sense that so many people were seeking her out and alleging they observed fraud, conducting hearings, and such.

59. Once at the hotel on November 29, 2020, (the night before the Guiliani hearing), while in the hotel room, Plaintiff came out of the shower ready for bed and overheard a call on speakerphone between Defendant and General Mike Flynn discussing plans for the next day. Defendant told Flynn Plaintiff was with her on speaker.

60. Defendant, Plaintiff, and Flynn discussed Flynn's plans to switch out her security team from Mayhem (who was also doing security for that event), with the First Amendment Praetorians ("1AP"), whom Mike Flynn described as "his guys."

61. Although Plaintiff had not met Liz Harris at this point, Defendant Townsend stated she had been out canvassing with Harris knocking on doors herself during November 2020. At the time, Plaintiff did not watch the entire hearing but later in 2021, watched the archive of Harris on the livestream testifying at the hearing with Defendant stating that they had been working on election integrity since 2018.

62. While at the hotel, Plaintiff expressed concern to Defendant and her associates via text that the hearing seemed like a "dog and pony show." Plaintiff told Defendant that she did not feel comfortable testifying. When Defendant told Plaintiff she wanted her to come down to testify, she responded that she was leaving instead and left.

63. On November 30, 2020, at 2:17 pm Plaintiff missed a call from the Phoenix FBI field office, but no message was left. She was unable to find out who called when she

called back. The following morning on December 1, 2020, Plaintiff who had been connected to Sidney Powell by Defendant's associates, told her not to make further attempts to reach the FBI and that she would have her attorney Howard Kleinfelder contact them.

64. Upon information and belief, while at the hearing on November 30, 2020, Defendant Townsend coordinated witnesses with Christina Bobb and Rudy Guiliani. Plaintiff also observed Defendant exchange missed calls with Sidney Powell prior to the hearing.

65. On December 2, 2020, Sidney Powell filed her election fraud case in Arizona with local counsel Alexander Kolodin and Trump electors as Plaintiffs. Defendant Townsend was listed as a witness and was identified to testify that she witnessed Scott Koch behind the secure line at the election center in violation of election center security rules. Ryan Hartwig who was the "citizen journalist" who had been at the airport, was also a named witness in her case.

66. According to news reports, also on December 2, 2020, Powell claimed at a rally outside of Atlanta to have evidence of "a plane full of ballots that came in," and stated in an interview on YouTube on December 5, 2020, "We have evidence of a significant plane-load of ballots coming in."

67. On or around December 3, 2020, arrangements were made by General Flynn and Sidney Powell to switch security teams for Plaintiff to the 1AP team.

68. While sleeping at approximately 11pm on or around December 4, 2020, Plaintiff was startled awake by one of her security detail, a former 20-year seasoned homicide detective, telling her he has reliable "intel" from Jim Penrose that the South Korean plane was on its way to Seattle to kidnap the whistleblower and possibly take her to South Korea and he needed her information to get a team to her right away.

69. Plaintiff refused to give the whistleblower's name and was told it would be on her if she was killed. Plaintiff called the whistleblower, put the phone on speaker, and let the 1AP team member speak with her while she provided her work information, and they sent a team to meet her at the Seattle FedEx approximately 30 minutes later.

70. It was not until mid 2022 after the ProPublica article about these events was published that Plaintiff learned the 1AP "security team" took the Seattle whistleblower to a hotel for several days and much like Plaintiff, repeatedly terrified her she was in danger of being killed. She cooperated and provided everything she knew and agreed to testify as an anonymous "Jane Doe" witness as long as she were to remain anonymous in the court documents. Though Jim Penrose stated in December 2020, they were unable to confirm the conspiracies the woman reported, the whistleblower stated to Plaintiff that she spoke a man she believed was Jim Penrose and she was left with the belief at some point she may be called to testify in their election fraud case. As of August 2022 the whistleblower states she knows what

34

she saw, and she still believes that what she saw with ballots coming through her facility not being properly tracked was indicative of widespread election fraud.

71. On or around December 7, 2020, Koch allegedly told retired FBI agents hired by Sidney Powell that he fabricated everything.

72. Upon information and belief, based on news reports, Plaintiff learned in 2022 that on or around December 11, 2020, Defendant Townsend informed attorneys she had been working with through her Article V efforts, Ken Chesebero and John Eastman, that she was concerned a plan to submit a slate of alternate electors "might be treasonous."

