Staci Burk
2487 S. Gilbert Road #106-609
Gilbert, Arizona 85295
stacigriffinburk@yahoo.com
(480) 343-4518
Proper

FILED ___ LODGED
___ RECEIVED ___ COPY

APR 1 0 2023

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# DISTRICT COURT OF ARIZONA

# UNITED STATES DISTRICT COURT

**Case No.:  2:22-cv-01967-DMF**

**STACI BURK,**

Plaintiff,

vs.

**SENATOR KELLY TOWNSEND**, A
SINGLE WOMAN IN HER PERSONAL CAPACITY
ACTING UNDER "COLOR OF LAW" AS A
GOVERNMENT OFFICIAL, AND DOES I-X.

Defendant.

**OPPOSITION TO MOTION TO
DISMISS OR IN THE ALTERNATIVE
MOTION TO STRIKE**

Plaintiff Staci Burk respectfully opposes Defendant's Motion to Dismiss or in the
Alternative Motion to Strike.

**Prior Pro Se "Political" Legal Cases Defendant Referred to in Her Motion were Filed at
the Urging and Support of Defendant Herself and Were Based on Lies and Misinformation
Defendant and/or Her Associates Falsely Represented to Plaintiff**

Plaintiff filed pro se "political" complaints at her own expense because she was lied to

and misled *by Defendant and her associates* as part of an effort to use, exploit, and later discredit

November 2020, Defendant and her associates attempted to induce Plaintiff to sign an affidavit to be presented to the FISA court alleging foreign interference in the election. Plaintiff was told this FISA warrant would be used to seize the Maricopa County Election Center, and the group needed to accomplish this before certification of the 2020 election.

Plaintiff refused to sign the affidavit before certification and secretly audio-recorded interactions with Defendant and her associates due to the unsettling and disturbing circumstances under which the information was requested. Shortly before Maricopa County certification on November 19, 2020, Defendant and her associates attempted to coerce and intimidate Plaintiff into completing the affidavit after she refused, telling her they secretly audio-recorded Plaintiff and were moving forward using the audio to get the FISA warrant regardless and she should cooperate, provide the affidavit evidence, and accept their offer of security.  (Ex A).

As background, in 2010, Defendant hypothesized birther theories contesting the legitimate election of Obama and supported her friend Sheriff Joe Arpaio to investigate. Also in 2010, Defendant shared the stage at a Surprise Tea Party meeting with Russian born immigrant attorney as she spoke of rigged voting machines, Hugo Chavez, and Venezuela. Defendant spoke of the effects and dynamics of false information on social groups as well as her Obama 'birther' theories (Ex B). In 2011, Defendant took the 'birther' theories to Donald Trump personally and invited him to Arizona, where she told him he would find a friendly crowd with the Arizona Tea Party.[1] In 2017, as General Mike Flynn served in Trump's cabinet, his friend and Tea Party associate Gregg Phillips conveyed Trump won the popular vote in 2016 via ~2M fraudulent noncitizen voters. After Trump publicly said a cabinet member told him there was proof of voter

---

[1] http://sonorannews.com/2016/09/26/surprise-tea-party-patriots-pack-hall-arpaio-zullo/

2

fraud, Phillips was identified as the source. Also, around 2017, Defendant posted to her social media that a "forensic audit" should be conducted. In 2018, Defendant shared unsubstantiated allegations of voter fraud on her social media. Also, in 2018, Trump signed E.O. 13848, creating procedures to address foreign interference in elections. In late 2019 and early 2020, Defendant posted selfie videos alleging anticipated voter fraud in the upcoming 2020 election by noncitizen voters suggested anticipated foreign interference.[2]

On November 30, 2020, at the Hyatt Hotel hearing where Defendant participated as a legislator, those decades earlier allegations from the Tea Party meeting were identical to those pushed just after the 2020 election by Trump lawyer Sidney Powell, Rudy Guiliani, and information warfare specialist Phil Waldron. The number of illegal noncitizen voters Trump quoted during his speech on January 6th, 2021, mirrors what Defendant issued in a press release right after the 2020 election. Trump attorney Rudy Giuliani alleged publicly their team received the noncitizen voter fraud information from Defendant. No credible evidence of noncitizen voters affecting the outcome was ever produced. In line with Defendant's pre-election predictions from 2019 of noncitizen voters from across the Southern border voting illegally in the 2020 election, attorney Sidney Powell publicly stated they had proof of trucks bringing illegal ballots across the Southern border, suggesting foreign interference.

Several days after the 2020 election, Plaintiff was contacted by a "whistleblower" who worked at a Seattle FedEx facility asking if she could help her reach the FBI, saying she could not get through. Plaintiff reached out to Defendant as House Elections Chair to help the woman. Instead of sending the FBI or authorities to her facility as requested, Defendant insisted Plaintiff

---

[2] https://www.azmirror.com/2020/02/26/house-republicans-pass-voter-fraud-hotline-measure/

obtain an affidavit from the woman. She refused, stating she wanted to remain anonymous but for authorities to come to her facility ASAP and investigate what she saw. Defendant told Plaintiff the woman had no choice but to come forward because witnessing what she believed was election fraud was a "matter of national security."

Plaintiff was unaware when she reached out to Defendant that she had already been speaking at Stop the Steal rallies outside the State Capitol and Maricopa Election Center. After Plaintiff spoke to Defendant, even though Plaintiff asked that she not, Defendant allegedly shared with others at the Stop the Steal rally that Plaintiff had vital information in proving voter fraud and was refusing to cooperate and provide the whistleblower's information and identity.

Defendant's actions resulted in several individuals from Defendant's Stop the Steal rally for whom Plaintiff had no prior relationship, contacting Plaintiff. Other unknown individuals began stalking, surveilling, and swarming Plaintiff's home seeking information. This sudden swarm of activity was unsettling to Plaintiff and her family. Instead of informing Plaintiff she had, in essence, "dog whistled" at the Stop the Steal rally, Defendant told Plaintiff the people showing up outside were "deep state" surveilling her because she had legitimate information she was withholding.

Defendant stated she truly believed there was election fraud with the mail-in ballots, and it was urgent that Plaintiff give up the woman's name. Plaintiff pressured Defendant that if she believed that was true, should get law enforcement to investigate as she gave the location and details, just not the woman's name. Instead, an alternate and parallel story quickly materialized the same day at the Stop the Steal rally outside the Maricopa County election center where Defendant spoke. Defendant's security Marco Trickovic and Ryan Hartwig from Project Veritas alleged he spoke with Defendant that day at the rally before going to the airport to take video of

the South Korea plane that allegedly dropped off fake ballots on the 5th and was coincidentally headed for Seattle, the same location as the woman who contacted Plaintiff. These men left the rally and went to the airport to take video of the plane. The following day the Trump campaign contacted Plaintiff and told her of the possible connection.

Several days later, on or around November 17, 2020, a man whom Plaintiff later learned had been attending rallies with Defendant throughout 2020 and was witnessed appearing to know Defendant on a first-name basis before the election, social engineered his way into Plaintiff's home, claiming he worked for the government, had important information about the South Korean plane, and security advice he could only share in person. Once in Plaintiff's home, Koch alleged he provided security for Democrat Congressman Mark Kelly and Gabby Giffords, showed Plaintiff alleged proof of this through contact logs, and went on to allege "his agents" took ballots favoring Biden from the plane to the Maricopa County Election Center.

After Koch made these revelations, Defendant and associates attempted to coerce and pressure Plaintiff into completing an affidavit that her associates, who were already in D.C. with Trump lawyers Guiliani and Powell, planned to take the affidavit to the FISA Court to secure a warrant to seize Maricopa County Election Center before certification. Defendant also corroborated Koch's story alleging to Plaintiff that while at the Stop the Steal rally, she witnessed a man, that another member of her security, Steve Daniels, identified as Scott Koch, behind the secure line at the election center while ballots were still being counted.

Despite immense pressure, Plaintiff refused to complete the affidavit before certification, without knowing more about Koch. A few days later, there was an attempted break-in at her home. Plaintiff called 911, Defendant, while on the phone with an associate of General Flynn, with local police present, ushered into Plaintiff's home a heavily armed paramilitary "security

detail," telling Plaintiff her life was in danger and she needed security. Plaintiff's local Sheriff Mark Lamb, also a friend of Defendant and associate of Flynn, reinforced at the time that he believed there was election fraud. The initial heavily armed "security detail," included a close associate and former deputy of Sheriff Lamb, was later replaced by another group of former FBI, law enforcement, and military, associated with General Flynn, who also served as his security. The men said they were working under "nonofficial cover," for the government uncovering election fraud which was alleged to be an inside job.

Defendant communicated collaboratively with General Mike Flynn while he and Sidney Powell were at the home of Lin Wood, and they prepared litigation related to the 2020 election. Defendant was a named witness in the Arizona case. Former National Security Administration official Jim Penrose was also with the group at Wood's home. The heavily armed paramilitary group ushered into Plaintiff's home used fear, intimidation, coercion, false stories, and manipulation of Plaintiff and her family to accomplish the group's political goals and objectives. Plaintiff believes these efforts were to control the public narrative and ensure Plaintiff was widely discredited to silence and marginalize her so that nobody would listen to or believe her in case she were to reveal the attempts to coerce and manipulate her into completing an affidavit to seize the Maricopa County Election Center by ambush before certification using a FISA warrant.