73. *At no time ever during any of this period or interactions with Plaintiff, did Defendant ever mention any concern her actions might be considered treasonous. Instead, Defendant repeatedly told Plaintiff there was fraud, her life was at risk, and it was critically imperative that those committing treason must be stopped.*

74. On December 25, 2020, Plaintiff was told by Jim Penrose that Koch allegedly made the entire story up and fabricated everything.

75. Shortly prior to and after this conversation with Penrose, associates of Defendant, Mike Flynn, and Sidney Powell repeatedly told Plaintiff that Jim Penrose was possibly a "mole," a "plant," and may be deliberately sabotaging the election integrity effort, not to trust anyone but Flynn or Powell. It was not until 2022, that Plaintiff learned Penrose was allegedly being investigated as part of Powell's team hacking into voting machines in Antrim County, Michigan, and Coffee County, Georgia, which allegedly occurred as late as May 2021, making it unlikely the December 2020 allegations that Penrose was a "plant" were true.

76. More importantly, on or around December 26, 2020, Defendant Townsend told Plaintiff she did not believe Koch's recanting story and reiterated Gregg Phillips (whom Defendant had also introduced to Plaintiff just after the election) said the True the Vote team had been tracking the South Korean plane since *before* the election, Patrick Byrne posted on social media fake ballot printing in China where that *same plane had been just before the election*. Also, John Shattuck told several people he confirmed two arrests in Seattle related to the plane.

77. None of these facts, according to Defendant Townsend at that time, fit with the story Penrose was asserting that Koch recanted. *At this point, Plaintiff did not know that Defendant knew and had prior contact with Koch before the election, and she trusted Defendant's version of the events over Penrose and she also trusted Shattuck telling her not to trust anyone but Mike or Sidney.* Also, at the same time, Penrose was

making cross allegations that Shattuck was an "info war operator" and was a danger to Plaintiff. [27]

78.  After this discussion, on December 27, 2020, Defendant Townsend posted to her Parler account, "All I can say is Korean Air and ballots," amplifying to her followers the Stew Peters video which Ryan Hartwig had put together on December 25, 2020 with Stew Peters with the full support and endorsement at that time of Carissa Keshel from Sidney Powell's team *using Plaintiff's name and Koch recording even though she refused to do an interview*. (see attached **I** ).

79.  With Defendant Townsend's amplification of the Stew Peters video to her followers on Parler, along with 1AP members and other influencers in the Flynn network also amplifying it, the video resulted in over one million views. The Parler site was taken down the following day.

80.  In 2022, well over a year and a half *after* Plaintiff has repeatedly told Defendant she does not believe there is any credible evidence of widespread election fraud, Defendant continued to push wild scary conspiracies to Plaintiff that Defendant's research shows Scott Koch owns a restaurant in Scottsdale that has an "adrenochrome" symbol outside and may have cartel ties. (see attached **A** ).

81.  The day Penrose told Plaintiff that his retired FBI agents spoke with Koch and he admitted he made it all up, was the same day Penrose demanded Plaintiffs iPhone for forensic examination after a terrifying ambush of Black SUVs, this terrifying incident seemed staged to lay backdrop for the call with Penrose demanding Plaintiff's cell phone for "forensic analysis," now as one of the many excuses to terrify her into voluntarily handing over her iPhone after she had repeatedly refused to give it to them from the beginning.  (see attached police report Ex. **R** ).

82.  Upon information and belief, Defendant Townsend worked directly with Mike Flynn and Jim Penrose assisted him on the project. Penrose stated to Plaintiff that her security issues and the Black SUV ambush was likely related to her recording of powerful people, including "politicians."

83.  Upon information and belief, Defendant was the only "politician" Plaintiff had secretly recorded who had said anything that someone wouldn't have wanted public and that would have been Defendant's statements that when she worked with Trump prior to his becoming President on the birther conspiracy, Trump knew the Obama birth certificate was a fake but lied publicly to put it to bed while also telling Defendant he knew it was fake. *Defendant after making those statements in*

---

[27] https://www.propublica.org/article/big-lie-trump-stolen-election-inside-creation

36

*November 2020, vigorously sought the endorsement of Trump well into 2022 for a Congressional seat as well as networking with his team for future political support and engagements.*

84. At no time before this filing did Plaintiff ever betray Defendant's trust and share the recording with anyone. She only audio recorded these calls in November 2020 because after the election, when her home was swarmed by Defendants associates seeking information and Defendant was repeatedly telling Plaintiff she was in danger and would be killed, Plaintiff was overwhelmed, scared, and recorded solely to protect herself should she be killed as Defendant repeatedly suggested through words and conduct could happen.