While the "security detail" was in her home, they continually pressured her to turn over her iPhone claiming they needed to "run forensics." Plaintiff didn't know the group wanted her phone to get anything they could use to discredit or leverage her, and this was standard practice according to Flynn. Plaintiff repeatedly refused to provide her phone without a warrant or subpoena. After weeks of pressure and continued refusal, two armed men from her "security detail" forcefully stole her phone from her hands. The following week Plaintiff learned it turned

up in Washington D.C. at the Willard Hotel, where Guiliani, Powell, and associates were operating a command center. After her stolen iPhone was taken to D.C., information and data is believed to have been extracted from Plaintiff's phone and used to harass, threaten, coerce, and terrorize Plaintiff for well over a year. After Plaintiff spoke with the January 6th committee, she was contacted by former Trump White House Office of Personnel Management lawyer, Andrew Kloster, stating he was representing former NSA official Jim Penrose, and wanted her assistance disconnecting Penrose from the "security detail" alleging her stolen phone wasn't directed by Penrose, but was more of a "rid me of this meddlesome Priest" thing.[3] One of them just showed up with it in D.C. after Defendant expressed concern Plaintiff might have recorded her early on.

**Defendant Counsel's Wilenchiks Attempts to Access Maricopa County Voting Machines in December 2020 via Plaintiff's "Pro Se" Legal Case per Defendant**

When the Judge in Plaintiff's pro se case over objection expressed he would allow "reasonable discovery," Defendant pressured Plaintiff to contact Christina Bobb, who gave Plaintiff Defendant's Counsel contact info to get an order to gain access to Maricopa County's voting machines (Compl. Ex G, attached Ex. C). Plaintiff did not reach out to Wilenchik.

Before January 6, 2021, Defendant's Council Wilenchik and Defendant allegedly helped gather and prepare an alternate slate of electors to present to Congress on January 6th. (see Ex. D and E). During that period, Defendant pressured Plaintiff to maintain her legal case without ever disclosing that she was allegedly telling Trump attorneys prior to January 6, 2021, that the alternate elector plan she was working on with Counsel Wilenchik in this case (which Plaintiff

---

[3] https://www.rawstory.com/1st-amendment-praetorian-2657737554/

was not aware of Defendant working on an elector plan at the time), might be considered treasonous if there was not a pending legal case on December 14th or January 6th (Ex F).

### Failure to State a Claim Upon Which Relief Can Be Granted

To survive a Rule 12(b) motion to dismiss, the complaint must assert a plausible claim, and set forth sufficient factual allegations to support the claim. *Ascroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949-1950, 173 L.Ed.2d 868 (2009)(citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 127 S.Ct. 1955, 167 L.Ed.2d 929  (2007)). All factual allegations set forth in the complaint are taken as true and construed in the light most favorable to plaintiffs. Indeed, factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Fed. R. Civ. P. 12(b)(6). *Lee v. City of L.A.*, 250 F.3d 668, 676 (9th Cir. 2001).

Fed. R. Civ. P. 8(f) requires a liberal reading of complaints. A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts supporting his claim, would entitle him to relief. Thus, these liberal pleading rules require only that the complaint sufficiently establish a basis for judgment against the defendant. *Yamaguchi v. United States Dep't of the Air Force,* 109 F.3d 1475, 1477 (9th Cir. 1997).

Plaintiff contends her complaint contains sufficient factual allegations which under *Twombly* and *Iqbal*, set forth the basis of her claims which taken in light most favorable to Plaintiff to establish a reasonable basis for relief.  Arizona is a notice pleading state. Plaintiff is not required to state all facts in detail upon which she bases her claim. Plaintiff contends she provided sufficient facts for Defendant to understand the "gist" and nature of her allegations sufficient to answer her complaint.

In line with *Lee*, for purposes of 12(b)(6), factual allegations pled in a Complaint are to be taken as true, Plaintiff alleged facts that satisfy the standard set in *Mintz*. Defendant engaged

8

in extreme and outrageous behavior when she created, amplified, and perpetuated false stories, knowingly exploited Plaintiff's vulnerabilities and fears, used her reasonably anticipated reactions to usher in a heavily armed paramilitary group of mercenaries. Defendant did not consider the harm or terror deliberately caused to her Plaintiff friend and her family even as Plaintiff disclosed to Defendant as it was occurring that the men's actions and presense were triggering her PTSD from her prior domestic violence experiences which Defendant knew of. All that mattered to Defendant was accomplishing the political agenda by any means necessary.

Just after the 2020 election, speaking from her position of authority as chair of the House Elections Committee on stage with Oathkeeper leader Sheriff Mack and QAnon icon Jacob Chansley at the Stop the Steal rally, as she had allegedly for nearly all of 2020, Defendant energized, agitated, and weaponized the crowd. She then "dog whistled" that Plaintiff had information that could prove election fraud instructing the crowd to gather proof and affidavits of election fraud. It was reasonably foreseeable, based on her statements, and given a fair amount of the crowd worked in law enforcement and intelligence, her followers would deploy to Plaintiff's home, invading her and her family's privacy, to stalk, surveil, and seek information Defendant alleged was vital to "saving the Country." Not only was the crowd's response predictable, but Plaintiff contends it is what Defendant wanted as she sought proof of election fraud.

As outlined in her complaint, Defendant's words and actions placed Plaintiff and her family in grave fear for their safety and give rise to her claims of constitutional civil rights violations under U.S.C. §1983, assault, false imprisonment, along with intentional and negligent infliction of emotional distress. Numerous additional facts support these claims that were not included in the complaint. However, given Arizona's notice pleading requirement, Plaintiff did not lay out all details but rather alleged a general overview of her claims and some required facts.

As outlined in her complaint, Defendant's actions caused Plaintiff physical harm as well as severe and prolonged emotional distress. Plaintiff was hospitalized due to heart arrhythmias and elevated blood pressure as a direct result of Defendant's actions and had severe and continued ongoing physical and psychological effects as alleged in her complaint.

**Defendant's complaint should not be dismissed on the grounds that Defendant *starting* or amplifying false election conspiracies is protected political speech. Defendant's actions went well beyond protected political speech and were a targeted abuse of power and exploitation of a vulnerable adult who had a constitutional right for her and her family and home to be free from intrusion and exploitation for the political gain of Defendant**

Defendant played a key role in manufacturing and spreading false conspiracies not only in claiming she was at the election center and personally witnessed Koch, but in amplifying his allegations on her Parler account that went viral. Given that Defendant allegedly knew Koch before the election, and had been associating with him at rallies, and as a government official had direct access to resources to confirm his allegations. Instead, she led Plaintiff and others to believe she there was already proof of election fraud, and the crowd's help was needed to investigate and gather affidavits for Trump lawyers before Plaintiff was ever involved.

Defendant knew Plaintiff and her family had no prior experience with militia or security groups which Defendant herself had years of extensive networking and contact with militias. Plaintiff's only knowledge about such groups was from pieces of information Defendant herself shared during their relationship. After Plaintiff's house was swarmed, instead of recognizing that the survillers were likely because she spread the information about Plaintiff and incited the crowd to gather evidence (something Defendant withheld at the time), instead Defendant further manipulated telling Plaintiff the stalkers were "deep state," and she and her family were in danger resulting in a paramilitary group taking over Plaintiff's home and privacy, while holding her and her family hostage. These actions by Defendant were extreme and outrageous.

Plaintiff was not aware at that time, Defendant was claiming there was election fraud not because she had reliable inside information as a government official and elections chair, but because Defendant had become fully immersed in a QAnon affiliated subculture of politics. Note footnote video on November 14, 2020, at Stop the Steal rally on stage speaking with Jacob Chansley, known as "Q Anon Shaman."[4] Plaintiff did not attend any Stop the Steal or election related protests or rallies and as such it took Plaintiff many months to understand and learn that all of the individuals who had sought her out after the 2020 election, when Defendant shared she had information, were all part of the same affiliated political group.

### U.S.C. 1983 and Notice of Claim Requirement

As held in *Boston v. Kitsap Cty.*, 852 F.3d 1182, 1183 (9th Cir. 2017), "42 U.S.C. § 1983 plaintiffs are not required to abide by state notice of claims statutes with regard to such Federal claims. The opportunity to exercise that option is much different than the circumstances that traditionally give rise to tolling in other cases." *In McDonald v. W. Branch*, 466 U.S. 284, 290, 104 S. Ct. 1799, 1803 (1984), the court opined, "[b]ecause § 1983 creates a cause of action, there is, of course, no question that Congress intended it to be judicially enforceable. Indeed, as we explained in *Mitchum* v. *Foster*, 407 U.S. 225, 242 (1972), "[the] very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights -- to protect the people from unconstitutional action under color of state law." See also *Patsy* v. *Florida Board of Regents*, 457 U.S. 496, 503 (1982)." In these cases, Courts have been clear that violation of a person's constitutional civil rights belong in Court and redress of such grievances shall be afforded utmost consideration afforded by the Constitution.

---

[4] https://youtu.be/uu6GS72J1JQ

11

Here, Plaintiff clearly alleged claims against former Senator Townsend in her personal capacity, not her official capacity. Even so, in line with *Boston*, where Plaintiff alleges Defendant acted in her role as a former Senator "under color of law," for purposes of her U.S.C. 1983 claim, Plaintiff's U.S.C. 1983 claims are not subject to notice of claim provisions or administrative exhaustion. *Boston v. Kitsap Cty.,* 852 F.3d 1182, 1183 (9th Cir. 2017).

As to the Plaintiff's State claims, Plaintiff specifically delineated she brought such actions against Defendant in her personal capacity, not in her official capacity.

Thus, because Plaintiff is not bringing forth her State claims in Defendant's official capacity and to the extent, Plaintiff alleges Defendant acted under "color of law" for her 1983 claims, the notice of claim requirements and administrative exhaustion provisions do not apply.