85. ***After these repeated failed efforts to coerce Plaintiff through terrifying threats of violence to voluntarily hand over her phone without a subpoena or a warrant, two days later, armed members of her "security detail," forcefully stole her iPhone from her person (while she was talking on it).***

86. When Plaintiff learned that her stolen phone was taken to the Willard Hotel in D.C. on or around January 4, 2020, Plaintiff secretly planned a final escape from her "security detail" and, although she was too terrified to use her iPhone (which she had replaced) because Penrose was a former NSA hacker, she went directly to Florence Police Department in person, but the police department had a sign that it was closed for in-person visits due to COVID-19.

87. Plaintiff notified her family by text as she left that she was ok and would be in touch in a day or two and went to a hotel to decide what to do next because she was very traumatized and overwhelmed by what had occurred in her home including the theft of her home and terrorizing that occurred by repeatedly telling her she would be killed.

88. Plaintiff's "security" former Military SWAT officer Brandon Pittman admitted he accessed her iCloud in real time and determined she had gone to police (as she took a photo of the police door which appeared in her iCloud).

89. Upon information and belief, Pittman's team lead, a former homicide detective who was returning to Arizona from D.C. told Pittman, according to him, to exit Arizona ASAP and "put [his] phone in a Faraday bag and do not take it out until past the border into Texas."

90. Upon information and belief, Pittman while waiting for his associate to return from D.C., so he could leave, and believing Plaintiff had gone to the police and he might be arrested, created chaos and confusion by telling different stories to Plaintiff's family (that Plaintiff was kidnapped), Penrose, and the police who responded. The interviewing police caught Pittman in these lies after interviewing others, confronted him, and noted his "changing of his story" in the missing person police report.

91. Upon information and belief, Defendant Townsend spoke with Mike Flynn about Plaintiff being missing and posted about Plaintiff being missing on her social media. (see attached **S** ).

92. In January 2021, once Plaintiff escaped the "security detail," she was contacted by Powell associates Ryan Hartwig and Garrett Zeigler who had worked in the Trump White House in Peter Navarro's office and was allegedly in contact with Hartwig and Josh Barnett while they were on the airstrip with the South Korean plane *prior to* Plaintiff learning about the South Korean plane incident from Brandon on the Trump campaign. Zeigler continued the assertion that he had inside knowledge that the FBI was involved in the cover-up, even posting this implication publicly (see attached **D** ).

93. Also in January 2021, a member of Plaintiff's security detail James Curtis from 1AP continued to maintain contact telling Plaintiff that the group was planning on scapegoating her, had extensive media connections, and that she needed to get out ahead of it. He told her he was on her side going against Flynn and associates.

94. *However, given the circumstances, Plaintiff and her family have not felt safe to return home in over 18 months. Defendant has been fully aware of this.*

95. Shortly after this, in January 2021, Plaintiff was contacted and met Liz Harris for the first time. Harris and her friend told Plaintiff they had been working directly with Jim Penrose and canvassed in November and December 2020 along with Defendant Townsend. Harris stated they gathered hundreds of affidavits and proof of election fraud and had evidence that proved Koch was right in what he said.

96. Plaintiff told Harris she did not trust Penrose after his alleged involvement in the theft of her phone and had no interest in working with them. Harris told Plaintiff she believed her and did not trust Penrose. She said Penrose sent her a link to access all of the data on her computer, and things were being changed and manipulated.

97. Allegedly, with Defendant Townsend in the background advising Harris that Plaintiff will "do anything with a little cheerleading." And to "keep the pressure on [Plaintiff]." Harris asked Plaintiff to help them by pursuing a petition for certiorari of her case to SCOTUS, to include their canvassing data because the Congressmen had it with them and started to present it but were unable to due to the Capitol breach on January 6, 2021.

98. Working with Defendant Townsend, Harris introduced Plaintiff to her friend Kirsten Shafer who was also the daughter of one of Harris's canvassers Earl Shafer. Harris was also working directly with Jovan Pulitzer (associate of Mike Flynn from the Eli Gold Board) at the time, but Plaintiff did not know Pulitzer was part of the same network and group.