**Plaintiff's Complaint Included Political Commentary as Factual Background Sufficient to Explain Circumstances and Were Not Intended to be Salacious and Any Formatting Errors Should Not Result in Dismissal Without Opportunity to Amend**

Plaintiff alleges she substantially complied with Fed.R.Civ.P 10(b) by numbering all paragraphs set forth her allegations. Plaintiff's allegations regarding Defendant's anti-vax and views of high-level Democrats participating in a child sex trafficking and adrenochrome extracting cabal were included because long after Plaintiff came to learn the nature of the false information being pushed and told Defendant she did not believe any of it or that there was any credible evidence of widespread election fraud, Defendant continued pushing terrifying and menacing false information to Plaintiff directly related to Koch over a year after the 2020 election into late December 2021.

These facts about Defendant's politics and her private messages to Plaintiff regarding child sex trafficking were included to show long after Defendant's associate Koch recanted and told Powell's retired FBI agents he made it all up, other witnesses, including Defendant herself

had back peddled from prior assertions, and the Arizona Audit showed no reliable evidence of

fraud, Defendant continued to claim her research showed Koch, the man associated with the lies

which that Plaintiff was manipulated into believing were true by Defendant and her associates,

was associated with a child sacrificing, adrenochrome extracting, child trafficking cartel.

Defendant continued to legitimize by her research that Koch was an evil, cartel-affiliated,

dangerous person, knowing that Defendant and her associates had pushed such claims that

Defendant was cartel associated and thus a potential threat to Plaintiff and her family. Defendant

reiterated she believed the "deep state" was out to get Trump because was exposing the cartel

and child sex trafficking.

Defendant and her associates repeatedly claimed from November 2020 that a weaponized

FBI was targeting Plaintiff and would arrest her on false charges or kill her to suppress any

evidence of election fraud. Defendant and her associates also claimed the "deep state" accesses

cartels to engage in "hits" and therefore cartels presented an ongoing danger to Plaintiff and her

family. Thus, Defendant bringing to Plaintiff's attention she found evidence Koch is cartel

affiliated is more of the same terrorizing rhetoric Defendant and her associates pushed.

Defendant repeatedly told Plaintiff she cannot allege publicly, there was no evidence of election

fraud, and insinuated she was in danger if she did so. As alleged such comments were chilling of

Plaintiff's First Amendment speech. Defendant and her associates knowingly and intentionally

induced such ongoing terror, by holding her and at times her family members hostage in

complete terror using fear, force, or fraud, for months, and then continued pressing to Plaintiff

that Defendant's "research" revealed Koch was believed to be cartel associated.

These extreme and outrageous acts of coercion, intimidation, and threats give rise to

Plaintiff's First Amendment U.S.C. §1983 chilling her free speech and Fourth Amendment

Search and Seizure, assault, false imprisonment, and infliction of emotional distress.

Should the Court determine Plaintiff's complaint is insufficient in that it did not allege

specific names of co-conspirators, Plaintiff respectfully asks the Court to grant her leave to

amend her complaint, correct deficiencies, and name such co-conspirators. Given the opportunity

and a sufficient time window of sixty to ninety days, Plaintiff could amend her complaint to

correct such deficiencies.

**Plaintiff Contends All Events Occurred within the Applicable Statue of Limitations And Defendant is Not Being Sued in Her Official Capacity as a Government Official**

Plaintiff contends this action was filed in November 2022 and was within the timeframe

which captures when Plaintiff became aware of conduct perpetrated by Defendant and is

generous in that it captures events from November 2020 forward. All of the events alleged in the

Complaint occurred within the two-year time frame and some of the harm has been ongoing and

occurred just weeks before filing of the Complaint.

Additionally, Defendant may not use the statute of limitations as a shield for inequity,

and thus, notwithstanding the important policy served by the limitations statute, Arizona courts

recognize equitable exceptions to the application of the statute when necessary to prevent

injustice. *Nolde v. Frankie*, 192 Ariz. 276, 964 P.2d 477 (1998). Equitable exception to

application of the statute of limitations exists when a defendant induces a plaintiff to forbear

filing suit. *Nolde v. Frankie*, 192 Ariz. 276, 964 P.2d 477 (1998).

Once Plaintiff began disclosing her doubts about the evidence, Defendant and her

associates engaged in a pattern and course of conduct designed to intimidate, threaten, and

coerce Plaintiff not to file a suit or speak publicly about the matters contained within this

14

complaint and insinuated that if she did so, would be killed or other harm would come to her or

her family. One of the "security detail" members insinuated Plaintiff she could be murdered if

"anybody got sued, arrested, or anything went public." When asked for clarification, was told

"you are a smart girl, figure it out."[5] Defendant's associates told Plaintiff since November 2020

she and her family could be killed or arrested on false charges alleging the group has extensive

ties and connections with law enforcement. In line with *Nolde*, Plaintiff asserts repeated attempts

to deflect or muddy the waters by Defendant and associates should toll any statute of limitations.

Plaintiff is not suing Defendant as a public employee for her state claims, or even in her

official capacity as to her U.S.C 1983 claims, thus A.R.S. 12-821.01 does not apply.

Defendant and her associates engaged in ongoing efforts to discredit and intimidate

Plaintiff, alleging she was a risk of exposing the group. Defendant's associate Ryan Hartwig told

his business associate that plans were made to have Plaintiff arrested on known fabricated

charges. This attempt was thwarted when Hartwig bragged about the planned revenge scheme as

political "payback" against Plaintiff for "exposing all of us." Shocked at what he heard, the

business associate alleges he asked Hartwig to repeat the plan, audio recorded it, then terminated

his contract and association with him. He reported the incident to law enforcement and contacted

Plaintiff to provide her with the information and audio recording.

Plaintiff contends given the false information, admitted lies, obfuscation, and threats, by

Defendant's or the associates she had direct part in ushering into her home, relevant facts were

not fully apparent to Plaintiff until within the past year. Thus, any applicable Statute of

Limitation should be tolled in line with Nolde v. Frankie, 192 Ariz. 276, 964 P.2d 477 (1998).

---

[5] https://www.motherjones.com/politics/2022/04/first-amendment-praetorian-january-6-committee-michael-flynn/

**Plaintiff's Status as a Vulnerable Adult in Accordance with Arizona Law**

Plaintiff alleged in her complaint pg 11, line 20, facts which allege Plaintiff due to her physical condition, has been assessed by the State of Arizona and deemed a qualified vulnerable adult since 2015. All factual allegations set forth in the complaint are taken as true. *Lee v. City of L.A.*, 250 F.3d 668, 676 (9th Cir. 2001). Additionally, Defendant was aware of Plaintiff's status and vulnerabilities and in fact instead of restraining her actions considering such vulnerabilities, Defendant and her associates intentionally used and exploited such vulnerabilities. Statutes related to vulnerable adult abuse do not require that the perpetrator be in "a position of trust or confidence" unless the allegation is related to certain types of misappropriation of finances for which the individual betrayed a fiduciary trust. A.R.S. §13-3623 refers to "any person who causes a vulnerable adult to suffer physical injury..." and "A person who intentionally or knowingly engages in emotional abuse of a vulnerable adult who is a patient or resident in any setting in which health care, health-related services or assistance with one or more of the activities of daily living is provided..." Plaintiff is physically compromised and receives in-home oxygen and such related services. Defendant was aware of Plaintiff's vulnerabilities, however, A.R.S. § 13-3623.D, does not require knowledge a victim was a vulnerable adult. As in *Williams*, Defendant fulfilled the requisite *mens rea* by directing his assault against the victim and therefore, he also assumed the risk that the victim would turn out to be a vulnerable adult. *State v. Smith*, No. 1 CA-CR 07-0937, 2009 Ariz. App. Unpub. LEXIS 216 (Ct. App. Jan. 15, 2009).

A vulnerable [adult] is "a person . . . who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.* cmt. n.2. Such "victims . . . are those who are in need of greater societal protection. They are the persons who, when targeted by a defendant, render the defendant's conduct more

...depraved." *United States v. Castellanos*, 81 F.3d 108, 111 (9th Cir. 1996). *United States v. Bernot,* LEXIS 65234, at *24 (E.D. Cal. May 9, 2014). A vulnerable adult "may be able to make [informed] decisions but is unable to protect herself against being abused, neglected or exploited." *Davis v. Zlatos*, 211 Ariz. 519, 525, ¶ 23, 123 P.3d 1156 (App. 2005). Exploitation means "the illegal or improper use of a vulnerable adult or his [or her] resources for another's profit or advantage." A.R.S. § 46-451(A)(4).

As alleged in her Complaint, the State of Arizona has legally determined Plaintiff is a vulnerable adult due to her medical condition and physical impairment. Such evidence can be proven at trial. Plaintiff alleged her status as a vulnerable adult is relevant when considering any potential award of punitive damages given the egregious nature of the inflicted and intended harm and surrounding circumstances of what occurred to her and her family in thier home.

### Conclusion

Plaintiff requests the Court deny Defendant's Motion to Dismiss and, in the alternative Motion to Strike complaint, order that Defendant file an answer to her Complaint.

Alternatively, should the Court decide that Plaintiff's complaint should be amended to specifically name Defendant's co-conspirators which Defendant indicates she failed to identify, some of which Plaintiff has just recently learned their identities, and for purposes of time and efficiency, draft her complaint in a more precise and clear way, Plaintiff requests leave to amend and correct any identified deficiencies.