99. In line with Defendant's admonition that Plaintiff "will do anything with a little cheerleading," Defendant communicated with Harris as she aggressively pressured Plaintiff and Kirsten Shafer to get her SCOTUS petition filed. Plaintiff repeatedly stated during this time that she was having heart issues and struggling to keep up physically and mentally, but this was ignored by Harris as she repeatedly demanded Plaintiff finish writing the petition for certiorari to include her canvass data. During this time, Plaintiff had repeated cardiac arrhythmia and a fainting episode due to the stress.

100.   On or around March 5, 2021, Kirsten Shafer physically assisted Plaintiff in delivering the SCOTUS petition as she could not walk a distance carrying the case documents due to her physical disability, even with her use of portable oxygen.

101.   ***Once downtown, Kirsten Shafer asked Plaintiff if she had ever been to the election center, which she had not, and suggested they go by the facility.*** Shafer drove up to the MCTEC center, in the back near two blue dumpsters. Later surveillance video shows a yellow bag of shredded documents had been tossed in the dumpster by a county official shortly before they arrived.

102.   Plaintiff did not look in the dumpster (where she might have found the bag if she had), but instead noticed inside the warehouse appeared the same "pallets of ballots" that were in the back of a Ryder truck in the parking lot (photo provided to the Senate and local press by the Maricopa County election center a couple of days before alleging they were 2020 ballots responsive to the subpoena). As per the attached photos, the boxes in the election center with open warehouse doors appeared like those in the media showing "pallets of ballots." Plaintiff took a photo and video recording, which she posted to her social media. (see attached **T**)

103.   Defendant Townsend seeing Plaintiff's social media post, immediately went to the election center and allegedly confronted election center staff. Defendant then angrily blamed Plaintiff for making her "look bad," when it turned out Plaintiff made an honest mistake and the boxes in the MCTEC center were registration forms.

104.   Once back to Earl Shafer's home with his daughter Kirsten, Earl Shafer noticed dumpsters in the photos from MCTEC and said he was confident they were shredding ballots and tossing them in the dumpster. The following morning Shafer said he was going down there to check it out because he was sure they were shredding. He asked Plaintiff if she was "in or out." Plaintiff repeatedly expressed doubt they would shred ballots and toss them in the dumpster but reluctantly agreed to go along. Shafer also brought his best friend Steve.

105.   Once at the election center, Shafer drove in the open gates entering the public parking lot, which was unobstructed. Plaintiff saw a bag in the dumpster of documents that had been shredded and abandoned. Shafer retrieved the bag and put it

in his car taking it to his home for examination. Once the bag was opened, it was discovered what appeared to be shredded 2020 ballots in the bag along with death certificates. There were only a handful of ballots in the bag, and the remaining contents were other county documents and registration forms. Harris urged Plaintiff to share the photos right away, which she did.

106.    Upon information and belief, Senator Sonny Borelli while working and speaking directly with General Flynn told his associate, Earl Shafer and Plaintiff, not to give the shredded ballots to the Attorney Generals' office or they would be destroyed. Months later, Plaintiff noticed in a newspaper article that Senator Borelli said he did not want the Attorney Generals' office to discredit the shredded ballots before they could conduct an audit.[28]

107.    According to Gregg Phillips (self-proclaimed friend of General Flynn), Jennifer Wright, the attorney overseeing the Arizona Attorney Generals election integrity unit (which Defendants Townsend and Senator Borelli established in 2019), had previously worked at True the Vote with Gregg Phillips and Sidney Powell on the advisory board, was alleging that Attorney General Brnovich was preventing the evidence she had of election fraud from coming out.[29]

108.    Plaintiff suggested they contact the FBI since shredding of election documents appeared to violate Federal law; 52 USC 20701 Retention and preservation of records and papers by officers of elections.

109.    *Plaintiff did notify the FBI and weeks later read in the media that Recorder Steven Richer stated publicly the shredded ballots were dead voter ballots that could not be legally counted. Dead voter ballots shredded by mistake by an unknowing or untrained election worker does not prove Recorder Stephen Richer himself "willfully" destroyed the records, thus Plaintiff does not believe 52 USC 20701 was violated.*

110.    Defendant Townsend told Plaintiff that Brnovich and the FBI were targeting Plaintiff even if they had to make up false charges because she was the one who filed an election fraud case, and she was the one they were after.

111.    Defendant Townsend, while communicating directly with General Flynn during this period, sent Plaintiff an article showing Plaintiff that the FBI raided a place in Georgia to confiscate the evidence and Plaintiff could easily be killed in an FBI raid

---

[28] https://www.azmirror.com/2021/03/11/top-gop-senator-shredded-ballots-will-evaporate-if-given-to-the-ag/

[29] https://www.azmirror.com/2019/08/22/dems-ags-hire-for-elections-integrity-unit-has-fueled-bogus-election-fraud-claims/

seeking to confiscate and destroy the evidence of election fraud. At the same time, Sidney Powell posted a similar reference alleging those working on election fraud in Arizona might be killed. (see attached **U**).