Plaintiff respectfully asks if the Court does permit Plaintiff to amend her complaint, the court allow sixty days to ninety days from the date of the order to submit the amended complaint. Plaintiff has been advised that doctors want to perform a heart procedure in the next four to six weeks, allowing her time to recover and amend her complaint in compliance with such order.

Pursuant to 28 U.S.C. § 1746, I Staci Burk, hereby declare under penalty of perjury that the

foregoing is true and correct to the best of my knowledge. Executed on April 10, 2023.

STACI BURK
2487 S. Gilbert Road #106-609
Gilbert, Arizona 85295
stacigriffinburk@yahoo.com
(480) 343-4518
Proper

Filed this 10th day of April 2023;

United States District Court
District of Arizona
401 W. Washington St., Suite 130, SPC 1
Phoenix, AZ  85003-2118
602-322-7200

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2023, I filed the foregoing document to the Clerk of the Court
copy of the foregoing sent via U.S. mail to:

Dennis I. Wilenchik, #005350
John "Jack" D. Wilenchik, #029353
Jordan C. Wolff, #034110
admin@wb-law.com
*Attorneys for Defendant Kelly Townsend*

By: _____

18

# Exhibit A



Susan ›

Nov 19, 2020, 10:27 AM

WH used my call reporting the incident (recorded without my knowing) and used it to get FISA warrant stopping certification in AZ. What we talked about is being offered, I can take it or leave it, but I'm involved now regardless. I can provide the evidence or not, but it's going forward.

Yes! I watched Giuliani Et al this am, thought maybe they did. We will talk tomorrow. Do you still have protection?

No. I thought I was safe and not going forward.

Nov 19, 2020, 12:22 PM

Can we talk?

I'm with Jack

I can talk tonite after he leaves

Ok thank you

Nov 19, 2020, 6:00 PM

<  **Marco Trickovic ⊘** 

The audio has him admitting he brought illegal ballots to the tabulation center. That was the smoking gun to get a warrant right away and secure the facility. Thats why they wanted it. Now they moved on and told us to back away so they can do what they do. They have my audio from today even though he detracts from what he stated the other night. Doesn't matter anymore. Its a dead case. They needed that within a certain time period. We will lose in Arizona going forward. I guess they are right. Doesn't really matter anymore. I put my family in danger for nothing really. You put yourself in danger for nothing. Its not worth it in the end. I wish I never would have gotten the tips I had about the plane and all of it. I'm going to just focus on figuring out how to best secure my family and stop with this stuff going forward. Not worth it.

Nov 18, 2020 4:49 AM

My point was Sommer heard everything. She is in a much bett~~
position to protect herself and she

10:22 ◢

 **Marco Trickovic @**

they are right. Doesn't really matter anymore. I put my family in danger for nothing really. You put yourself in danger for nothing. Its not worth it in the end. I wish I never would have gotten the tips I had about the plane and all of it. I'm going to just focus on figuring out how to best secure my family and stop with this stuff going forward. Not worth it.

Nov 18, 2020 1:49 AM

My point was Sommer heard everything. She is in a much better position to protect herself and she could have sent an affidavit. She didn't want to put her family at risk either.

I told her get her affidavit over to them. She has a husband and they have two people and guns (that they know how to use).

Nov 18, 2020 1:53 AM

I get it. Again its all good. I need to wake up early. You should try and get some rest as well.

Nov 18, 2020 1:54 AM

New Message



Marco ›

Tue, Nov 10, 2:38 PM

On the other line

Call me when done. I'm getting you some protection

Tue, Nov 10, 3:48 PM

**Mark Lamb**   ML  ›

Call him. He is expecting your call

They want to get deputies to watch over you

Tue, Nov 10, 5:19 PM

**John Shattuck**   JS  ›

On line w whistleblower

Oh okay

Wed, Nov 11, 3:03 AM



# Exhibit B

The Wayback Machine - https://web.archive.org/web/20101022051159/http://www.sonorannews.com:80/archives/2010/101013/f...









Home      Local News      Opinion / Editorial      Feature News      The Hub      Classifieds      Archives      About

VOL. 16 ISSUE NO. 41   |   OCTOBER 13 – 19, 2010

BY LINDA BENTLEY | OCTOBER 13, 2010

# Pursuing the chink in Obama's armor

*'When Barack Obama started on the campaign trail … it was like listening to the same Communist apparatchik'*

Share

SURPRISE – Despite the cancelation of the event that originally would have brought her to the Valley, Dr. Orly Taitz, Esq. decided, due to the dedication and support from those who organized her speaking event at the Holiday Inn, she would come anyway.

Jeff Lichter, who organized the event, also attended Taitz's hearings on behalf of Capt. Pamela Barnett regarding Obama's eligibility in U.S. District Court for the Central District of California last year before Judge David O. Carter.

He said Carter's demeanor changed markedly from September, when he stated he would hear the case on its merits and set trial dates for January of this year, and October when Carter decided to instead dismiss the case.





click here to **Make a Contribution**

## Laundromat For Sale

**Centrally located in Cave Creek,** the Laundromat has 16 dryers, eight front loading washers, two 35 pound washers and three 50 pound washers. An adjoining office offers wash and fold, ironing and contract seamstress services. Ownership is ideal for a retired couple who can serve the public while gaining income.
## Call 602-315-5964

Cave Creek Weather Forecast, AZ (85331)



**Jeff Lichter**

Lichter told the audience the Democratic National Convention nomination documents, signed by Speaker Nancy Pelosi, omitted the clause attesting to Obama's constitutional eligibility for office in 49 states. Constitutional eligibility was only attested to in the state of Hawaii because it is required there by state law.

Kelly Townsend, who is involved with the Greater Phoenix Tea Party Patriots, spoke about an experiment conducted in 1951 by social psychologist Solomon Asch.

Townsend went on to explain the experiment and said, as a participant, subjects were asked to look at two cards. The card on the left contained one line, while the card on the right contained three lines of varying lengths. The subjects were asked to choose which of the three lines on the right card matched the length of the line on the left card. The task was repeated several times with different cards.

Asch devised the experiment to examine the extent to which group pressure could affect one's perceptions. In total, about one third of the subjects placed in this situation went along with the clearly erroneous majority.

Asch performed the experiment with college students, in which only one person in each group was a real subject. The rest were instructed to give incorrect answers on 12 of the 18 trials.

To his surprise, 37 of the 50 subjects conformed to the majority at least once and 14 of them conformed on more than six of the 12 trials.

Asch found the results "disturbing" and stated, "The tendency to conformity in our society is so strong that reasonably intelligent and well-meaning young people are willing to call white black. This is a matter of concern. It raises questions about our ways of education and about the values that guide our conduct."

Afterward, most of the subjects said they really didn't believe their conforming answer, but went along with the group out of fear of being ridiculed.

Townsend stated there are people out there that may believe Obama is ineligible but are afraid of being ridiculed and called a "birther" and said, "All it takes is one to speak the truth and others will follow."

Taitz talked about how she left Moldavia, Russia in the 1980s when she was in her late 20s and said, "When Barack Obama started on the campaign trail ... it was like listening to the same Communist apparatchik."

And, as Taitz has been pursuing the issue of Obama's ineligibility for the past two years, CNN and MSNBC have ridiculed her as being the "Birther Queen," with Chris Matthews saying she should be tied up and burned at the stake. Taitz's supporters, on the other



**Kelly Townsend**

hand, liken her to Lady Liberty and Joan of Arc.

Taitz told the audience about Georgia's U.S. District Court Judge Clay Land's $20,000 sanctions against her for filing what he called a frivolous lawsuit, a move she claims was an attempt to intimidate her.

Although she lost her bid for secretary of state during California's primary, Taitz expressed concern about the legitimacy of our elections and cautioned against "black box voting," the use of voting and ballot tallying machines made by Sequoia, which she said is owned by a shell company in Venezuela connected to Hugo Chavez.

She said 17 states use these ballot counting machines run by software easily manipulated to flip election results.

Taitz also suspects there is massive voter fraud and advised citizens to demand paper ballots. Also, with all the zest for early and mail-in ballots, she wondered, "How many people are registered and voting in multiple states?"

When Taitz started looking into Obama's background two years ago, she learned Obama was using Social Security Number (SSN) 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, issued in Connecticut between 1976 and 1977 while Obama was attending high school in Hawaii.

She said national databases revealed 140 addresses and 39 SSNs linked to his name. And, since he never lived in Connecticut, there was no reasonable explanation for Obama to have a Connecticut-issued SSN.

Taitz also said Obama used a different SSN when he served in the Senate.

In researching the issue, I personally discovered that same Connecticut-issued SSN was used to create Obama's fraudulent Selective Service System registration records. (See: Obama conspiracy – It's no longer just a theory )

Aside from the issue surrounding his SSN, information kept surfacing about Obama that Taitz called "shocking," including the Kenyan Parliament's announcement during session that Obama was born in Kenya.

"Every day we're finding new information," said Taitz.

When Ken Allen of Tucson made a Freedom of Information Act request for Obama's mother Stanley Ann Dunham and stepfather Lolo Soetoro's passport and immigration applications, Obama was listed on his mother's passport application as Barack Obama "Soyabarka."

Taitz said she later learned it was customary in some Asian countries to create a name by combining the names of the parties. In this case it was a combination of Soetoro and Barack.

What was peculiar was the State Department, in fulfilling Allen's request, withheld pages from Soetoro's immigration application filed in 1965, citing privacy issues.

Taitz asked, "Whose privacy?" as she noted both parents were deceased and Maya, Obama's half sister, wasn't born until 1971.

She then questioned why Obama would be listed on Soetoro's immigration application. Calling the Certification of Live Birth posted on the Internet "a piece of garbage," Taitz said it contained no corroborating information saying Obama was born in Hawaii.