112.    Upon information and belief, Defendant Townsend under color of law, fed, ~~started, and~~ promoted conspiracies that caused direct harm to Plaintiff. As an example, ***Defendant while communicating directly with General Flynn and Liz Harris promoted to the Gateway Pundit information about the fire at Hickman Farms the same day the shredded ballots were found and sent a text to Plaintiff about this on the same day.*** Defendant's associate Earl Shafer admitted that he lied about being threatened for retrieving the shredded ballots from the dumpster and where the bag with some shredded ballots and other election materials went, which was to a 1AP member Shafer had planned with.  (see attached **U**).[30] [31]

113.    Plaintiff in her deeply traumatized and heightened PTSD state repeatedly told by multiple Senators and a member of her security detail that she was in danger and would be killed, believed their lies and filed a motion in her case with the urging and cheerleading, as well as actual writing of the document by her security detail, only to learn that none of the allegations regarding the Hickman fire was any way related to the shredded ballots as Defendant insinuated and pushed out to Gateway Pundit. The fire was allegedly caused by faulty wiring.

114.    ***Defendant acting under "color of law" and with a "cloak of authority" as a government official, exercised tyranny in violation of Plaintiff's Fourth Amendment right to be free from undue search and seizure, liberty interest, First Amendment, and due process when he outrageously and repeatedly told Plaintiff she would be arrested (but that she was immune completely), or insinuated they might be killed by "high-level people," to coerce and manipulate her into doing what she wanted.***

115.    ***As a government official, Defendant has a responsibility to act with care and accuracy when promoting theories that constituents give greater weight to, due to their perceived positions of power and inside access to the government to verify the accuracy of their purported claims.***

116.    These communications by Defendant as an elected Senators acting under color of law, knowing Plaintiff was a vulnerable adult under ARS 13-3623 due to her physical disability, and because of her relationship history with Defendant Townsend, that she could be manipulated by "cheerleading."

---

[30] https://archive.ph/d979g

[31] https://www.thegatewaypundit.com/2021/03/breaking-exclusive-retired-purple-heart-veteran-arizona-dove-dumpster-found-shredded-ballots-now-wanted-man/

41

117.    Defendant Townsend engaged her vigilantes and exploited the situation targeting Plaintiff for the information she wanted relating to the Seattle whistleblower, resulting in Defendant's "vigilantes" (like those she incited to monitor election "drop boxes" in April 2022), causing Plaintiff severe emotional distress through manipulation and various intentionally fabricated lies to gather information for Defendants.[32]

118.    Defendant knew or should have known, in November 2020 when Plaintiff communicated directly to Defendant that her PTSD from prior domestic violence and stalking was exacerbated by Defendant's statements and the surrounding circumstances of her "vigilante" associates stalking, surveilling, and targeting Plaintiff to get what they believed was critical proof and evidence of election fraud.

119.    Even though Defendant was aware, the security team terrified her because these individuals stated they were powerful and capable of leveraging their power against Plaintiff and her family. They included former FBI supervisors, former homicide detectives, intelligence agents who stated they worked at DIA with General Flynn, prison wardens, seasoned law enforcement officers, etc., several of whom told Plaintiff stories about their being part of audits in other states witnessing election fraud directly, and manipulatively coercing and convincing her that clicking on the election center NEST camera could access the election center data (which was all lies and false), while simultaneously terrifying her by constantly running to the doors and windows with AK47 type weapons and rifles exacerbating her PTSD.

120.    Knowing she was experiencing this and that both Plaintiff and her family were being completely traumatized by her and her associate's actions due to their history of trauma, Defendant refused to cease her efforts.

121.    In May 2021, when Plaintiff stated she no longer believed there was any credible evidence of widespread election fraud based on what she had seen, learned, and experienced, Defendant and her associates used coercive control, telling Plaintiff that it was not over for her no matter what if she turns on the group, the things Koch said would happen to her (She would be discredited, arrested on false charges, or killed).