She said, "The only reason to hide the original birth certificate is because it's a fraud."

Taitz summed up LTC Terry Lakin's situation, after the Army judge basically denied him any means to defend himself, as "judicial rape."

"We've done all the research," said Taitz, who said inaction was not due to lack of evidence and that "Corruption is the problem."

Lichter explained the non-binding resolution Obama introduced when he was in the Senate declaring John McCain a natural born citizen "because he was born to parents who are citizens, the very thing that would disqualify [Obama]."

Lichter then introduced Lyle Rapacki, who recently returned from meeting with Pastor James David Manning of the ATLAH World Missionary Church and the transcript committee in Harlem to determine how the transcripts from the May Obama CIA Columbia trial would be released.



**Lyle Rapacki**

Rapacki said he does intelligence work and, on the unconventional side, he's "fighting the good fight to right this ship of state."

He said Taitz has laid a lot of groundwork for others and due to her tenacity – her diligence – she's helped others pick up the ball.

"There are very powerful folks trying to keep this quiet," said Rapacki, adding, "No one person has scored on this issue. We're trying to find a chink in the armor."

Rapacki stated, "We're not functioning under the Constitution anymore. No one has standing because we're operating under corporate law. It's a game to keep this from 'We the People.'"

Laying out what was proved during Manning's 10th Amendment trial, Rapacki explained that Obama was a CIA operative in Afghanistan from 1981-1984.

Because Obama left Occidental College as a C+ student, when he returned from Afghanistan he had nowhere to go.

A fraudulent education record at Columbia was subsequently created to get Obama into Harvard.

And, to get into Harvard, Obama would have had to have grades that placed him on the dean's list. However, no such records exist.

Rapacki said it is all part of a grand scheme with Fox News complicit in keeping it quiet. "The information is not sensational," said Rapacki, "What's sensational is it's a lie."

With the transcripts being released in a matter of days, Rapacki said Manning was getting ready to conduct the sentencing phase of the ATLAH trial and stated, "We'll be armed with facts instead of emotion."

At the end of the event, Townsend encouraged people to contact their state senators to ask

them to vote for Russell Pearce for president of the Senate. She said he didn't ask anyone to do this but stated he was the most deserving of that post.

She said the vote will take place in the Senate immediately after the Nov. 2 election. Visit www.orlytaitzesq.com for more information or to donate to help offset the $20,000 sanction Taitz was required to pay.



Copyright © 2010 Sonoran News

# Exhibit C



2 People >

Text Message
Fri, Dec 11, 7:24 PM

Kelly Townsend

 Staci Burk, Christina Bobb

Hi Christina

Christina Bobb

Hello! I'm working with our forensic team now to see how quickly we can get out there to do it. I'm going to send you the contact for our local counsel who can help you get the exam scheduled and approved by the court. His name is Jack. Please reach out to him ASAP and let me know the window we have to work with. Thanks!

Jack Wilenchik   JW   >



# Exhibit D

KELLY TOWNSEND
1700 West Washington, Room 111
Phoenix, AZ 85007
CAPITOL PHONE: 602-926-4467
ktownsend@azleg.gov



COMMITTEES:
ELECTIONS – Chairwoman
Education
Federal relations

DISTRICT 16

December 31, 2020

Dear Vice President Pence,

As the Chairwoman of the Arizona House Elections Committee, I write to you with upmost urgency to communicate to you several occurrences that thwart our ability as legislators to investigate legitimate and concerning allegations of election fraud in the most recent general election. On December 14, 2020, Arizona sent an alternate slate of electors, along with a resolution from 21 current and 8 newly elected legislators asking you to refrain from accepting the Biden electors until we could adequately investigate these claims of fraud.

Soon after the election, I requested an Elections Committee discovery hearing in order to use subpoena power to acquire the voting machines and ballots in order to do a comprehensive and forensic audit. I was told that it was not a good idea and was denied the ability. I continued to request the hearing with the Speaker of the House, asked publicly, and tried every avenue to no avail. A full month later on December 9th, the Senate President authorized a hearing via the Judiciary committee, and that did result in subpoenas to the Maricopa County Supervisors (who oversee the elections process) that have yet, as of the writing of this letter, been complied with.

Court cases have been dismissed due to not having evidence, however our efforts to do an audit to obtain such evidence have been suppressed. We held a hearing on 11/30/2020 with Rudy Giuliani to at least hear testimony from citizens who experienced irregularities, along with subject matter experts who reported severe irregularities and probable tampering with the machine apparatus. On 11/30/2020, a group of Arizona citizens reported publicly that they had uncovered with great confidence a minimum estimation of 160,000 fraudulent voters, based on over 1000 declarations/affidavits collected. This supports an earlier document submitted to the Attorney General and would largely impact the outcome of the election.

We have experienced obstruction at every turn. For your reference, I have itemized, in Exhibit A, many of the various ways we have been stopped from investigating claims of fraud and gross irregularities. It is my hope that you will see that the Arizona Presidential election is still in dispute and unresolved. We call on you to take this into consideration as you perform your duties on January 6th, and not accept the electors until we have resolution to these matters.

With utmost respect,

Senator-Elect Kelly J. Townsend



**Exhibit A**

1. Requests from the House Elections Chairwoman (myself) and the House Federal Relations Chairman (Mark Finchem) to hold an evidentiary hearing were repeatedly denied and have yet to be honored. Multiple Chairmen of various committees requested a hearing in order to investigate claims, to no avail. We were forced to hold an unofficial hearing on November 30th where many came forward with very concerning evidence and claims.

2. The Senate Judiciary Committee hearing was not held until 41 days after the election on 12/14/2020, the same day as the Electors were to cast their votes. This delay rendered the hearing of little effect regarding having confidence in the correct votes cast. The Chairman thus issued a subpoena for the equipment and ballots, but the Maricopa Board of Supervisors has countersued and refuse to comply. They will not release any machine or ballot info, even though within the RFP for the Dominion machines, it is stated that their key features are their ability to conduct hand counts, perform risk limiting audits, and publish ballot images and adjudication records with markings on a public website, calling it their open data initiative. Now that they are being asked for it, they are refusing to make it available, citing voter confidentiality. There is no voter information contained in the machine or on a ballot, however, so that reasoning is insufficient. Their inaction and nonfeasance prevent us from proper discovery.

3. I, along with several others, requested the Governor to call us in for special session to be able to deal with the issue. It is our understanding that we cannot enforce the subpoena for equipment and ballots unless we are in session. His ongoing unwillingness to call us into session to address these issues had kept us from adequate discovery. On 12/02/2020, Governor Doug Ducey was asked by the media if he was going to honor the Legislator's request for a special session. He proceeded to incorrectly name Monday January 13th as our first day back in regular session. In response, the reporter asked, "So you see no need for a special session to look at any of these issues or the issue of Presidential electors...," to which the Governor interrupted and said, "I'll see the Legislature in January."

4. The House leadership attempted to deter Representative Bret Roberts from sending a letter to Attorney General Brnovich and the Maricopa County Board of Supervisors regarding the accurate performance of a hand count based on the statutory requirement to do so by precinct, versus vote center. By doing a hand count based on voting centers, it renders it impossible to tell if there was a rogue precinct involved in fraud. Nevertheless, Rep. Robert's efforts to enforce statute were thwarted by House leadership.

5. One week prior to the Electors voting, on December 7th, the House and Senate leadership closed the buildings in the name of COVID-19, preventing any in-person hearings or work to be performed. This greatly hindered our ability to push for discovery regarding election integrity during the last days before the Elector's votes were cast.



6. The Maricopa County Board of Supervisors held a closed meeting on 11/20/2020 in order to certify the election results, where the public was not allowed to participate and ask questions. Prior to that meeting, on 12/08/2020, Merissa Hamilton (a data integrity expert) delivered to the Attorney General a statistically significant listing of deceased voters that received a ballot and those deceased who actually returned a ballot. At the aforementioned meeting, the Maricopa County Elections Director Ray Valenzuela stated that the list of deceased voters casting a ballot was mere folklore and dismissed it as a nonissue. This accusation is still pending an investigation.

7. After submitting a public records request for the Federal only voters who cast a ballot in the 2020 General election, I was told by a staff member that the Elections Director was "vetting the list" before he gave it to me. I did not request a cleaned-up list of voters, but the list in its entirety. This diminished my confidence in that list, that I have a true representation of persons who cast a ballot that cannot establish their identity or citizenship.

8. Arizona State House leadership prevented Legislators from issuing press releases having to do with the election that did not conform to their own opinion. This diminished our ability to communicate to the public our concerns about how the election and post procedures were being handled.

9. On 12/01/2020, I requested the Attorney General's Elections Integrity office to investigate the claims made at the November 30th Giuliani hearing and provided them the link. I was told that none of the items listed at the Giuliani hearing would be investigated by that office.

10. The Maricopa County Recorder attended more than one DefCon conference that focused on the ability to hack voting machines. The Legislature was never informed that the outcome of these conferences recommended that elected officials be notified due to unprotected ports on the machines, passwords left unset or left in default configurations and security features of the underlying commercial hardware were left unused or even disabled. It was recommended that to improve election security, paper ballots should be used, and a rigorous post-election audit be performed. We learned about this issue via social media, and it was obfuscated by the Election officials.

11. Arizona Republican State Chair Kelli Ward reports the following malfeasance and obstruction:

    a. No allowed review of the digitally adjudicated ballots – over 200,000.

    b. Only 100 of the duplicated ballots reviewed – 3% error rate in favor of President Trump. Maricopa County refused to look at the other 28,000 ballots.

    c. No meaningful signature verification. County employees doing signature verification offsite, over the internet, without oversight, and at times at a rate of 30 signatures or more per minute.