---

[32] https://www.12news.com/article/news/politics/elections/kelly-townsend-encourages-vigilantes-camp-outside-ballot-drop-off-boxes-is-that-legal/75-3395bf65-7624-4ee5-a447-241b05c9da1f

https://www.youtube.com/watch?v=JKJUjtOoq8Q

122.     When Plaintiff began speaking publicly on social media about her experiences, a reporter Hank Stevenson, contacted Plaintiff. Then, Plaintiff was shaken up at the time because of statements Defendant, and her associates were making at the time.

123.     The reporter told Plaintiff he was fine talking "off record," that he was "not with a publication," and asked Plaintiff to send him her recordings and receipts which she did. During the conversation, Plaintiff did not catch until listening to that recording recently, that Mr. Stevenson told Plaintiff Defendant Kelly Townsend was his "favorite legislator."[33]

124.     This explains why when Plaintiff was clear that it was only Defendant who she knew PRIOR to the 2020 election. It was Defendant who introduced her either directly or indirectly to everyone on the "map" he published.[34] This reporter made false allegations such as Plaintiff was an "unreliable narrator," even though he had no legitimate basis for making such false statements other than following through on the threats Defendant promised would happen if she continued speaking publicly.

125.     When Plaintiff told Defendant she wanted nothing to do with her crazy conspiracies and expressed she no longer believed there was any credible evidence of election fraud, Defendant repeatedly tried to bring Plaintiff back into Koch's lie telling her she found evidence that the same Scott Koch owned a restaurant in Scottsdale and outside of the restaurant was a white rabbit and some crazy nonsense about adrenochrome and cartels (**note Defendant and Plaintiffs security team throughout November and December 2020 constantly told her she was in danger of being killed by cartels because that's whom the high-level players hire for hit jobs which was terrifying Plaintiff and her family. (see Ex. __V__ ).

126.     *It was terrifying for Plaintiff to hear Defendant acting as a government official telling her after Defendant's associates had been telling her for months cartel guys might kill her, according to Defendant's "research," the Scott Koch guy who lied about election fraud and believes crazed conspiracy theories, is associated with cartels and killing kids for adrenochrome.*

---

[33] https://soundcloud.com/staci-burk/hank-stevensen-substack-re?si=7297ea540a3948519ac1270f18e9c9cc&utm_source=clipboard&utm_medium=text&utm_campaign=social_sharing

[34] https://arizonaagenda.substack.com/p/she-spread-election-conspiracies

127.    In January 2022, former President Trump at a rally in Florence, Arizona, publicly supported and promoted Defendant for her election integrity efforts. At that rally on the stage, Defendant continued to incite the crowd to indict election workers.

128.    This promotion and anticipated endorsement from Trump along with the networking she secured at least in part as a result of her championing election integrity, amounts to unjust enrichment at the expense of Plaintiff and her reputation, when Defendant knew or should have known these allegations about election fraud were false. Instead, they were being pushed as a means of exploitation and manipulation of Plaintiff for Defendant's own political and financial objectives.

129.    Defendant achieved both her and the Arizona Senate's desired political goals of winning favor with former President Trump. Defendant achieved this even after she referred to him a fraud to Plaintiff in November 2020 because he put her birther conspiracies to bed publicly embarrassing her.

130.    *Defendant on her own and by and through associates, has violated Plaintiff's first amendment rights for over a year, engaging in ongoing intimidation efforts asserting through words and actions, that Plaintiff she cannot say publicly she no longer believes there is any credible evidence of election fraud or speak about her experience without experiencing further acts of threats, intimidation, and retaliation. (which has happened regardless).*

131.    **To be clear, for well over a year and a half, Plaintiff has expressed to Defendant and others that she does not believe there exists any credible evidence of widespread election fraud and told Defendant that her continued public assertions that election workers should be arrested and indicted is harmful and unwarranted as there is no evidence of intent to commit election crimes even if they made mistakes as Defendant alleges.**

132.    Plaintiff has incurred substantial damages and costs to her reputation, career, costs for her and her family living in alternative accommodations away from home for over eighteen months, hospitalization, and other damages to be proven at trial.

## COUNT ONE — CIVIL RIGHTS

133.    Plaintiff incorporates herein by reference all allegations as well as background contained in this Complaint as if stated herein again in full.

44

134.    hereby incorporates all previous allegations in this Complaint.