12. The Secretary of State took 24 days to answer a public records request by Merissa Hamilton, asking them to deliver the meeting minutes from their technical committee to certify the Dominion voting equipment. Only after four requests and the involvement of the Ombudsman did she obtain the information. The results of that request showed that despite the voting equipment not being able to calculate the votes properly, which was never addressed, the machines were still certified. The Maricopa County RFP for the Dominion equipment did not give the public a chance to give input on the procurement. There was never any discussion or an offer of various options to choose from. The Board of Supervisors went straight to a vote with no discussion and approved the machines unanimously.

13. There are multiple/numerous examples of how on election day observers and poll workers were prevented from overseeing the various procedures, thereby undermining confidence that there was no illegal activity and violating Arizona's statutes regarding election integrity. We have had no formal investigation into the vast majority of these accusations.

**Summary:**

Arizona has many unresolved issues that we would like to have investigated in order to confidently say our electors voted for the true victor in the 2020 Presidential election. We still have outstanding issues left unresolved and are being stopped at nearly every turn from investigating. For example, the Maricopa County Recorder's office started counting early ballots 14 days before election day. During that time, the backup server was removed each night by a Dominion employee. This is of significant concern because the information on those servers could have been manipulated and/or provided to nefarious people as to how many ballots/votes were needed to change the results of the election as time went on.

Many in the Legislature believe that if we are able to do a forensic audit, we could investigate these and other serious claims brought forward to us. However, as you can see by the list above (not exhaustive but brief for your benefit) we have many entities who appear to be blocking our efforts to get to the bottom of the issue. One can only ask, in a supposedly secure and fair election, why discovery is being quashed.

**Conclusion:**

It is asked that all of these issues be considered when contemplating the eleven Arizona electoral votes. Our election is still in dispute, and we have obfuscation and attempts at running out the clock to prevent discovery of the facts. We believe it is impossible to conclusively declare a winner in Arizona and pray that you would refrain from counting the electoral votes from our state, and consider the alternate slate should we be able to establish validity to the various claims of election fraud on such a scale that would change the outcome.

*Thank you, kindly, for your attention to these matters.*





## A RESOLUTION TO CONGRESS

WHEREAS, it is the constitutional and legal obligation of the Legislature of the State of Arizona to ensure that the state's presidential electors truly represent the will of the voters of Arizona; and

WHEREAS, pursuant to the direction of Congress as set forth in United States Code, title 3, section 1 as authorized by Article II, section 1, clause 4 of the Constitution of the United States, and state law adopted pursuant thereto, Arizona conducted an election for presidential electors on the Tuesday next after the first Monday in November of 2020—that is, on November 3, 2020; and

WHEREAS, that election was marred by irregularities so significant as to render it highly doubtful whether the certified results accurately represent the will of the voters; and

WHEREAS, Congress has further directed in U.S. Code, title 3, section 2 that when a state "has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such manner as the legislature of such State may direct"; and

WHEREAS, that provision implicitly recognizes that Article II, Section 1, Clause 2 of the U.S. Constitution grants to each state legislature, with stated limitations, the sole authority to prescribe the manner of appointing electors for that state; and



WHEREAS, the United States Supreme Court and other courts have explained that when a state legislature directs the manner of appointing electors, it does so pursuant to a grant of authority from the U.S. Constitution rather than by reason of any state constitutional or other legal provision; that this authority may be exercised by the legislature alone without other aspects of the normal lawmaking process; and that the state legislature's authority over the appointment of presidential electors is plenary and may be resumed at any time; and

WHEREAS, because U.S. Code, title 3, section 7 mandates that all presidential electors vote for President and Vice President of the United States on December 14, 2020, it is impossible to pursue the Legislature's preferred course of action, which would be for Arizona's voters to participate in a new and fair and free presidential election before that date; and

WHEREAS, in view of the facts heretofore recited, the Legislature is required to exercise its best judgment as to which slate of electors the voters prefer; and

WHEREAS, legal precedent exists where in 1960 the State of Hawaii sent an alternate slate of electors while the Presidential election was still in question in order to meet the deadline of selecting electors, and upon recount the alternate slate of electors' ballots were ultimately counted; and

WHEREAS, the undersigned have an obligation to find the truth. For this reason, on several occasions since November 3, we state lawmakers have requested fact-finding hearings to include a comprehensive and independent forensic audit. At this time, no such audit has been authorized. This leaves the uncertainty of the election results in a state that requires further investigation and resolution; and

WHEREAS, ongoing election irregularity litigation is currently active, and there are unresolved disputes by both the Legislature and at least one Presidential campaign, rendering the election inconclusive as of date of signing of this letter,



THEREFORE,

Be it resolved by the undersigned Legislators, members of the Arizona House and Senate, request that the alternate 11 electoral votes be accepted for to Donald J. Trump or to have all electoral votes nullified completely until a full forensic audit can be conducted.  Be it further resolved that the United States Congress is not to consider a slate of electors from the State of Arizona until the Legislature deems the election to be final and all irregularities resolved.


Signed this day, 14 December, 2020.


Senator Elect Kelly Townsend
Legislative District 16

Representative Bret Roberts
Legislative District 11

Representative Kevin Payne
Legislative District 21

Representative Bob Thorpe
Legislative District 6

Representative Mark Finchem
Legislative District 11

Senator David Farnsworth
Legislative District 16

Senator Sonny Borrelli
Legislative District 5

Representative Leo Biasiucci
Legislative District 5

AMERICAN
OVERSIGHT

Representative Anthony Kern
Legislative District 20

Representative David Cook
Legislative District 8

Senator Sylvia Allen
Legislative District 15

Representative John Fillmore
Legislative District 16

Senator Elect Nancy Barto
Legislative District 15

Representative Travis Grantham
Legislative District 12

Majority Leader Warren Petersen
Legislative District 12

Representative Walter Blackman
Legislative District 6

Representative Steve Pierce
Legislative District 1

Representative Shawnna Bolick
Legislative District 20

Representative Tony Rivero
Legislative District 21

Representative Noel Campbell
Legislative District 1

Senator David Gowan
Legislative District 14


AMERICAN
OVERSIGHT

Members-Elect concurring...

Representative Elect Jacqueline Parker
Legislative District 16

Representative Elect Brenda Barton
Legislative District 6

Representative Elect Beverly Pingerelli
Legislative District 21

Representative Elect Joseph Chaplik
Legislative District 23

Representative Elect Jake Hoffman
Legislative District 12

Representative Elect Judy Burges
Legislative District 1

Senator Elect Wendy Rogers, Lt Col, USAF (ret)
Legislative District 6

Representative Elect Quang Nguyen
Legislative District 1

Representative Elect Steve Kaiser
Legislative District 15

AMERICAN
OVERSIGHT

**From:** Kelly Townsend </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0DAFE3EE486F4BB69BA501B3BD111861-KELLY TOWNS>
**Sent:** Tuesday, January 5, 2021 1:06:01 PM
**To:** Bradley Rotter <brad@rotter.com>;Phil Cannon <ptcannonx@gmail.com>
**Cc:** Ron Hooper <ron@ronhooper.com>;Jerome Corsi <jeromecorsi6554@gmail.com>
**Subject:** Re: Pence letter

Fyi

This Resolution to appoint the alternate slate of electors is prepared and ready for the election audit findings, should they result in what I expect to happen.  I just dropped it at the Senate and it is listed on the website already.

https://www.azleg.gov/legtext/55leg/1R/bills/SCR1002P.htm

**From:** Kelly Townsend
**Sent:** Thursday, December 31, 2020 2:02 PM
**To:** Bradley Rotter <brad@rotter.com>; Phil Cannon <ptcannonx@gmail.com>
**Cc:** Ron Hooper <ron@ronhooper.com>; Jerome Corsi <jeromecorsi6554@gmail.com>
**Subject:** RE: Pence letter

Gentlemen,

Thank you for doing this for Arizona.  I noticed the attachment was blank on my end, so I am attaching both documents again in hopes they reach the Vice President.  We are all indebted to you.

Thank you,

**Senator-Elect Kelly J. Townsend**
Member, Legislative District 16
602.926.4467
ktownsend@azleg.gov

**From:** Bradley Rotter <brad@rotter.com>
**Sent:** Thursday, December 31, 2020 1:42 PM
**To:** Phil Cannon <ptcannonx@gmail.com>; Kelly Townsend <ktownsend@azleg.gov>
**Cc:** Ron Hooper <ron@ronhooper.com>; Jerome Corsi <jeromecorsi6554@gmail.com>
**Subject:** Fwd: Pence letter

Senator Townsend

Please meet Corsi Undergrounder Phil Cannon who can get your letter to Keith Kellogg who is the Natl Security Advisor to the VP

Phil
Is that cool?



Begin forwarded message:

**From:** Ron Hooper <rhooper@termlimits.com>
**Subject: Fwd: Pence letter**
**Date:** December 31, 2020 at 12:25:36 PM PST
**To:** Bradley Rotter <brad@rotter.com>

Brad, is there a way to confirm Pence's receipt of Kelly's resolution noted in here attached doc? On December 14, 2020, Arizona sent an alternate slate of electors, along with a resolution from 21 current and 8 newly elected legislators asking you to refrain from accepting the Biden electors until we could adequately investigate these claims of fraud.