135.    Defendant Senator Townsend, acting under color of state law, knowingly, willfully and intentionally deprived Plaintiff Burk of her rights, privileges and immunities secured by the Fourth Amendment, Fourteenth Amendment, and First Amendment to the United States Constitution and derivative rights under 42 U.S.C. § 1983 by:

136.    Subjecting Plaintiff Burk to unreasonable searches and seizures seeking information about voter fraud then later about Plaintiff's private life through the theft of her personal cell phone for use as leverage and exploitation of such personal information;

- Needlessly and unreasonably subjecting Plaintiff to excessive physical force;
- Unlawfully detaining Plaintiff without her consent and thereby wrongfully imprisoning her through use of both force and fear of force;
- Subjecting Plaintiff Burk to loss of both liberty and property without due process of law;
- Subjecting Plaintiff Burk to loss of her First Amendment rights due to manipulation, threats, and coercive control;

137.    The above-described civil rights violations, directly and proximately caused Plaintiff general and special damages, in an amount to be proven at trial, including: physical injuries, present and future medical expenses, pain, suffering, mental and emotional anguish, loss of income, diminished earning capacity, and loss of consortium.

## COUNT TWO — ASSAULT AND BATTERY

138.    Plaintiff incorporates herein by reference all allegations as well as background contained in this Complaint as if stated herein again in full.

139.    hereby incorporates all previous allegations in this Complaint.

140.    Defendant Townsend in her fevered attempt to find and prove election fraud intentionally acted in a manner that caused Burk reasonable apprehension that she would be touched in a harmful or offensive manner.

141.    Defendant Townsend acted "in concert" with others known and unknown to accomplish assault and battery against Burk with other individuals acting as Defendants agents and accomplices to such actions.

142.    This harmful or offensive touching by the Defendant Townsend, as indicated above, directly and proximately caused Plaintiff Burk general and special damages, in an amount to be proven at trial, including physical injuries, present and future medical expenses, pain, suffering, mental and emotional anguish, loss of income, diminished earning capacity and loss of consortium.

## COUNT THREE — FALSE IMPRISONMENT

143.    Plaintiff incorporates herein by reference all allegations as well as background contained in this Complaint as if stated herein again in full.

144.    hereby incorporate all previous allegations in this Complaint.

145.    Defendant Townsend acting directly and in concert with agents to restrain Plaintiff and restrict her movements without her consent or lawful authority.

146.    The conduct of Defendants agents, as described above, resulted in the direct restraint of the Plaintiffs liberty interest and freedom of movement, either by actual force or from the fear of force.

147.    The conduct of the respective Defendant and her agents, as described above, would have caused a reasonably prudent person, under those circumstances, to believe that she was restrained.

148.    The Defendant is liable for the actions of their agents pursuant to the principle of agency law.

149.    Plaintiff was aware of and harmed by the respective Defendant and her agents restraint. The restraint of Plaintiff directly and proximately caused Plaintiff general and special damages, in an amount to be proven at trial, including: physical injuries, present and future medical expenses, pain, suffering, mental and emotional anguish, loss of income, diminished earning capacity, and loss of consortium.

## COUNT FOUR — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

150.    Plaintiff incorporates herein by reference all allegations as well as background contained in this Complaint as if stated herein again in full.

151.    hereby incorporate all previous allegations in this Complaint.

152.    Defendant knew engaging Plaintiff Burk for use and exploitation to accomplish her political objectives as well as dissemination of false narratives to support Defendant's political agenda would be damaging to Plaintiff's personal life.

153.    Defendant knew the dissemination of false narratives concerning Plaintiff to support her personal and political agenda would be damaging to Plaintiff's professional life.

154.    Defendant's continued actions in written and spoken form is extreme and outrageous conduct.

155.    Defendant's intentional acts, knowingly exploiting Plaintiff Burk, a vulnerable adult, caused Plaintiff and her family severe emotional distress.

156.    Plaintiff's emotional distress includes physical manifestations.

157.    As a direct and proximate case from Defendant's intentional acts, Plaintiff Burk suffered emotional harm from the psychological terror inflicted by the repeated terrifying stories and events resulting in general damages in an amount which shall abide by proof at trial, but which is in excess of the jurisdictional requirements of this Court. Plaintiffs have also incurred costs for psychological treatment expenses, loss of consortium, and upon such information and belief, allege that they may incur additional expenses in the future for additional treatment.


## COUNT FIVE — NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

158.    Plaintiff incorporates herein by reference all allegations as well as background contained in this Complaint as if stated herein again in full.

159.    Defendant's actions of inciting her impromptu "vigilante posse" to gather and prove election fraud while exploiting Plaintiff for her own political ends resulted in Plaintiff and her family suffering severe psychological distress as both she and her daughter anticipated severe physical injury during the Black SUV ambush and Defendant's words, and terrifying surveillance, stalking, and repeated and ongoing psychological abuse she experienced as a result of Defendant and her associates interaction with Plaintiff and her family.