---------- Forwarded message ---------
From: **Kelly Townsend** <ktownsend@azleg.gov>
Date: Thu, Dec 31, 2020 at 1:14 PM
Subject: Pence letter
To: Bradley Rotter <brad@rotter.com>
CC: rhooper@termlimits.com <rhooper@termlimits.com>

Brad and Ron,

Please find attached the letter written for Mike Pence.  Feedback is welcome.

Thank you,

**Kelly J. Townsend**
Chair – Elections Committee
Member, Legislative District 16
Arizona House of Representatives
602.926.4467
ktownsend@azleg.gov

--
Ron Hooper
Western Regional Director
U.S. Term Limits
Termlimits.com



**From:**   Kelly Townsend </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0DAFE3EE486F4BB69BA501B3BD111861-KELLY TOWNS>

**Sent:**   Thursday, January 7, 2021 9:01:50 PM

**To:**   Jennifer Goss <Jenngoss@yahoo.com>

**Subject:**  Re: #italydidit Are you willing to look at the proof of election fraud?

---

I continue to insist on a full independent forensic election audit.

Thank you for reaching out.

kt

**From:** Jennifer Goss <noreply@freeroots.com>
**Sent:** Thursday, January 7, 2021 8:38 PM
**To:** Kelly Townsend <ktownsend@azleg.gov>
**Subject:** #italydidit Are you willing to look at the proof of election fraud?

Dear Representative Townsend,

https://youtu.be/QBGiHZfOheI
The CIA, MI-6, the Italian embassy. Any of this ringing a bell?
Every single one of you must search your conscience and do the right thing. Democracy will die under your watch if you do nothing. Who among you is brave enough to act?

For nearly two months, we have been told there's "no evidence" of electoral problems – at least sufficient to affect the outcome of the presidential race. Actually, there is so open your eyes and do something about it!

Thank you
Jennifer Goss



**From:**     Kelly Townsend </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
               (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0DAFE3EE486F4BB69BA501B3BD111861-
               KELLY TOWNS>
**Sent:**     Saturday, January 2, 2021 6:20:29 AM
**To:**       kellyjtownsend@yahoo.com
**Subject:**  FW: Pence letter
**Attachments:** Pence Letter.docx;Untitled attachment 00064.html

**From:** Bradley Rotter <brad@rotter.com>
**Sent:** Thursday, December 31, 2020 9:00 PM
**To:** Kelly Townsend <ktownsend@azleg.gov>; Ron Hooper <ron@ronhooper.com>
**Cc:** Mark Victor Hansen <speaker@markvictorhansen.com>; Crystal Dwyer Hansen <crystal@crystalvisionlife.com>
**Subject:** Fwd: Pence letter

Kelly

The letter is perfect.

On another note, after the dust settles, I thought you would enjoy getting to know my pals in Scottsdale, and high
profile couple Mark Victor and Crystal Hansen

> Begin forwarded message:
>
> **From:** Kelly Townsend <ktownsend@azleg.gov>
> **Subject:** Pence letter
> **Date:** December 31, 2020 at 12:14:13 PM PST
> **To:** Bradley Rotter <brad@rotter.com>
> **Cc:** "rhooper@termlimits.com" <rhooper@termlimits.com>
>
> Brad and Ron,
>
> Please find attached the letter written for Mike Pence.  Feedback is welcome.
>
> Thank you,
>
> **Kelly J. Townsend**
> Chair – Elections Committee
> Member, Legislative District 16
> Arizona House of Representatives
> 602.926.4467
> ktownsend@azleg.gov



# Exhibit E

# azcentral.

# Arizona State Bar investigates lawyer involved in 'fake electors' effort by state Republicans



**Ronald J. Hansen**
Arizona Republic

Published 8:22 p.m. MT Sept. 2, 2022 | Updated 10:05 p.m. MT Sept. 3, 2022

The State Bar of Arizona is investigating multiple attorneys related to the 2020 election, with one inquiry requesting the emails of a lawyer who was prominently involved in assembling the "fake electors" who falsely claimed then-President Donald Trump won the state.

A retired judge involved in the probe sought emails Friday from a reporter with The Arizona Republic involving Phoenix lawyer Jack Wilenchik, who helped convene the Trump slate of electors for Arizona in December 2020. The judge also asked for any communications between Wilenchik and Republic reporters.

In the emails, first reported on by the New York Times in July, Wilenchik acknowledged the alternate electoral slate wasn't legal. Another lawyer involved in the coordinated effort in several key states, Christina Bobb, shared with Wilenchik and others receiving the emails that at least one GOP official in Pennsylvania worried the undertaking was illegal, the Times wrote.

Wilenchik was not immediately available for comment Friday afternoon. He is a longtime GOP lawyer who has ties to some of the key figures involved in the efforts to overturn or at least cast doubt on the state's 2020 presidential election results.

The Arizona Supreme Court tapped retired Pinal County Superior Court Judge Stephen F. McCarville in April to serve as deputy independent bar counsel in a probe "related to the November 2020 election," according to an administrative order by the court.

The language of the order suggests the state Bar needed extra help to manage a large number of filings against lawyers.

"Due to the number of charges received ... it may be necessary to utilize State Bar Counsel and investigators to assist," the state Supreme Court wrote in its order creating McCarville's role.

Probes by the state Bar can provide grounds for legal discipline or lead to criminal prosecution if warranted.

## What was the reason for the fake electors?

Wilenchik's emails offered a troubling window into the effort by Trump and his allies to halt Joe Biden's presidential election victory.

Their plan was to submit papers to Congress suggesting Trump won states where certified results showed Biden had won. Arizona, the state where Biden posted his narrowest victory, figured prominently in the plan, which had the cooperation of the GOP electors slate, led by Kelli Ward, the chairwoman of the Arizona Republican Party.

Trump's allies hoped the dual slates of electors would serve as a justification for slowing or reversing the Jan. 6, 2021, certification of Biden's victory.

The effort collapsed when then-Vice President Mike Pence refused to consider the fake electors. That is when a pro-Trump mob violently stormed the U.S. Capitol, halting the process for hours.

Well before that, however, Wilenchik expressed doubts about the plan.

"We would just be sending in 'fake' electoral votes to Pence so that 'someone' in Congress can make an objection when they start counting votes, and start arguing that the 'fake' votes should be counted," he wrote in an email, according to the Times.

The Dec. 8, 2020, email went to Boris Epshteyn, an adviser to Trump's campaign who served as a bridge between the Trump campaign and John Eastman, a California law professor who helped devise the legal strategy. Eastman is now under investigation by the State Bar of California.

In a follow-up email, Wilenchik wrote that "'alternative' votes is probably a better term than 'fake' votes."

Wilenchik also seemed to acknowledge the plan rested on shaky ground: In an email, he said they should submit the fake electors "even though the votes aren't legal under federal law — because they're not signed by the governor."

In a court filing, Ward outlined a view of the electors plan that people told The Republic months ago: While the strategy was legally questionable, they didn't view their activity as criminally wrong.

That filing was part of a lawsuit Ward and her husband filed against the congressional committee investigating the Jan. 6, 2021, riot at the U.S. Capitol. That Democratic-led committee had sought Ward's phone records from Election Day 2020 through the day of the riot.

McCarville's email to The Republic cited his appointment by the Arizona Supreme Court to investigate complaints filed against members of the State Bar of Arizona after the 2020 election.

The Republic declined McCarville's request for information. Under Arizona law, The Republic has a right to keep sources confidential, and federal law provides protection against third-party discovery of non-published journalistic work product.

The state Bar's investigation comes as others have weighed the electors and other election-related fallout.

Arizona Attorney General Mark Brnovich has said the electors issue is under review by the U.S. Justice Department.

His office opened a probe of Maricopa County's election administration after a partisan-led recount reaffirmed President Joe Biden's victory and identified concerns viewed by election officials as minimal or misinformed.

Scrutiny involving Wilenchik in a politically charged matter isn't surprising for an attorney whose professional practice has sometimes put him near controversial figures, including former Maricopa County Sheriff Joe Arpaio.

More recently, Wilenchik has represented Cyber Ninjas, the firm hired to lead the Arizona Senate's partisan review of ballots in Maricopa County, in a monthslong battle involving The Arizona Republic to prevent thousands of documents from public disclosure.

The Republic last year requested emails, text messages and all other communications from Cyber Ninjas and the Senate. When they refused, The Republic and a left-leaning watchdog group called American Oversight filed lawsuits alleging violations of the Arizona Pubic Records Law.

Doug Logan, the CEO of Cyber Ninjas, is facing a criminal investigation from authorities in Michigan who claim he illegally dismantled voting equipment in a failed plot to prove election fraud in that state.

Wilenchik also has represented state Rep. Mark Finchem, R-Oro Valley, an election denier who led "Stop the Steal" rallies and who was outside the U.S. Capitol during the Jan. 6, 2021, riot. Finchem is the Republican nominee for secretary of state, a job that would give him supervision of the state's elections and put him next in line for governor.

The electors plan included Bobb, a lawyer and former reporter for the conservative One America News Network, who has represented Trump during his battles over scores of

classified records he refused to give back to the National Archives and the Justice Department. Legal experts have warned that she could face criminal obstruction charges over her role in that matter.

Bobb wrote a Dec. 12, 2020, email saying that Doug Mastriano, the man heading the alternate electors' effort in Pennsylvania, worried their plan may be illegal, the Times reported.

Mastriano now is the GOP's gubernatorial nominee in that state.

The Times also reported that correspondence about the fake electors wasn't shared with the White House Counsel's Office, which had already rejected the idea as legally unsound.

Wilenchik wrote in an email that Ward, the state's GOP chair, wanted "to keep it under wraps until Congress counts the vote Jan. 6th (so we can try to 'surprise' the Dems and media with it) — I tend to agree with her."