160.    Defendant committed negligent infliction of emotional distress when she told Plaintiff stories about foreign invasion, cartels targeting Plaintiff, and law enforcement targeting her resulting in fear of contacting law enforcement or authorities for help, even though she eventually did.

161.    As a direct and proximate result of Defendants negligent infliction of emotional distress, Plaintiff Burk and her family suffered emotional harm from the psychological terror inflicted by the repeated terrifying stories and events resulting in general damages in an amount which shall abide by proof at trial, but which is in excess of the jurisdictional requirements of this Court. Plaintiffs have also incurred costs for psychological treatment expenses, loss of consortium, and upon such information and belief, allege that they may incur additional expenses in the future for additional treatment.

## COUNT SIX – CIVIL CONSPIRACY

162.    Plaintiff incorporates herein by reference all allegations as well as background contained in this Complaint as if stated herein again in full.

163.    Defendants conspired with others to defraud Plaintiff and perpetrate tortious conduct as alleged hereinabove.

164.    In furtherance of that conspiracy, Defendants and others took the actions described hereinabove.

165.    As a result of Defendants' conspiracy and corresponding actions, the Plaintiff has been damaged in an amount to be proven at trial.

## COUNT SEVEN - FRAUD

166.    Plaintiff incorporates herein by reference all allegations as well as background contained in this Complaint as if stated herein again in full.

167.    Defendants represented to Plaintiff repeatedly there was election fraud and that she and her associates had proof of such.

168.    Defendants' representations were false in that there is no such credible evidence of widespread election fraud that would change the outcome of the election.

169.    Defendant was aware of the falsity of her representations at the time they were made and manipulated and exploited Plaintiff with those representations for her own political ends.

170.    Plaintiff was unaware of the falsity of Defendants' representations at the time they were made.

171.    Defendants' misrepresentations were material in that Plaintiff would not have responded the way she did pursuing the false allegations but for Defendants' misrepresentations.

172.    Defendants intended that Plaintiff rely on their misrepresentations and file and pursue legal action prior to January 6th which Defendant apparently believed was essential to protect her from possible allegations of treason.

173.    Plaintiff did in fact rely on Defendants' misrepresentations, believed them to be important, and fully funded on her own the pursuit of legal efforts and investigation into the truth which resulted in Plaintiff learning that Defendants' representations and those of her associates which she ushered into Plaintiff and her family's life were false.

174.    As a direct and proximate result of Defendants' misrepresentations and Plaintiff's reliance thereon, Plaintiff was damaged in an amount to be proven at trial and is entitled to recover those damages.

## CONCLUSION

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

A. For general damages and losses already incurred, and to be incurred in the future, in an amount reasonable and proper to be proven at trial;

B. For past and future medical expenses and other economic losses incurred by Plaintiff in an amount to be proven at trial;

C. For punitive damages in an amount to be proven at trial;

D. For attorney's fees, pursuant to 42 U.S.C. § 1988 and all corresponding Arizona law;

E. For Plaintiffs costs and expert fees, pursuant to 42 U.S.C. § 1988 and all corresponding Arizona law;

F. For such additional relief as the Court may deem just and proper in the premises.

***Based on the amount of lies and intentional manipulation, deception, misleading, and conflicting accounts of persons who provided Plaintiff information throughout this ordeal, (which is part of what gives rise to this complaint), it is possible that some information after discovery could turn out to be inaccurate. Plaintiff also intends to retain Counsel for this action but has yet to have time to confer with retaining counsel for this action, however it is necessary to file now to preserve her statute of limitations. At this time, Plaintiff believes Defendant Townsend is the most complicit actor bringing in the entire range of other actors to Plaintiff's

49

experience as she had not directly interacted with any of the named and involved actor's absent Defendant Townsend's introduction.

Pursuant to 28 U.S.C. § 1746, I Staci Burk, hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. However, as of this date, this information is true and correct to the best of Executed on November 11, 2022.



_____
STACI BURK
2487 S. Gilbert Road #106-609
Gilbert, Arizona 85295
stacigriffinburk@yahoo.com
(480) 343-4518
Proper

Filed this 11th day of November 2022;

United States District Court
District of Arizona
401 W. Washington St., Suite 130, SPC 1
Phoenix, AZ  85003-2118
602-322-7200

50