This summer, she and her husband, Michael, were subpoenaed by the Justice Department in connection with the alternate electors plan, according to Politico.

Arizona's would-be Trump electors met at the state GOP headquarters and signed the paperwork to submit to Congress on Dec. 14, 2020. They tweeted about their effort, which included a video of them taking part.

All of Arizona's Republican slate of electors participated in the effort.

They included:

Tyler Bowyer, a top executive with Turning Point USA and a committeeman for the Republican National Committee; Nancy Cottle, who chaired the Arizona Trump electors; Jake Hoffman, a state representative; Anthony Kern, a former state representative now running for the state Senate; Jim Lamon, a former U.S. Senate candidate; Robert Montgomery, chair of the Cochise County Republican Committee; Samuel Moorhead, second vice chair of the Gila County Republican Party; Loraine Pellegrino, the secretary of the

Arizona Trump electors; Greg Safsten, executive director of the Arizona Republican Party; Ward, the state GOP chair; and Michael Ward, Kelli Ward's husband and a GOP activist.

## How does the state Bar investigate attorneys?

The State Bar of Arizona is a nonprofit organization operating under the Arizona Supreme Court. It investigates allegations of misconduct among the state's 18,500 active attorneys and provides legal training.

The attorney disciplinary process is a system of appeal, challenge and review that can keep cases alive for years.

A state Bar "charge" is the first step in the process. Charges are akin to allegations and can be brought against any attorney.

The Bar reviews allegations to determine if there is enough information to dismiss a case or proceed with a recommendation of discipline.

The Bar may bring in outside counsel, as it did with McCarville.

The Bar does not typically make charges public unless it files a formal complaint against an attorney.

The Bar's recommendation then goes to the Arizona Supreme Court's Attorney Discipline Probable Cause Committee for review. The committee can take any number of actions, including dismissing a case, ordering the Bar to investigate further, or imposing a range of discipline.

An attorney can appeal the committee's decision to the state's presiding disciplinary judge and all the way up to the Arizona Supreme Court.

*Includes information from Arizona Republic reporter Robert Anglen.*

*Reach the reporter Ronald J. Hansen at ronald.hansen@arizonarepublic.com or 602-444-4493. Follow him on Twitter @ronaldjhansen.*

**Subscribe to our free political podcast,** *The Gaggle.*

**Exhibit F**

**The New York Times** | https://www.nytimes.com/2022/08/02/us/politics/arizona-trump-fake-electors.html

# *Arizona Officials Warned Fake Electors Plan Could 'Appear Treasonous'*

Politicians involved in Donald Trump's effort to put forth electors to falsely claim he had won Arizona said doing so without first filing a legal challenge could look like a crime.

  **By Maggie Haberman and Luke Broadwater**

Aug. 2, 2022

Two Arizona Republicans recruited by allies of former President Donald J. Trump to join an effort to keep him in office after he lost the 2020 election grew so concerned about the plan that they told lawyers working on it that they feared their actions could be seen as treason, according to emails reviewed by The New York Times.

Kelli Ward, the chairwoman of the Arizona Republican Party, and Kelly Townsend, a state senator, were both said to have expressed concerns to Mr. Trump's lawyers in December 2020 about participating in a plan to sign on to a slate of electors claiming that Mr. Trump had won Arizona, even though Joseph R. Biden Jr. had won the state.

The scheme was part of a broader bid — one of the longest running and most complicated that Mr. Trump undertook as he sought to cling to power after losing the 2020 presidential election — to falsely manufacture a victory for him by creating fake slates of electors in battleground states who would claim that he had been the true winner.

Some of the lawyers who undertook the effort doubted its legality, and the emails, which have not been previously reported, were the latest indication that other key players also knew they were on shaky legal ground, and took pains to create a rationale that could justify their actions.

Kenneth Chesebro, a lawyer working for Mr. Trump's campaign, wrote in a Dec. 11, 2020, email to other members of the legal team that Ms. Ward and Ms. Townsend had raised concerns about casting votes as part of an alternate slate of electors because there was no pending legal challenge that could flip the results of Arizona's election.

"Ward and Townsend are concerned it could appear treasonous for the AZ electors to vote on Monday if there is no pending court proceeding that might, eventually, lead to the electors being ratified as the legitimate ones," Mr. Chesebro wrote to the group, which included Rudolph W. Giuliani, Mr. Trump's personal lawyer.

Mr. Chesebro wrote the word "treasonous" in bold.

The use of the word underscored how well aware at least some of Mr. Trump's allies were that they were undertaking truly extraordinary steps to keep him in office, so much so that they risked being seen as betraying their country.

Ms. Ward, who pushed for the electors plan to be kept secret, ultimately joined the effort and signed a document that purported to be a "certificate of the votes of the 2020 electors from Arizona" and claimed that Mr. Trump had won the state's 11 Electoral College votes.

One person working on the plan, the Arizona-based lawyer Jack Wilenchik, conceded in emails that the Electoral College votes the campaign was working to organize "aren't legal under federal law" and repeatedly referred to them as "fake," The Times has reported.

In a later email, Mr. Wilenchik said that the rush to file the papers with the Supreme Court was "to give legal 'cover' for the electors in AZ to 'vote'" on Dec. 14, 2020, the day the Electoral College was slated to gather and cast votes.

Ms. Townsend did not serve as one of the electors for Mr. Trump, but pushed his claims of a stolen election.

Both Ms. Ward and Ms. Townsend have since received subpoenas from the Justice Department asking questions about the fake electors plan and demanding documents detailing communications with Mr. Trump's legal team.

The department has widened its investigation into the events leading up to the Jan. 6 attack on the Capitol, including issuing a subpoena for Pat A. Cipollone, the White House counsel to Mr. Trump who pushed back on some of his most extreme efforts to overturn the election, according to a person familiar with the subpoena.

Ms. Ward, Ms. Townsend, Mr. Wilenchik and Mr. Chesebro did not immediately respond to requests for comment.

Kelly Townsend, an Arizona state senator, did not serve as an elector for Mr. Trump, but pushed his claims of a stolen election. Bob Christie/Associated Press

The push to organize slates of false electors involved hands-on work by Mr. Giuliani, who the emails indicate spoke with Ms. Ward and Ms. Townsend as the Trump campaign was apparently urging the electors to vote on Dec. 14.

Mr. Chesebro sought assurances from Mr. Wilenchik that he would quickly file papers to the U.S. Supreme Court contesting a ruling by Arizona's Supreme Court affirming Mr. Biden's win in the state.

"Reason is that Kelli Ward & Kelly Townsend just spoke to the mayor about the campaign's request that all electors vote Monday in all contested states," Mr. Chesebro wrote to Mr. Wilenchik, apparently referring to a conversation with Mr. Giuliani.

He said that the concern from Ms. Ward and Ms. Townsend was that activating an alternate group of electors in favor of Mr. Trump "could appear treasonous" in the absence of a pending lawsuit. "Which is a valid point — in the Hawaii 1960 incident, when the Kennedy electors voted, there was a pending recount," Mr. Chesebro added.

He was referring to an instance that he and others were using as a foundation for their argument that they could put forward fake slates of electors. In 1960, the result of the election in Hawaii was unsettled as the Electoral College was close to meeting. The governor certified a slate of electors in favor of Richard M. Nixon, who claimed he had won as the recount continued. John F. Kennedy also formed a slate of electors.

When the vote count was finished, Mr. Kennedy had won, and his slate of electors ultimately was certified.

However, little about the 1960 incident resembled what happened in 2020. By the time the Electoral College met on Dec. 14, 2020, the votes had all been counted, Mr. Biden had been declared the winner and various courts had tossed challenges filed by Mr. Trump's allies.

In a follow-up email, Mr. Chesebro wrote that he no longer saw "cause for concern" because a legal action some of the group planned to file was "at the printer" and that the Supreme Court considers an action docketed whenever it is mailed. He wrote that it would be in the mail by the time the Electoral College met.

Mr. Wilenchik filed the petition the same day, records show. (The Supreme Court denied the petition in February 2021.)

In the weeks after the election, Mr. Chesebro wrote a series of memos outlining a plan to send so-called alternate electors to Congress for the certification. A little more than two weeks after Election Day, Mr. Chesebro sent a memo to James Troupis, another lawyer for the Trump campaign in Wisconsin, laying out a plan to name pro-Trump electors in that state, which was also won by Mr. Biden.

Mr. Chesebro also sent a Dec. 13, 2020, email to Mr. Giuliani that encouraged Vice President Mike Pence to "firmly take the position that he, and he alone, is charged with the constitutional responsibility not just to open the votes, but to count them — including making judgments about what to do if there are conflicting votes."

That idea became the basis for Mr. Trump's pressure campaign against Mr. Pence in which the president attempted to convince his own vice president that he could block or delay the congressional certification of Mr. Biden's victory on Jan. 6, 2021.

Mr. Chesebro also was involved in a Dec. 24, 2020, email exchange with John C. Eastman, the pro-Trump lawyer, over whether to file legal papers that they hoped might prompt four justices to agree to hear an election case from Wisconsin.

In those emails, Mr. Chesebro argued that the "odds of action before Jan. 6 will become more favorable if the justices start to fear that there will be 'wild' chaos on Jan. 6 unless they rule by then, either way."

Their exchange took place five days after Mr. Trump issued a call for his supporters to attend a protest at the Ellipse near the White House on Jan. 6, 2021, the day Congress would certify the electoral vote count confirming Mr. Biden's victory. "Be there. Will be wild!" Mr. Trump wrote on Twitter.

**Exhibit E**