Staci Burk
2487 S. Gilbert Rd. #106-609
Gilbert, Arizona 85295
stacigriffinburk@yahoo.com
(480) 343-4518

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

|  |  |
|---|---|
| | CV-22-1967-PHX-DMF |
| **STACI BURK, an individual,** | |
| Plaintiff, | **PLAINTIFF'S THIRD AMENDED COMPLAINT** |
| v. | |
| | VIOLATION OF 42 U.S.C. 1983 FOURTH AMENDMENT FIRST AMENDMENT FOURTEENTH AMENDMENT |
| **KELLY TOWNSEND, an individual in her personal capacity, RYAN HARTWIG and Jane Doe, a married individual, MICHAEL T. FLYNN and Jane Doe, a married individual, SIDNEY POWELL, a single woman, DOUG LOGAN and Jane Doe, a married individual, TOWN OF FLORENCE, a municipality, and DOES I-C inclusive,** | FALSE IMPRISONMENT |
| | ASSAULT |
| | INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS |
| | NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS |
| Defendants. | CIVIL CONSPIRACY |

Plaintiff, Staci Burk, hereby respectfully brings the following Complaint against Defendants Kelly Townsend, Sidney Powell, Michael T. Flynn, Ryan Hartwig, Doug Logan, and Town of Florence, and DOES I-C known and unknown at this filing.

## JURISDICTION AND VENUE

1.      At all times relevant, Plaintiff Burk was a resident of Arizona.

2.      This court has venue under 28 U.S.C. §1390 as the events giving rise to this complaint primarily occurred in the state of Arizona under the geographical jurisdiction of this court.

3.      This court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C.1331, because the case involves a federal question and complaint arising out of 42 U.S.C. §1983.

4.      Pursuant to U.S.C. §1367, this court has supplemental jurisdiction over the state court claims, as these claims arise out of the same transaction or occurrence and share a common nucleus of operative fact.

## PARTIES

5.      At all times relevant to this Complaint, Plaintiff Staci Burk is a retired Medical Facility Licensing Surveyor, former Gilbert School Board President, and mother of four adult children and three grandchildren. Burk submits herself to the jurisdiction and venue of this Court and is entitled to bring this action under both state and federal law for all general, special, and any other permissible damages.

6.      Defendant Kelly Townsend was at the time of these events and remains a resident of Arizona subject to the jurisdiction of this Court. At all times relevant to this Complaint, Defendant Kelly Townsend was a Member of the Arizona Legislature, and this action is brought against Townsend in her personal capacity. At all relevant times to this Complaint, Townsend was acted under the color of state law purporting to act with authority granted to her under the Arizona Constitution and State law

governing powers and duties granted to the legislature and its members to conduct investigations and inquiries.

7.    Defendant Ryan Hartwig was at the time of these events and remains a resident of Arizona subject to the jurisdiction of this Court.

8.    Defendant General Micheal Flynn was at the time of these events an out-of-state resident of Florida, however, was physically present in, and engaged in conduct that gives rise to this complaint while either in Arizona or having sufficient minimal contact having traveled to Arizona and had direct communication and contact with Arizona residents including Plaintiff and co-Defendants, raised money from Arizona residents as part of an associated fundraising effort.

9.    Defendant Sidney Powell was at the time of these events an out-of-state resident of Texas, however, was physically present in, and engaged in conduct that gives rise to this complaint while either in Arizona or having sufficient minimal contact having traveled to Arizona and had direct communication and contact with Arizona residents including Plaintiff and co-Defendants, raised money from Arizona residents as part of an associated fundraising effort.

10.    Defendant Town of Florence is a municipality within the State of Arizona, charged with the oversight and supervision of peace officers within its jurisdiction. The Town of Florence through its agent's employee officers of the Town of Florence Police Department and the doctrine of respondent superior engaged in conduct that gives rise to this complaint.

### VIOLATION OF 42 U.S.C. 1983

11.    *Defendant Kelly Townsend*, while Arizona House Representative and Chairwoman of the House Elections Committee *holding herself out as a government official with plenary authority acting under color of state law A.R.S. 41-1151 and related state laws and state constitution provisions regulations, and customs which grant lawmakers authority to engage in investigative inquiries*, engaged in a pattern and course of conduct beginning well before the 2020 election alleging election fraud.

Immediately following the 2020 election, *Townsend claimed "plenary" authority engaged in a broad investigation into election fraud engaging multiple actors in a civil conspiracy that violated Plaintiff's [and her family's] Constitutional rights in the following ways*;

- solicited a citizen's posse of militia and QAnon adherents to stalk, surviel, interrogate, and seek out affidavits and proof of election fraud for her inquiry.

- when Plaintiff sought Townsend's help to reach authorities for a "Jane Doe" citizen instead of doing so, sought an affidavit from Plaintiff and spread that Plaintiff had a "hot lead" resulting in Plaintiff becoming a target at her home by Defendant's agents.

- solicited agents to "vigilante" style seek access to Plaintiff's Doe witness resulting in her agent, Scott Koch, a former police officer, fabricating a story of his involvement in a counterfeit ballot scheme.

- after Defendant's agent fabricated his claims, Townsend then bolstered his story by stating to Plaintiff that she personally witnessed Koch behind the secure line at the Election Center acting nefariously while ballots were being counted.

- the following day after Koch's and Defendant's associate planted the fabricated story, Townsend and her agents working directly with then President Trump's lawyers, Rudy Guiliani and Defendant Powell pressured Plaintiff intensely to sign an affidavit memorializing the story (that later turned out to be fabricated), as the group sought Plaintiff's affidavit claiming plans to use it to obtain a FISA warrant to seize the election centers in the implicated states asserting foreign involvement.

- when Plaintiff refused to sign the affidavit without knowing more about Koch, and Defendant Townsend and her agents learned Plaintiff secretly audio recorded the interaction because she was leery of Koch's motives after fabricating his way into her home falsely claiming to be a government official, Defendant used gaslighting, fear, and coercion, to engage in a clean up effort with such associates and agents.

4

- through words and actions directly and through an agent, exploited a break-in attempt at Plaintiff's home (unknown if it was random or part of the effort), coercing Plaintiff and her family to believe they needed a heavily armed paramilitary security team of former law enforcement of Defendant's associates, who with Florence Police providing the cover of chaos, entered into Plaintiff's home using fear, intimidation, gaslighting, and coercion, to hold Plaintiff hostage and gain access to Plaintiff's recordings stored on her iPhone and storage device.

- as part of this incident Defendant Townsend directly coerced Plaintiff who she knew was a vulnerable adult due to her physical condition and was especially in a vulnerable emotional state from the attempted break-in for which she called 911.

- these acts were done in furtherance of a conspiracy in violation of Plaintiff's Fourth Amendment right to be free from undue search and seizure by a government agent and those acting in concert with government agents.

-

- Defendant Townsend and her agents through words and actions, gaslit, manipulated, and coerced and held Plaintiff and her family hostage for seven weeks with three to four guys at a time (former FBI, law enforcement, and military), rotating out every three to four days using fear, gaslighting, intimidation, and coercion, alleging fabricated stories of election fraud, while manipulating to gain access to the Seattle "Jane Doe" witness and any audio recordings of co-conspirators or agents of Defendant Townsend Plaintiff may have.

- Townsend continued to engage Plaintiff directly and through agents including Liz Harris who Defendant Townsend claimed Plaintiff "just needed cheerleading," while claiming supportive "proof" of election fraud and pressuring Plaintiff to pursue litigating Defendant's claims of election fraud, while using fear, intimidation, gaslighting, and coercion.

- as Townsend and co-Defendants relentlessly alleged fabricated stories Defendant and her agents discounted any contradicting evidence, and their so-called "proof" became increasingly bizarre including Defendant Townsend claiming "research" alleging Koch, her former associate who planted the original fabricated story she bolstered, was an adrenochrome harvesting cartel member long after Plaintiff expressed privately and publicly that Plaintiff no longer believed Defendant's nonsense.

- in May 2021, when Plaintiff physically escaped agents acting on behalf of Defendant using fear, gaslighting, and coercion, by June 2021 Plaintiff told law enforcement authorities she no longer believed there was credible evidence of election fraud.

- when Townsend learned Plaintiff told law enforcement at the Arizona Attorney General's office that Plaintiff no longer believed in the fabrications Townsend pushed, as a government agent, used, coercion, manipulation, fear, and intimidation to repeatedly chill Plaintiff's speech, in violation of Plaintiff's First Amendment right to speak freely without chilling from a government agent, as part of a concerted effort to prohibit Plaintiff speaking publicly about what had occurred and that she no longer believed there was any credible evidence of widespread election fraud.

12.   "A state employee who is off duty nevertheless acts under color of state law when (1) the employee 'purport[s] to or pretend[s] to act under color of law, (2) his 'pretense of acting in the performance of his duties . . . had the purpose and effect of influencing the behavior of others,' and (3) the harm inflicted on plaintiff 'related in some meaningful way either to the officer's governmental status or to the performance of his duties.' " (Naffe, supra, 789 F.3d at p. 1037, internal citations omitted.)

13.   Defendants Ryan Hartwig, General Michael Flynn, Doug Logan, and Sidney Powell were in direct contact with Defendant Townsend throughout the relevant period and such actors worked collaboratively with Defendant Townsend and then President Trump, in a civil conspiracy as outlined below to advance the objective of Defendant's proclaimed investigation into election fraud while Defendant Townsend asserted and proclaimed her power as a government official to investigate election fraud which Defendants carried out in an egregious violation of Plaintiff's and her family's Constitutionally protected First, Fourth, and Fourteenth Amendment rights.

14.     Courts have identified at least four tests to determine whether a private entity acts under the color of state law: (1) the private entity engages in conduct that is traditionally exclusively reserved to the state ("Public Function Test"); (2) the private entity acts jointly with the state ("Joint Action Test"); (3) the private entity acts under state compulsion or encouragement ("State Compulsion Test"); and (4) the private entity engages in conduct in which there is a sufficient nexus between the conduct   and government regulation   ("Government Nexus Test").   *Johnson v. Knowles,* 113 F.3d 1114, 1118 (9th Cir. 1997) (citing *Collins v. Womancare,* 878 F.2d 1145, 1148-49 (9th Cir. 1989)). An additional inquiry is whether there is the "pervasive entwinement" of a private organization with a public institution. *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 298-99, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001).

15.     Upon information and belief, Defendants Hartwig, Flynn, Logan, and Powell, worked directly with Defendant prior to the 2020 election in the case of Hartwig and Powell and afterward in the case of Flynn and Logan. Logan performed a "forensic audit" for the Arizona Senate while Defendant Townsend was a body member of the Arizona Senate and auditing of elections is an action generally reserved to the State as a "State Function." Hartwig, Flynn, Powell, and their agents acted against Plaintiff in violation of her civil rights as she was physically seized and restricted in her movements, in violation of her Fourth and Fourteenth Amendment liberty rights by a heavily armed paramilitary police force, that were ushered in under chaos and cover initially provided by Florence Police, and the entire seizure was a joint action as well as under state compulsion or encouragement by Defendant Townsend.

16.     Defendant Townsend claimed a direct nexus between her purported actions of "plenary" power and authority to investigate election fraud and governmental regulation, thus Defendant with her own words satisfies the government nexus test. Defendant Townsend and her agents, including Doug Logan,

who performed the audit on behalf of the Senate, and such investigative actions were "pervasively intertwined," throughout the entire nine-month period in which Defendants Townsend, Powell, and Flynn, and their agents violated Plaintiff and her family's liberty rights were violated by using fear, manipulation, intimidation, gaslighting, and coercion, acting under color of law in joint action, compulsion, and while pervasively intertwined with State actors including Defendant Townsend.

17.    Defendant Townsend's agents, acted under the encouragement and compulsion of Defendant Townsend, as she directly encouraged agents to investigate election fraud "vigilante-style," which such agents aggressively did so with a frantic and fevered pitch, in violation of Plaintiff and her family's civil rights, which led to such agents holding Plaintiff and her family hostage using fear, intimidation, and coercion, for seven weeks with a heavily armed team, and another several months with additional agents resulting in severe psychological trauma and physical harm to Plaintiff and her family.

18.    Defendant Town of Florence Police Department in their official duties responding to a 911 call of an attempted break-in, provided a shield of cover in chaos for Defendants to advance the joint effort, leaving the scene with Plaintiff in a harmful and dangerous situation upon exit, left behind a heavily armed "security detail" of former law enforcement who claimed they were "protecting," but who then seized Plaintiff and her family using fear, coercion, and intimidation in violation of her Fourth and Fourteenth Amendment right to liberty.

19.    Generally, "members of the public have no constitutional right to sue state [actors] who fail to protect them against harm inflicted by third parties." *L.W. v. Grubbs* (*Grubbs I*), 974 F.2d 119, 121 (9th Cir. 1992) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989)). One exception to that rule is the state-created danger doctrine, *id.*, under which "the state may be constitutionally required to protect a plaintiff that it affirmatively places in danger by acting with deliberate

indifference to a known or obvious danger." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019). Sinclair v. City of Seattle, 61 F.4th 674, 680.

20.   To succeed on a state-created danger claim, a plaintiff must establish that (1) a state actor's affirmative actions created or exposed him to "an actual, particularized danger [that he] would not otherwise have faced," (2) that the injury he suffered was foreseeable, and (3) that the state actor was deliberately indifferent to the known danger. *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133-34 (9th Cir. 2018) (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006)). Sinclair v. City of Seattle, 61 F.4th 674, 680.

21.   Here, both Defendant Townsend and Town of Florence created and exposed Plaintiff and her family to an actualized danger from a heavily armed, intimidating, which was readily obvious from appearance alone, danger they would not have otherwise faced, injury was foreseeable in that the actions which Defendants and agents, former FBI, law enforcement, and military officers took as they frantically terrified Plaintiff and her family with words and actions repeatedly telling Plaintiff and her family they would be killed by cartels hired by the "deep state," or by rogue factions of the FBI or intelligence agencies with "shoot to kill" orders to cover up election fraud, and repeatedly ran around Plaintiff's home responding to every rabbit in the yard as if she and her family were about to be killed, terrifying Plaintiff and her family.

## HISTORY AND BACKGROUND

1.   Defendant Townsend has pursued and spread baseless conspiracy theories regarding Presidential elections dating back well over a decade, something Plaintiff was not aware of when the incidents that give rise to this complaint occurred.

2.   While leading the Arizona Tea Party in 2010, and running for Arizona House, Defendant Townsend platformed conspiracy theories at Tea Party meetings that voting machines were "rigged," involving Hugo Chavez and Venezuela.

9

3.     In 2011, as a Member of the Arizona House, Townsend personally met and solicited Donald Trump, to come to Arizona to meet Maricopa County Sheriff Joe Arpaio as she proposed legislation to restrict Obama from appearing on the Arizona ballot in 2012 unless he produced a birth certificate, and once he did, along with Trump, Townsend urged Arpaio to conduct a taxpayer-funded Sheriff's Office investigation into whether Obama's birth certificate was fake.

4.     In 2012, Arpaio and his then Chief of Staff Jerry Sheridan, who ran for Maricopa County Sheriff in 2020 (with John Shattuck, an associate of Defendant Powell, Flynn, Guiliani, Lara Trump, and Shawn Wilson, a private security company called Mayhem Security, serving on his 2020 campaign), investigated Obama's birth certificate using former CIA contractor Dennis Montgomery who they paid 200K to "inform" later alleging during sanctions in the abuse of power case before Judge Murray Snow, Arpaio and Sheridan claimed they were "duped" by Montgomery.

5.     In the aftermath of the 2020 election, Shattuck worked directly with Defendant's Powell, Flynn, Townsend, Wilson, and Giuliani, as Defendant Powell and Townsend alleged, they had evidence that Hammer and Scorecard "flipped" votes on Dominion voting machines, based on Dennis Montgomery's claims, mirroring the unverified claims Townsend platformed in the 2010 Tea Party meetings.

6.     In 2017, months after an associate of Defendant General Mike Flynn, Gregg Phillips made unproven claims Trump won the popular vote but for voter fraud involving non-citizen voters, Defendant Townsend posted to her social media that Arizona needed to turn over voting data for an audit.

7.     By 2018, Defendant Townsend and activist Shelby Busch, organized various QAnon ideology conspiracy-centered grassroots groups to join under a larger umbrella called #oneloudvoice led by Felisa Blazek.

8.     On March 4, 2019, Defendant Townsend led a MAGA school protest and at that event met Marco Trickovic, leader of the militia group Arizona Three Percenters, who following that event along with his childhood friend Steve Daniels

began providing security for Defendant Townsend as she spoke at rallies and protests throughout 2020.

9.      On April 25, 2019, Defendant Townsend posted a selfie video of her suspicions and belief that noncitizen voters rushing the border might commit perjury and register to vote illegally and this could be enough votes to "flip" the 2020 outcome, thanking then-President Trump for "looking into this." A few months later in September, Townsend, House Elections Chair, posted updates of her meetings with the "White House" and Vice President Pence reporting, "*so now we have the White House on board to look into this and see what else we can do and get done."*

10.      On June 25, 2020, Project Veritas featured a profile article of Defendant Hartwig alleging *"Another Facebook whistleblower: Interference on a global level in elections."* Defendant Hartwig allegedly went undercover for Project Veritas James O'Keeffe wearing a secret camera while recording his employer a subcontractor for Facebook discussing the censorship of conservatives.[1] Hartwig alleged the censorship amounted to "global" election interference testifying for Congressman Matt Gaetz and in August 2020, was publicly endorsed for his effort by Brazil President Eduardo Bolsonaro.[2]

11.      On August 26, 2020, Defendant Townsend posted a video soliciting citizens for a law enforcement posse, stating "we're not trying to coordinate in the moment, because we will see chaos we will see loss of life… no longer are Americans going to sit by and watch towns burn to the ground and they're going to involve themselves. So let's coordinate in that and make it official… a community has many parts and the citizen militia and those who want to defend their town and property are

---

[1] https://www.projectveritas.com/news/another-facebook-whistleblower-interference-on-a-global-level-in-elections/

[2] In 2022, a mass protest like January 6, 2021, also occurred in Brazil following Bolsonaro's election loss.

one of the many parts needed to do so. If we work together, then we are far more effective."

12.    In September 2020, in addition to Oathkeepers, Three Percenters, and Proud Boys, and various grassroots groups, the #1loudvoice network included two security "police forces" grounded in QAnon ideology that are also formal government contractors; (1) First Amendment Praetorians, consisted of over four hundred highly skilled and trained former FBI, NSA, law enforcement, Secret Service, intelligence community members, military special operations officers, and (2) Mayhem Security Solutions, a security group of former law enforcement and military officers owned by Shawn Wilson.

13.    In October 2020, #1loudvoice held a Patriot Party Rocks event in Scottsdale, Arizona. Following the 2020 election with Defendant Flynn and Powell on December 12, 2020, and January 6, 2021, at the Ellipse outside the Capitol in Washington, D.C., and at State Capitols. Also, during this period Defendant Powell and Flynn met with Arizona legislators in a private meeting with multiple attendees.

**House Elections Chair Defendant Kelly Townsend Declared She Had "Plenary" as Elections Committee Chair to Lead a Comprehensive Investigation into Election Fraud and Acted in Accordance with Her Proclaimed Power**

14.    On November 4, 2020, the day following the election, Defendant Townsend, representing herself as House Elections Chair with "plenary" authority to investigate election fraud, solicited a crowd of her followers consisting in part of militia and QAnon supporters "citizen's posse," to go out and collect affidavits and proof of election fraud.

15.    On November 6, 2020, Plaintiff was contacted to help a Seattle FedEx whistleblower "Jane Doe," who believed suspicious ballots were coming through her facility and had been unable to reach the FBI and was told Plaintiff knew people and might be able to help.

16.    Plaintiff tried to help Doe reach the FBI and was unable to get through. Field offices were closed to walk-ins due to COVID. Plaintiff reached out to Defendant Townsend for help reaching proper authorities.

17.    Defendant Townsend told Plaintiff as House Elections Chair she had plenary authority to A.R.S. 41-1151 to issue subpoenas and investigate election fraud and she was investigating the 2020 election irregularities. Defendant Townsend pressured Plaintiff to get an affidavit from Doe.

18.    Plaintiff told Townsend Doe refused and wanted to remain anonymous or she would do an affidavit attesting to what she knew but wanted it to be anonymous.

19.    Townsend insisted there was election fraud and Plaintiff needed to give her Doe's name, saying it was a "matter of national security."

20.    Townsend shared Plaintiff's contact information with her security detail Marco Trickovic, leader of the Arizona Three Percenters, and mobilized Trickovic who was also assisting Townsend with investigating election fraud. Townsend was also in direct contact with Ryan Hartwig, Liz Harris, and Shelby Busch, and had been attending rallies and BLM "Back the Blue" counterprotests together throughout 2020 and were at the Stop the Steal rally. Busch, Harris, and Townsend worked directly with Trump lawyers Rudy Guiliani and Defendant Powell.=

21.    On November 7, 2020, Defendant Townsend solicited Defendant Ryan Hartwig at the Stop the Steal rally to assist in her election fraud investigation she was conducting and advised him that Plaintiff had a lead on a whistleblower in Seattle.

22.    Reportedly after Defendant Townsend and Defendant Hartwig spoke, it spread very quickly at the Stop the Steal rally that Plaintiff had a "hot lead" on an airport mail facility whistleblower and would not give up the woman's name.

23.    Townsend continued throughout this time to represent herself to Plaintiff and others as House Elections chair exercising her "plenary" authority under A.R.S. 41-1151 as a committee chairperson to issue subpoenas and investigate election fraud.

24.     Defendant Townsend messaged her associate and rally attendee Sommer Tolley asking Tolley if she could get Plaintiff's home address for Townsend.[3]

25.     Plaintiff did not know any of these individuals besides Defendant Townsend prior to the 2020 election and had not been attending the frequent rallies and events Townsend participated in with these individuals throughout 2020.

26.     Shortly after speaking to Defendant Townsend and learning Plaintiff was contacted by a whistleblower in Seattle, Defendant Hartwig, an affiliate of Project Veritas, received a "tip"[4] that a South Korean plane allegedly carrying counterfeit ballots was departing Phoenix Sky Harbor headed for the Seattle airport FedEx where the Doe whistleblower who contacted Plaintiff worked.

27.     Hartwig contacted Defendant Townsend's security Trickovic, White House staffer Garrett Zeigler, 2020 Congressional candidate Josh Barnett, Shelby Busch, Barnett's campaign manager, and John Shattuck who had worked on Maricopa County Jerry Sheridan's campaign, and who had been in direct contact with Lara Trump, Don Trump Jr., Rudy Guiliani, Sidney Powell, Vice President Pence's staffer Paul Teller, and Department of Justice attorney Ken Klukowski, and made multiple calls during this period facilitating communication between the various parties. The group went to the Phoenix airport and took video of the plane as it was departing capturing the tail number.

28.     According to Garrett Zeigler and others, Deputy Secretary of Homeland Security Ken Cuccinelli ordered the South Korean plane seized by the FBI and U.S.

---

[3] Defendant Townsend had been to Plaintiff's home years earlier and knew Plaintiff's address was protected under the Address Confidentiality Program.

[4] According to Hartwig's pilot source, Oprah Winfrey's pilot Don Johnson, who was a friend of Charlie Kirk, the Samsung CEO's who were passengers, their boss, Jay Y. Lee, was in prison for a political corruption and bribery scandal that resulted in the conviction of both he and then South Korean President Park and several months earlier there was a meeting between those same executives and Clinton campaign staffer and Google CEO Eric Schmidt, alleging they wanted to take Trump out and make sure he was not re-elected.

Marshalls for a "reverse screen" when it landed in Seattle. Reportedly no counterfeit ballots were found.

29.     The next day, on November 8, 2020, Plaintiff was contacted by Trump campaign attorney, Brandon Paroly, from Pennsylvania, and was told about the South Korean plane incident. Paroly insinuated the Korean Air incident from the night before may also be connected to her Seattle "Jane Doe" witness.

30.     On November 8, 2020, Plaintiff spoke with Defendant Townsend's security Trickovic for the first time. Trickovic was adamant the Korean Air incident and Plaintiff's Seattle whistleblower were connected.

31.     *Shortly after Defendant Townsend told Hartwig about Plaintiff's "hot lead," the Seattle "Jane Doe," and Townsend had engaged and solicited the crowd to go out and gather evidence and affidavits for her investigation, Plaintiff and her family began having people show up outside her home surveilling and attempting to gain access to Plaintiff and her home.*

32.     When Plaintiff told Defendant Townsend about people showing up outside her home, Townsend told Plaintiff it was because she was sitting on important information (the identity of the Seattle whistleblower) and the "deep state" would assassinate people or do whatever it took to cover up election fraud and Plaintiff was in danger as long as she was sitting on that information.

33.     On November 13, 2020, Defendant Townsend pushed a deceptive press release alleging 36,473 voters did not prove citizenship in a meme that also read fight voter fraud. On January 6, 2021, during his speech at the Ellipse, former President Trump expanded and amplified Defendant's alleged claim stating Arizona had 36,473 noncitizen voters. There was no evidence ever produced supporting this claim.

34.     Also, during this same time period, Defendant Townsend and Sidney Powell publicly pushed at rallies almost identical claims of involving Hugo Chavez

and rigged voting machines as those Townsend had platformed and disseminated during her 2010 Tea Party meeting.[5]

35.     On or around November 16, 2020, Defendant Townsend solicited two associates, from the Stop the Steal rally to deploy to Plaintiff's home to investigate election fraud and collect affidavits. Tolley reiterated Townsend's claim that Plaintiff was in danger offering to come over and help protect Plaintiff from the strangers lurking outside. Once Townsend's associate Tolley came to Plaintiff's home, Tolley told Plaintiff Koch was a government official and friend of hers who learned about Plaintiff and needed to speak with her in person at her home. Koch used false pretenses purporting to be a government official to gain access to Plaintiff inside her home, with Tolley vouching for his being a government agent.

36.     Once inside, Plaintiff felt uncomfortable with the pair in her home and as a result secretly recorded the conversation while placating Koch and Tolley for the safety of her family and herself. During the conversation, Koch fabricated a story that his agents were part of an operation removing counterfeit ballots from the South Korean plane and taking them to the Maricopa County Election center while others were sent via FedEx to Nevada.

37.     When Koch left Plaintiff's home in the early morning of November 17, 2020, Tolley began pushing she could not believe Koch confessed to all that and they needed to do something immediately.

38.     A few hours later, Tolley and Defendant Townsend's security Trickovic, were on the phone with Defendant Townsend's associate Shelby Busch who was allegedly in D.C. with Rudy Guiliani and Sidney Powell. Townsend then told Plaintiff while at the election center she witnessed Koch acting nefarious behind the secure

---

[5] On November 13, 2020, Attorney Lewis Sessions, who also represents FBI most wanted Russian oligarch Seimon Mogolivich, deposed Powell's witness Leamsy Salazar, as Salazar claimed what he witnessed in the U.S. 2020 election with voting machines was like what he witnessed as Chavez security during the coup de taut in Venezuela in 2013.

line while ballots were being counted. Tolley along with the group in D.C., acting on Townsend's direction, pressured, coerced, and intimidated Plaintiff urging her repeatedly to sign an affidavit repeating in the affidavit what the Seattle "Jane Doe" witness told her and what Scott Koch told her about his direct involvement in counterfeit ballot fraud.

39.    Defendant's agents told Plaintiff the group was working with DOJ Ken Klukowski along with Guiliani and Powell's teams, and were pressuring Plaintiff's for an affidavit which they alleged implicated foreign involvement via a South Korean plane, to obtain a FISA warrant to seize the election centers including paper ballots and machines, from the alleged counties including Maricopa before certification.

40.    While Defendant Townsend directly and through agents Trickovic and Tolley, and Guiliani, along with Defendant Powell directly and/or through agents Busch and others put extreme pressure on Plaintiff to complete the affidavit for a FISA warrant, ASAP before the Board of Supervisors certified the county, Plaintiff disclosed that when she got scared with Koch and Tolley in her home, she secretly recorded the conversation and did not want to do an affidavit without being exact on what was said.[6]

41.    *Plaintiff refused to sign an affidavit without knowing more about Koch.*

42.    *Two days later, on November 20, 2020, Maricopa County certified without Defendants Powell and Townsend obtaining access to the paper ballots and voting machines through a FISA warrant and surprise ambush of the election centers.*

**Defendants Didn't Access Ballots and Voting Machines by Ambush of the Election Centers as Plaintiff Refused to Sign the FISA Affidavit, Defendants Actions Show Concern that Plaintiff Possibly Recorded Their Attempt to Do So**

---

[6] Plaintiff also felt Tolley, Busch, and others were pressuring her on what to write in the affidavit.

43. After Plaintiff refused to cooperate things unraveled very quickly and were quite terrifying for Plaintiff and her family. So much so that it took quite some time for Plaintiff to unwind everything amidst all the fear, intimidation, gaslighting, and chaos that escalated immediately after she refused to sign the affidavit.

44. The following day on November 21, 2020, Shattuck visited Plaintiff in person that morning, showed Plaintiff a photo on his phone of a man murdered assassination style, and told Plaintiff she was still in danger, and he would be in the area if she had any security issues.

**TOWN OF FLORENCE POLICE INVOLVEMENT AND 911 CALL**

45. Later that evening there was an attempted break-in at Plaintiff's home. Plaintiff immediately called 911, while on with 911 and panicking and terrified Plaintiff sent the security footage of the perpetrator in her yard using the app's share feature. Shattuck messaged back he was on his way with Koch's boss Shawn Wilson from Mayhem Security Solutions.

46. Plaintiff was very distraught and shaken up by the incident as police arrived. Plaintiff told Florence officer Cody Linderoth she was very afraid for her safety. Plaintiff told Linderoth she sent the security camera video to Shattuck who was working with then President Trump's lawyers Defendant Powell and Guiliani and the DOJ and she was scared because she had refused to do the affidavit and Shattuck messaged, he was on his way with the boss of the guy who allegedly was part of the ballot fraud.[7]

---

[7] Koch claimed he was part of the alleged counterfeit ballot fraud that Townsend had witnessed behind the line at the election center while ballots were being counted and Koch had told Plaintiff if anyone got too close they would be discredited, killed in an accident or suicide, or arrested on false charges and she feared for her safety.

47.     Defendant Shattuck and Shawn Wilson arrived on the scene a couple of minutes later. It appeared the officers were familiar with Shawn Wilson.[8]

48.     While Florence Police were present Shattuck spoke on the phone with Defendant Townsend while also walking outside for privacy, Shattuck told Wilson they needed to, "get a team on [Plaintiff]." Within twenty minutes, more heavily armed men arrived who were also former law enforcement and part of Wilson's security group.

49.     Plaintiff was on oxygen, clearly distraught, shaken up, and very confused about what was happening. Due to Plaintiff's physical condition and disabilities, prior to this date, on this date, and through the present, has been deemed by the State of Arizona as a vulnerable adult under A.R.S. 13-3623(F)(6). It was easily apparent Plaintiff was physically compromised and vulnerable. Plaintiff's neighbor alleged she told the officer that Plaintiff was vulnerable, and she believed Shattuck and Wilson, were conning and manipulating Plaintiff. Plaintiff did not learn her neighbor told the Florence Police officer this that day until over eighteen months later.

50.     Defendant Townsend coerced and pressured Plaintiff over the phone, alleging she and her family needed the security team reiterating the danger.[9] Plaintiff was very shaken up and Florence Police officers were also still present going in and out searching for the suspect.

51.     Florence Police formed a legal "special relationship" when Plaintiff contacted 911 and they responded to the scene. Having formed a special relationship

---

[8] It appeared officers knew Wilson was a friend of Sheriff Lamb and their Pinal County jurisdictions overlapped. John Shattuck told Plaintiff he and Lamb attended Trump rallys together with their wives and both Wilson and Lamb claimed they were friends that had lunch regularly. Around November 10, 2020, when the group sought access to the Seattle woman, Defendant Townsend's security Trickovic told Plaintiff that Sheriff Lamb was going to get deputies to watch over her. Lamb told Plaintiff Townsend had asked him to get security for Plaintiff and if he could get the Seattle woman's information. Plaintiff told Lamb at that time she was fine and didn't need security.

[9] Townsend also told Plaintiff at that time she was going to mail her something. When the object arrived days later it was a Faraday bag to block electronics from surveillance, something Plaintiff had never heard of.

Florence Police had a duty to ensure Plaintiff, a vulnerable adult, was secure and safe when they vacated the scene. This was not done.

52.     Officer's Linderroth, Ian MacFie and Chris Byrne, instead left behind a heavily armed and intimidating security detail of former police officers led by Shawn Wilson, who claimed association with Plaintiff's County Sheriff Mark Lamb and that Wilson was a government contractor. As such, in the chaos, the lines were blurred between bonafide law enforcement and the group of law enforcement officers left behind as "security" by Florence Police and at the urging of Defendant Townsend and an associate of then President Trump's lawyer, Defendant Powell.

53.     The Town of Florence failed to adequately train the officers on scene on how to appropriately assess Plaintiff's safety and ensure the scene was safe upon departure, where Plaintiff expressed concern regarding what was happening.

54.     Plaintiff's County Sheriff Mark Lamb the week before, alleged he believed the 2020 election was being stolen from then President Trump. Wilson was adamant the election fraud was true, while his team further terrified Plaintiff and her family claiming they were in danger. Wilson told Plaintiff he saw ATV tracks in the desert wash behind her home and that he witnessed an ATV with men surveilling her house from the wash. One of Wilson's guys claimed there was also an SUV outside her home on the street surveilling.

55.     Plaintiff and her family were scared by these events. Wilson claimed he was working with Shattuck, who was in direct contact with Defendant Townsend and Guiliani, to get to the bottom of the alleged counterfeit ballots. Wilson's agents bolstered Koch's story alleging he likely used some of their colleagues for that job. During this time Shattuck told Plaintiff that Wilson was in direct contact with Defendant General Flynn and had provided an affidavit to Defendant Powell, who they told Plaintiff was then President Trump's lawyer.

56.     On November 24, 2020, while Plaintiff was surrounded by the heavily armed intimidating security team of former law enforcement, Defendant Townsend

contacted Plaintiff, told Plaintiff there was proof of widespread election fraud, with a scheme consistent with what the Seattle "Jane Doe" disclosed as well as Koch, and that she had just spoken with Gregg Phillips who offered 75K in whistleblower assistance and that she had talked him up to 100K for Plaintiff if she would help. Plaintiff told Defendant Townsend if it was really that serious, Plaintiff would not take money because that would affect her credibility.

57.    Based on Defendant Townsend's words and actions, Plaintiff believed there must be something to the claims for Defendant as House Elections Chair, a government official overseeing election-related policymaking, to be that rigorous in her pursuit, especially given people showing up outside Plaintiff's home and the claims Defendant Townsend was making.

58.    Also at this time Townsend gave Plaintiff House Speaker Rusty Bower's phone number and told her to call Bowers and tell him about the Seattle woman and Koch, and "be sure to record it." Plaintiff later learned during the January 6th hearings, that on or around November 23, 2020, the day before Townsend asked Plaintiff to make the call to Bowers, Bowers had asked Giuliani for proof of Defendant Townsend's alleged claims of noncitizen fraudulent voters.

59.    Plaintiff also learned two years later Defendant Townsend was on a video claiming the day after the election she asked House Speaker Bowers to hold a discovery hearing to acquire voting machines and ballots for a forensic audit.

60.    Plaintiff learned in 2021 when she met Liz Harris, that during November and December 2020, Harris and Defendant Townsend personally knocked doors and engaged in a canvassing effort led by Defendant Townsend and Harris while working with Defendant Powell's team.

61.     Defendant Townsend told Plaintiff she had canvassed and knocked doors with Harris in November 2020 while investigating election fraud in her role as House Elections Chair.[10]

62.     On or around November 26, 2020, Defendant Townsend contacted Plaintiff and pressured her to come testify at a Giuliani hearing which Townsend and Representative Finchem planned with Trump attorney Christina Bobb for November 30, 2020. Plaintiff is medically high risk for COVID and had not left her home in the during the pandemic except maybe five times. Townsend pressured Plaintiff to get a suite and Townsend would stay with Plaintiff and her security and she would have Plaintiff testify when Townsend summoned her limiting potential exposure. Plaintiff got a suite and stayed with Townsend and the security team but declined to testify.[11]

63.     On November 30, 2020, Defendant Townsend and a panel of eight or nine legislators participated in an official appearing hearing in which then President Trumps lawyers and Waldron testified. While on the dais during, Townsend asked Giuliani and Waldron about the allegation that counterfeit ballots were flown in on planes. Waldron responded stating they had obtained "some" affidavits [from Townsends associates] and stated they were still in the process of gathering more.

64.     At that point, even though Plaintiff by then had the heavily armed, intimidating security detail of former law enforcement surrounding her, Plaintiff until that point had repeatedly refused to sign an affidavit for Defendants and had still declined to provide them contact info for "Jane Doe." When Waldron said they were

---

[10] Days after the election, Townsend's security Trickovic, who she met at a MAGA school protest in 2019 and Harris went to a polling center and recorded themselves observing an unattended voting machine and posted this video publicly. Trickovic also recorded a video of a woman alleging her ballot was not counted after she was forced to use a Sharpie at a polling place, which Defendant Townsend shared to social media.

[11] Plaintiff went to the hotel and spent the night in the room with Defendant Townsend but did not testify. Plaintiff later learned Townsend's associate Busch who had been part of pressuring Plaintiff to sign the affidavit for the FISA warrant spoke with Giuliani and was concerned about Plaintiff's loyalty when Plaintiff had refused to sign the affidavit for the FISA warrant and had texted her that the Hyatt hearing seemed like it might be a dog and pony show.

"in the process" of obtaining more affidavits, Defendant Townsend, continued to actively pressure Plaintiff for the contact information of "Jane Doe."

65.    On December 1, 2020, Defendant Powell's assistant Carissa Keshel stated she spoke with Defendant General Flynn and wanted Plaintiff to get information from the Seattle woman and for a declaration. Keshel reiterated Defendant Flynn was sending a security team switching out Wilson's Mayhem team and replacing them with guys Defendant Flynn could trust. Defendant Townsend discussed with Defendant Flynn the switching out of the law enforcement team "protecting" Plaintiff, as well as plans for the Giuliani legislative panel hearing the following day with Defendant Flynn on November 29, 2020.

66.    The 1AP team replacing Wilson's team told Plaintiff their team investigated and learned Wilson was "dirty" alleging Defendant Powell and Flynn confirmed with Defendant Townsend that she had witnessed both Koch and Wilson at the election center behind the secure line and they believed Wilson was infiltrating Plaintiff to find out what she knew about their counterfeit ballot scheme.[12]

67.    Plaintiff later confirmed that Wilson, Koch's boss was part of Defendant Flynn's network and months later Defendant Flynn's brother Joe inadvertently told Plaintiff a different story which was likely the truth –Wilson asked for 30K to do the "op" and they didn't want to spend that kind of money for Wilson's team.[13]

68.    ***On December 2, 2020, Defendant Powell, who was in direct contact with Defendant Townsend, stated on the Pete Santilli show that she had evidence of trucks of ballots coming from Mexico (mirroring Townsend's 2019 claims of an anticipated "flipped" or stolen election in 2020 by noncitizen voter registrations***

---

[12] However, Plaintiff learned Defendant Flynn and 1AP security detail Geoffrey Flohr spoke with Wilson prior to coming to Plaintiff's home, and now in 2023 Wilson attends events coordinated by Defendant Flynn's organization and 1AP has also been security for at such events.

[13] In 2023, Wilson is actively attending and participating in events hosted by "The America Project," Defendant Flynn's organization and per an email sent by Liz Harris, participating in election integrity conference calls with her group. Wilson also produced a related campaign video.

*coming across the Southern border), as well as "planes full of ballots," pushed by associated of Defendant Townsend before Plaintiff ever learned about it.*

69.   On December 3, 2020, Defendant Powell filed an Arizona election contest case *Bowyer v. Ducey*, in which she listed the Seattle "Jane Doe" whistleblower who claimed to witness canvas bags of ballots she described as "not properly tracked" labeled "ballots" and "official election mail," as Defendant Powell's "Jane Doe" witness alleging she would testify about planes of ballots flown around the U.S.[14]

70.   Defendant Townsend and Hartwig were listed as witnesses expected to testify in Defendant Powell's *Bowyer v. Ducey* case filed in this Court along with QAnon board owner Ronald Watkins. When Watkins ran for Congress in 2022, he listed a condo owned by Defendant Townsend and Powell's associate Liz Harris as his residential address on his voter registration.

71.   ***Based on the election related evidence Plaintiff has personally reviewed gathered by Defendants and Harris, combined with the totality of the circumstances Plaintiff personally witnessed and experienced with the involved players throughout her experience, once physically away from the pressure, intimidation, gaslighting and coercion, Plaintiff has expressed since 2021 privately***

---

[14] In Spring 2022, "Jane Doe" told Plaintiff she still adamantly believes she witnessed ballot fraud and the election was stolen, despite Plaintiff offering an alternative explanation to Jane Doe that Plaintiff had learned in early 2022 which was the ballots were not tracked so they would not be slowed down because there had been a lawsuit alleging that might happen. Doe remained adamant she witnessed fraud saying, "I know what I saw," and that she still believes she witnessed election fraud.

Though Doug Bock Clark at ProPublica was provided contact information for the Seattle whistleblower in August 2021 and given permission to contact her for his story, according to Doe, he made no attempts to reach her. Plaintiff mistakenly believed for a time that Plaintiff was Defendant Powell's "Jane Doe" witness because the security team repeatedly referred to Plaintiff as a "witness." When Plaintiff spoke with ProPublica stated she thought she was Powell's witness although Plaintiff also said Powell had not specifically told Plaintiff that. Per court records Powell's "Jane Doe" planned to testify about witnessing planes, which did not apply to Plaintiff ever as she was never at either airport during the incidents." In fact Plaintiff had not left her house in weeks before all the people and activity showed up at Plaintiff's home. Plaintiff learned in the Spring 2022 that the Seattle whistleblower was Powell's anonymous "Jane Doe" witness.

24

*and publicly that she no longer believed there was any credible evidence of widespread election fraud.*

72.     Defendant Townsend used, fear, intimidation, and coercion, directly with Plaintiff while working in collaboration with co-Defendants and agents as part of a failed attempt to seize election centers with a FISA warrant, using an affidavit to they hoped would be signed by Plaintiff.

73.     When that effort failed, Defendant Townsend and her co-Defendant's agents worked collaboratively together, held Plaintiff and her family hostage in violation of her Fourth Amendment Right to be free from unreasonable search and seizure and Fourteenth Amendment right to exercise her liberty interests and pursue her career without undue interference and manipulation by State officials, without due process of law, in violation of their oaths to the Constitution in order to manipulate and coerce her into believing Defendant's associate Koch's initial fabrications were true and to obtaining affidavits for Defendant Townsends proclaimed "plenary" investigation into election fraud while seeking access to the "Doe" witness.

74.     *On December 3, 2020, at a rally outside of Atlanta, Georgia, Defendant Powell alleged to have evidence of "a plane full of ballots that came in," also claiming she had evidence that the election result was the "greatest crime of the century if not the life of the world."*

75.     On December 4, 2020, at approximately 10pm, former homicide detective, agent of Defendant Powell and Flynn, Geoffrey Flohr, [15] came into Plaintiff's bedroom and woke her up frantic alleging he had reliable information from "Top Shelf," believed to be former National Security Agency cybersecurity analyst Jim Penrose, who was also working on Defendant Powell's team, alleging the HL8230 plane was on its way to Seattle and "Doe" was about to be kidnapped and

---

[15] Flohr served as security for Defendant's Flynn and Powell while in D.C. and accompanied Defendants Powell and Flynn to the White House meeting with then President Trump on December 18, 2020, and was Defendant Flynn's security on January 6, 2021.

taken to South Korea in danger of being killed unless Plaintiff gave him her information so they could get a team to protect her.

76.     Plaintiff refused to give Flohr Doe's name or contact information but contacted Doe on speakerphone. Flohr told Doe they had reliable information she was about to be kidnapped and needed a security team.[16] Doe told Flohr they couldn't get into the back area at her work without security clearance. Flohr said their team did have security clearance and could, but it was urgent they get to her before the plane landed. Doe told Flohr to send a team. Doe later told Plaintiff the group was able to get past security checkpoints at her work into the area which required national security clearance and credentials.[17]

77.     Doe told Plaintiff the team took her to a hotel where the 1AP security team and a man from Defendant Powell's team she believed was Jim Penrose flew out to question her. Doe said she gave the group an affidavit and expected to testify in Powell's case as her "Jane Doe" witness.[18]

---

[16]   This behavior mirrored the pattern Defendant Townsend and Shattuck while working with Defendant Powell and Guiliani forced the security team of former law enforcement into Plaintiff's home, in front of Florence Police, which then held Plaintiff and her family hostage with fear, intimidation, and coercion.

[17]   In 2023, Plaintiff learned that Garrett Zeigler claimed that prior to November 2020, he had tied the NXVIM sex trafficking cult leader to Eric Schmidt who had consulted with the Samsung executives the group believed was on that plane. It is possible given Zeigler's relationship to Hartwig and Patrick Byrne who was working Defendant's Powell and Flynn at the time, that this might have been the source of why Penrose and the Powell team believed the Seattle woman might be kidnapped.

[18]   Doe told Plaintiff in 2023 that she still believes she witnessed ballot fraud, and the election was stolen from Trump. When Plaintiff offered an alternative explanation —that perhaps the bags that were not being properly postmarked or tracked because Plaintiff later learned, a group called Vote Forward sued in advance alleging conspiracies that Trump might slow down mail processing to gain an advantage. Thus, the ballots she called "ghost shipments," were not tracked at every point to ensure they were not slowed down by the process. Doe doubled down stating she still believes she witnessed ballot fraud and whether it can be proven or not, stated, "I know what I saw." At the time in November 2020, when the Seattle woman reached out to Plaintiff frantically for help, before the security team went to her location, in reviewing old texts Plaintiff discovered that the woman sent the same video that Defendant Townsend repeatedly urged her to watch throughout 2020 but she was never able to watch. The video "Fall of the Cabal," is apparently a QAnon recruitment tool.

78.     ***On December 5, 2020, Defendant Powell interviewed with the host of a YouTube channel, stating "We have evidence of a significant plane load of ballots coming in."***

79.     Defendant Townsend, a government official overseeing election policy with access to internal government knowledge to verify her claims, Defendant Powell, a former Federal prosecutor, and Defendant Flynn, former head of Defense Intelligence, and their agents a group of twenty to thirty former FBI, law enforcement, and military, held Plaintiff and her family hostage using fear, intimidation, and coercion while repeating constant stories of how Plaintiff and her family's lives were in danger and they were in legitimate danger of being killed by the opposing factions of the FBI and "deep state," or arrested on false charges.[19] Plaintiff, her family, and friends were terrified by these claims coming from those with apparent knowledge and government authority.[20]

80.     Defendant's Townsend, Powell, and Flynn exploited Plaintiff's fear and intimidation which they contributed to and caused through repeated stories of government malfeasance, and then used Plaintiff and her family's reaction of fear to justify fundraising claiming the need to "protect" whistleblowers specifically mentioning a "witness" in Arizona which Defendants were "protecting."

81.     Defendants Powell and Flynn through their organization "Defending the Republic," fundraised claiming they needed money to protect witnesses, meanwhile, Plaintiff and her family, were being manipulated, lied to, manipulated, and exploited by Defendants. Plaintiff and her family, on a limited income, felt obligated out of pure

---

[19] Plaintiff and her family did not have any law enforcement or military background and it was extremely traumatizing and terrifying for Plaintiff, her family, and friends, to hear Defendant's agents, a group of former FBI supervisors, law enforcement, intelligence, and military officers to make these claims. The "security team" not only terrified Plaintiff with these claims but her family, friends, and her doctor as well when they spoke with her during a zoom medical appointment alleging Plaintiff's and her family's lives were in danger.

[20] At the time of these actions, Defendant Townend was serving as House Elections committee chair working directly with Rudy Giuliani and Defendant Powell agent and lawyer for then President Trump.

necessity to borrow money from extended family to feed and house the heavily armed security team that held them hostage exercising complete control over Plaintiff, her family, and friends using terror, intimidation, and coercion, and flee their home due for safety following this experience in their home.

82.     Defendant's agents refused to allow Plaintiff to leave her home, set up alarms around the perimeter of her property that would notify them right away when and if Plaintiff did attempt to leave, and when she tried more than once to leave was repeatedly physically blocked and stopped from leaving by the former law enforcement agent, Brandon Pittman, acting as agents of Defendants Townsend, Flynn, and Powell. At one point, because Plaintiff continually tried to escape, Pittman former military SWAT, pulled out handcuffs from his bag and laid them on Plaintiff's kitchen counter as a means of intimidation.

83.     Plaintiff and her family have incurred extensive costs and damages borrowed from extended family for stress related medical care and direct costs to secure Plaintiff and her family's safety for almost two years due to the intentional acts of terrorizing Plaintiff and her family with fear which Defendants Townsend, Powell, and Flynn, did directly with their own words and actions as well as through agents.

84.     Plaintiff and her family were physically held hostage for weeks by agents who worked directly with Defendants, in violation of Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure and Fourteenth Amendment rights to pursue liberty interests without undue restraint.

85.     Defendant's security team worked for Defendant's Powell and Townsend investigating and gathering proof of election fraud. As each new group of three to four men rotated every three to four days holding Plaintiff hostage with fear and intimidation, and exercising extreme coercive control over almost everything Plaintiff did including who Plaintiff talked to, while most of the men who were former FBI and law enforcement repeatedly listened to and dissected the Koch recording, gaslighting Plaintiff claiming not only was everything Koch said legit and true, but

pressuring and coercing Plaintiff to pursue legal filings in the form of an election contest and dispute, while the group claimed to have gathered evidence across the Country validating all of the things Koch said.

86.     Defendant Powell's agent Carissa Keshel in November 2020 listened to Plaintiff's Koch recording, by early December 2020 Keshel stated she and Abbie Frye as agents of Powell had gathered proof that everything Koch said was true. Members of the 1AP security team repeatedly listened to the Koch recording and as individuals with law enforcement backgrounds claimed it was true and they had personally gathered and seen proof supporting Koch's claims from across the U.S., including in Michigan. As former law enforcement, these statements strongly influenced Plaintiff's perception of her interaction with Koch and belief at the time that the claims must be true for there to have been over thirty people swarming Plaintiff and her home over those several weeks as they rotated shifts.

87.     On December 7, 2020, the heavily armed former law enforcement security team while Plaintiff was held hostage using fear, intimidation, and coercion, gaslit stories of election fraud and validated Koch's claims. Plaintiff told the men that Powell's cases in Federal court were being properly dismissed because she should have filed her claims in State court under election statutes as Governor Ducey had tweeted. At the urging of the security detail and with permission of Powell's assistant Carissa Keshel, Plaintiff cut and pasted Powell's complaint and filed it in State court adding more detail about Koch and Plaintiff's voter registration issues.[21]

88.     On December 8, 2020, Geoffrey Flohr insisted they needed to sweep Plaintiff's home for bugs which was confusing, but Flohr claimed it was necessary. Defendants Powell and Flynn hired Los Angeles County FBI Supervisory Special Agent Emmanuel Ladsous to come to Plaintiff's home and perform the sweep.

---

[21] On or around November 4, 2020, Defendant Townsend contacted Plaintiff urging her to report her registration cancellation to the Election Integrity Unit which she had.

Ladsous's words and actions validated Defendants Townsend, Powell, and Flynn's, claims increasing Plaintiff and her family's fears and concerns.[22]

89.     On December 9, 2020, Defendant Townsend spoke on the Garret Lewis show and told the audience that legislators have the power to send Arizona electors and there is no need to even go into session for this to occur. Although Plaintiff learned this in 2022, it is another example of Defendant during that period as she did to Plaintiff repeatedly claiming her "plenary" power as a government official acting under "color of law" to investigate election fraud and intervene without convening the entire legislature convening to act as an official governing body.

90.     On December 11, 2020, Defendant Townsend allegedly spoke with Rudy Guiliani expressing concerns that if there were no legal case pending submitting slate of alternate electors could be considered treasonous.[23]

91.     That same evening, Defendant Townsend contacted Plaintiff, pressuring Plaintiff to reach out to Christina Bobb and Defendant's lawyer Jack Wilenchik, for to provide Plaintiff subpoenas to gain access to voting machines through discovery in Plaintiff's election contest once Defendant Townsend learned the Pinal Court Judge said he would grant Plaintiff "reasonable discovery." Plaintiff was confused by

---

[22] This incident was so bizzare and out of her experience, after it was clear the group, used and manipulated her, Plaintiff later questioned if Ladsous had been brought into plant bugs.

[23] Plaintiff learned Defendant allegedly made these statements after reading the New York Times article linked below. In December 2020 and throughout the Spring 2021, Defendant Townsend was in regular contact with Plaintiff and made zero mention of "treason" concerns while Townsend repeatedly pressured Plaintiff to pursue her litigation and appeal to SCOTUS alleging she believed Koch's claims and had other evidence with Harris's canvass to support his claims. By summer 2021, as Plaintiff learned all claims were coming from the same connected network, and later learned **Townsend knew Koch personally prior to the election, this was more proof Plaintiff had been lied to and manipulated by Defendants and by August 2021 Plaintiff told everyone in the circles that she no longer believed there was any credible evidence of election fraud.** In 2022, Defendant Townsend continued gaslighting Plaintiff with new "research" Townsend claimed alleging she discovered Scott Koch owned a restaurant in Scottsdale, AZ, and appeared to have cartel ties to those who harvest adrenochrome (a chemical she claimed was from scared children's blood), as well as associations with child sex trafficking which Defendant's associates claimed the election fraud counterfeit ballots were run using the same networks as child trafficking. Plaintiff believes this is and was all fabricated political nonsense. https://www.nytimes.com/2022/08/02/us/politics/arizona-trump-fake-electors.html

Townsend pushing this because she had repeatedly told Plaintiff they already had digital evidence of "vote flipping." Because of this incongruence, Plaintiff did not reach out to Wilenchik as Townsend requested.

92.     Defendant Powell's legal team also sought for Jim Penrose and Doug Logan to provide subpoenas to access to voting machines using Plaintiff's case. Plaintiff did not respond to this request for the same reason and did not issue any subpoenas or discovery requests in her election case.

93.     Plaintiff learned nearly eighteen months later, that in mid-December 2020, Plaintiff's neighbor allegedly called the FBI stating she believed Plaintiff, a vulnerable adult, was being held hostage and manipulated by a right-wing militia group and was in danger. Plaintiff's neighbor told Plaintiff that when the "security" men were outside Plaintiff's home changing batteries on security cameras and the neighbor asked whom they worked for, the men told her they were FBI which prompted Plaintiff's neighbor to call the FBI. Plaintiff's neighbor said the FBI agent confirmed to her the 1AP men were not affiliated with the FBI but also did not take further action other than possibly request a welfare check through local law enforcement.

94.     Plaintiff's neighbor alleges she expressed concern for Plaintiff's safety. Shortly thereafter Florence Police deployed to Plaintiff's home. When Florence Police arrived, Defendants Townsend, Flynn, and Powell's agents, the 1AP men, pushed Plaintiff back from the door stepping outside quickly pulling the door closed behind them.

95.     After twenty minutes of speaking to Florence Police, Plaintiff opened the door and the men, all former police and military were having a friendly, jovial chat with the responding officers. In front of the 1AP men, with the men standing between Plaintiff and the officers, the Florence Police asked Plaintiff if she was ok, and after Plaintiff said the only reasonable answer that she was, they left. Florence Police officers did not disclose that Plaintiff's neighbor had called the FBI expressing

concern for Plaintiff's safety, nor did they state that the men had allegedly lied to Plaintiff's neighbor.

96.    On December 14, 2020, Defendant Townsend posted to social media a resolution in which she reportedly solicited twenty-eight legislative colleagues to adopt and sign a resolution that Townsend then sent to Jerome Corsi (who worked with Defendant Townsend in 2011 on the Obama birther conspiracies), and Ron Hopper who Defendant asked to provide Mike Pence the letter urging Pence "refrain from accepting the Biden electors until [she and her legislative colleagues] could adequately investigate these claims of fraud."[24]

97.    Defendant Townsend did not state that she and a handful of colleagues pushed and gaslit such claims of election fraud in Arizona as she personally solicited, directed, and led investigations into such claims, which as a government official claiming to act with "plenary" authority directly violated Plaintiff's constitutional rights in what the Founders would have deemed as the most egregious acts of tyranny from a government official.

98.    Participating in the deployment of a "police force" to hold Plaintiff and her family hostage for weeks, using fear, intimidation, and coercion, to accomplish one's governmental objective of investigating election fraud, is an unthinkable act of tyranny and an egregious violation of the civil rights of Plaintiff and her family.

99.    From November 21, 2020, until January 11, 2021, Plaintiff had the organized "security team" agents of Defendants, consisting of usually three to four heavily armed former FBI, law enforcement, and military, rotating new men every three to four days, who used constant fear, intimidation, and coercion, to control Plaintiff, her family, and friends.

100.    After a member of her "security team" insinuated she may be killed because she was "more trouble than she was worth," Plaintiff planned an escape while

---

[24] Paul Boyers electronic signature was included on the document, but he alleged he did not sign the document.

her "security" was sleeping and went straight to Florence Police station which was inaccessible in person due to being "closed for COVID."

101.   The 1AP security team, exercised coercive control while refusing to allow Plaintiff to leave her home, and refusing to leave when asked. When Plaintiff's longstanding friend from out of town came to visit on January 6, 2021, and the group of four men were in Plaintiffs home, Plaintiff's friend saw how terrified Plaintiff was and suggested she take Plaintiff out to dinner so they could have some time together. The group of men refused, telling Plaintiff's friend, "No. She's not going anywhere." The men then terrified Plaintiff's friend telling her and her cousin that they were in danger and were likely to be followed home and killed.

102.   As, Defendant's Townsend, Powell, and Flynn, controlled the security team acting as their agents, the men refused to allow Plaintiff to use her phone. When Plaintiff was caught in her bathroom using her phone (she had been going in her closet to make calls), armed Rich Chichester stood by demanding Plaintiff they were told by Penrose she was not to be using her phone, while also armed Brandon Pittman forcefully took Plaintiff's phone from her hands while she was speaking on a call. Plaintiff was later told her phone turned up at the Willard Hotel, in Chichester's bag, after Chichester had left Plaintiff's home and gone to D.C., in early January 2021.

103.   Plaintiff confirmed data was extracted from Plaintiff's phone and the information contained on it was used by Defendants agents through May 2021 to manipulate, drop hints of blackmail, harass, intimidate, and terrorize with extreme fear and coercive influence of Plaintiff over the next year.

104.   Defendants Doug Logan and Jim Penrose who were reportedly at the Willard Hotel where Plaintiff's stolen phone was confirmed to have been taken in early January 2021 by Defendant Flynn's security Geoffrey Flohr, had been using a Cellubrite device, which extracts data from cellular devices while they worked directly as agents for Defendants Powell and Flynn.

**By late December 2020, Defendants Powell and Townsend, knew Koch Fabricated and Intentionally Manipulated Plaintiff and Others Creating Ambiguity While Fundraising and Pursuing a Forensic Audit as Townsend, Hartwig, 1AP James Curtis, and Liz Harris Claimed to Have Evidence Supporting Koch's Claims Contradicting Claims Koch Fabricated**

105.   On December 23, 2020, Defendant Ryan Hartwig, who had originally learned about Plaintiff from Defendant Townsend at the Stop the Steal rally, contacted Plaintiff telling her that Defendant Powell gave permission and much like Defendant Townsend and Shattuck pressured Plaintiff to get the story out claiming it was vital for her safety and that of her family to do so. Hartwig claimed he had lots of right-wing media connections and wanted to get the story out ASAP for both of their safety. *Plaintiff refused to do so.*

106.   Defendant Hartwig insisted Plaintiff give him a copy of the Koch recording. Plaintiff refused. Hartwig told Plaintiff Defendant Powell wanted it pushed out publicly and it was important to do so for her safety. Defendant Hartwig sent Plaintiff screenshots of messages from Powell's agent Carissa Keshel stating Powell wanted it to go public. Plaintiff then gave Hartwig a copy of the Koch recording and the recording of Shawn Wilson, which he then used on the Stew Peters show.

107.   Defendant Hartwig stated he was in direct contact with Powell and during such time continued for months throughout 2021, to push out the Korean Air story at multiple speaking engagements and in person as well as online podcasts with Josh Barnett. While speaking publicly at a Stop the Steal rally on January 2, 2021, Defendant Hartwig claimed he was working directly with Defendant Sidney Powell and was a witness for her to Korean Air.[25]

108.   In January 2021, Plaintiff informed Hartwig Koch allegedly fabricated his claim. Hartwig contradicted Penrose reiterating his "source" overheard a meeting

---

[25] https://youtu.be/0nJ6RVmufU0

of plans to take out Trump adding the source was sent pictures of his kids and threatened. Hartwig's statements were consistent with the information Plaintiff was told by Shattuck and Trickovic from the beginning and did not fit with the story advanced by Penrose that the source was a baggage handler trolling a MAGA coworker. In January 2021 as Hartwig continued pushing the Korean Air claims publicly using Plaintiff's name, he stated he was working directly with Powell.

109.   Despite extreme pressure from Shattuck working with Guiliani and Powell, as well as Defendant Townsend, Plaintiff continued refusing interviews on right-wing podcasts throughout November and December 2020. Defendant Hartwig, while working with Defendant Powell's team, appeared on Stew Peters show ***repeatedly using Plaintiff's name*** while speaking about how he and his associates had been at the airport and took video of the plane, while using aliases for those who accompanied him at the airport.[26]

110.   On December 23, 2020, an agent and associate of Defendants Flynn, Powell, Logan, Townsend, and Liz Harris, Jovan Pulitzer claimed in an interview that his methods could detect evidence of counterfeit ballot, such as bamboo in the paper if he were given access to paper ballots.[27]

111.   In July 2021 Plaintiff told Defendant Townsend she *doubted the whole election fraud narrative and that she was done with all of it.* Defendant Townsend told Plaintiff she was not done, said she spoke with the guy who evaluated the paper and found anomalies insinuating what Koch claimed was true.

---

[26] https://rumble.com/vc4jkf-facebook-whistleblower-sidney-powell-team-drops-bombshell-election-fraud-pr.html

[27] Pulitzer's exact words were, "American paper has a signature in it and with the format, you can look at that paper… Now let's say there was an influence of China ballots. China does not have the tree and lumber population we have. They use bamboo and they use they do use wood pulp. They use bamboo in their paper and they use about 27 different mixes of grasses that we don't have here in the United States. And although you can't look at it and see it, it's very detectable and so I can assure you that outside of catastrophic failure you can actually detect the mill that paper came from and what time of the year."

112.   Plaintiff and her family were traumatized by the experience. It was not until May 2021 when Plaintiff physically escaped the gaslighting, fear, intimidation, and coercion of Defendant's agents that Plaintiff began seeing more clearly the network of Defendant's agents and the relationships. At that time Plaintiff began seeking the truth, sought out evidence to weigh the credibility of Defendant's claims.

113.   In 2022, Defendant Logan insinuated the possibility of counterfeit ballots in his presentations of his findings. Pulitzer, who was paid 200K by Defendant Logan as a subcontractor of the Senate commissioned audit claimed he did find counterfeit ballots as a result of his inquiry.

*114.   Defendant Townsend told Plaintiff it was her pressuring colleagues during the Guiliani meeting in which she told them they had "plenary power," that resulted in the audit being done which she alleged found counterfeit ballots.*

115.   In late 2021, Plaintiff informed Defendant Townsend she was confident she no longer believed there is any credible evidence of widespread election fraud. Defendant Townsend became angry and falsely accused Plaintiff of nefarious motives for holding such a belief and alleged she was a traitor to the Country if she really believes that. Throughout 2021, in violation of Plaintiff's First Amendment rights Defendant Townsend repeatedly threatened Plaintiff she needed to "stay with the herd" or else.

116.   Defendant Townsend as a government official intimidated Plaintiff with her words and conduct in a manner that chilled Plaintiff from expressing her opinion that there was no credible evidence of election fraud openly without fear of retaliation from Defendant in violation of Plaintiff's First Amendment right to speak freely about her beliefs without threat, intimidation, or coercion from a government official.

117.   Plaintiff at times still expressed this opinion privately and publicly but as a result was the target of a sustained campaign by Defendants Townsend, Hartwig, Logan, and agents of Defendant Powell and Flynn who then engaged in ongoing threats, harassment, coercion, and repeated smearing of Plaintiff's character.

118.   In November 2021, after Plaintiff voluntarily spoke with the January 6th committee, Defendant Hartwig told his boss that he and White House staffer Garrett Zeigler (who had been involved with Korean Air before Plaintiff learned about it), that he and Zeigler were scheming to have Plaintiff arrested on false allegations for "political revenge," alleging Plaintiff messed everything up and caused Defendants and so many people a whole lot of trouble by dropping a recording of Senate Majority Whip Sonny Borelli, working with Defendant Townsend, Flynn, and Powell, at the time telling Plaintiff her life was in danger and she was in danger of being killed by "high level people."

119.   Defendant Hartwig's boss surprised by what he was hearing Hartwig brag about the revenge scheme to have Plaintiff arrested on fabricated felony charges, secretly audio recorded Hartwig and published the recording to social media then contacted Plaintiff. Zeigler denied involvement in the scheme when confronted on social media by those who heard Hartwig bragging that Zeigler was assisting him in the effort.

120.   Defendant Hartwig, who spoke with Defendant Townsend and Pinal County Sheriff Lamb on the day he learned about Plaintiff and then went out to the airport later that day to film the Korean Air, boasted that he Sheriff Lamb as well as legislator Garland Shreves who worked in the Pinal County Prosecutor's Office claimed they were friends, and he was pulling a favor to have Plaintiff arrested on fabricated charges. At that time in 2022, Hartwig alleged Plaintiff was going to be arrested "any day." Both Sheriff Lamb and Shreves denied involvement in Defendant Hartwig's alleged scheme. Plaintiff hired an attorney and thousands in attorney's costs and experienced severe emotional distress only to learn that Hartwig's claims were either fabricated or their "plan" was thwarted, and no such records of reports existed.

121.   Also, around this time, Plaintiff was contacted by attorney Andrew Kloster, who worked on the Wisconsin audit, and on January 6, 2021, served as an

attorney for the Trump White House Office of Presidential Personnel Management, stating he was representing Jim Penrose who had worked as an agent for Powell and had directing Plaintiff's "security" to get Plaintiff's phone for him. The armed men who held Plaintiff hostage forcefully took Plaintiff's phone from her hands while she was on it. As Penrose expressed concern Plaintiff might be speaking to the U.S. House January 6th committee and that he might have potential exposure, his attorney Kloster contacted Plaintiff.

122.   Kloster stated Penrose's former attorneys who served Plaintiff with a letter in the summer of 2021 based on fabrications, threatening to destroy Plaintiff's career should not have occurred. Kloster sought to have Plaintiff sign an affidavit attesting, falsely, that Penrose was not directing 1AP Plaintiff's security team in December 2020, while working for Defendant Powell. Plaintiff refused as she had already provided audio-recorded evidence which contradicted his request to the January 6th committee per their request.

123.   Additionally, since December 2020, agents working on behalf of and/or Defendants Townsend, Powell, Flynn, Hartwig, and Logan, as well as certain members of Plaintiff's former heavily armed "security detail" have repeatedly both publicly and privately assailed Plaintiff's credibility, resulting in harassment by their followers. These actions directly conflict with statements made previously by Defendant Townsend in which she attested to Plaintiff's integrity and credibility.

## COUNT ONE — CIVIL RIGHTS 42 U.S.C. 1983

124.   Plaintiff incorporates herein by reference all allegations contained in this Complaint as if stated herein again in full.

125.   Defendant Kelly Townsend, acting under color of state law, representing to Plaintiff and others that in her capacity as House Elections Chair and later as Senate Committee Chair, represented herself as having plenary power to initiate, direct, lead, and conduct, an investigation into potential fraud in the 2020 election. While acting

under color of state law, and with the cloak of authority, defendant Townsend knowingly, willfully, and intentionally, deprived Plaintiff Burk of her rights, privileges, and immunities, secured by the Fourth Amendment, Fourteenth Amendment, and First Amendment to the United States Constitution and derivative rights under 42 U.S.C.§1983. Defendants Sidney Powell, Mike Flynn, Doug Logan, and Ryan Hartwig committed acts described herein in collaboration with Defendant Townsend, a state actor, which violated Plaintiff's rights, thus subjecting them to 42 U.S.C.§1983 as these individuals worked collaboratively in furtherance of Defendant Townsend's official act of investigating election fraud as part of a civil conspiracy.

126.   Defendant's subjected Plaintiff Burk to an unreasonable search and seizure as part of seeking information about voter fraud and then later Plaintiff's private life through the theft of her personal cell phone for purposes of extracting the data to determine what audio recordings and evidence she may have retrieved on Defendant's pressure campaign for the FISA warrant affidavit and later used Plaintiff's personal data as a means of exerting pressure, intimidation, blackmail, harassment, as part of attempts to silence Plaintiff and mitigate any potential damage. As part of the unreasonable search and seizure of Plaintiff's person and liberty, Defendants;

- Needlessly and unreasonably subjected Plaintiff to excessive physical restraint and force in violation of her Fourth and Fourteenth Amendment right to be free from unreasonable search and seizure by government agents or those acting on their behalf;

- Plaintiff's personal property, her iPhones, were illegally seized and personal data was extracted by Defendant's agents seeking to determine if Plaintiff audio recorded Defendant Townsend participating in a calculated effort to seize voting machines by FISA warrant after her associate fabricated a story to Plaintiff of involvement in election fraud which she then bolstered;

- Unlawfully detained Plaintiff without her consent through use of both force and fear of force, and intimidation;

39

- Subjecting Plaintiff to loss of both liberty and property without due process of law, in violation of her Fourteenth Amendment;

- Subjecting Plaintiff to repeated chilling of her First Amendment right due to manipulation, threats, and coercive control.

127.   The above-described civil rights violations directly and proximately caused Plaintiffs general and special damages in an amount to be proven at trial for present and future medical expenses including treatment for stress-related physical injuries including cardiac issues, migraines, exacerbation of chronic pain attributed to trauma, psychological trauma, pain, suffering, mental and emotional anguish, loss of income, diminished earning capacity, lost tuition from withdrawal of education, loss of consortium, and expenses for alternative living for two years for Plaintiff and her family being unable to return to Plaintiffs home due to fear and trauma, and other related losses, including punitive damages to deter such conduct in the future.

**COUNT TWO — FALSE IMPRISONMENT**

128.   Plaintiff incorporates herein by reference all allegations contained in this Complaint as if stated herein again in full.'

129.   Defendants acting directly and in concert with agents acting on apparent authority to restrict Plaintiff's movements and liberty without her consent or lawful authority. These acts were done in her own home, as well as transporting Plaintiff across State lines through fear, force, and intimidation. Defendants restricted Plaintiff's movements holding her hostage and controlling her liberty, and freedom to leave, through both words and physical intimidation. Defendant's agents placed motion detection devices on the perimeter of her property that would alert them if Plaintiff attempted to escape and if she set off the alarm, quickly mobilized to stop her.

130.   The conduct of Defendants and their agents acting on their behalf, as described above, resulting in direct restraint of Plaintiffs liberty interests and freedom of movement, by fear, or fear of force, and intimidation.

131.   The conduct of the respective defendant and their agents as described above would have caused a reasonably prudent person under the circumstances to believe that they were restrained.

132.    The defendant is liable for the actions of their agents pursuant to the principle of agency law.

133.   Plaintiff was aware of and harmed by the respective Defendants agent's restraint. The restraint of Plaintiff directly and proximately caused Plaintiff's general and special damages, in an amount to be proven at trial, including physical injuries, present and future medical expenses, pain, suffering, mental and emotional anguish, loss of income, diminished earning capacity, and loss of consortium.

### COUNT THREE — ASSAULT

134.   Plaintiff incorporates herein by reference all allegations as well as background contained in this Complaint as if stated herein again in full.

135.   Defendants Townsend, Flynn, Powell, and Hartwig engaged in aggressive and desperate attempts to find and seek information about election fraud both on their own and through agents acting on their behalf with apparent authority, to advance a political objective, and in doing so intentionally acted in a coercive manner that caused Burk and her family members to repeatedly for well over a year and a half, to suffer reasonable apprehension they would be touched in a harmful or offensive manner.

136.   Defendants and their agents harmful or offensive conduct intentionally creating such fear, as indicated above, directly and proximately caused Plaintiff Burk general and special damages, in an amount to be proven at trial, including physical and psychological injuries, present and future medical expenses, pain, suffering, mental and emotional anguish, loss of income, diminished earning capacity and loss of consortium. Plaintiff also seeks punitive damages to deter such conduct in the future.

**COUNT FOUR - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

137.   Plaintiff incorporates herein by reference all allegations contained in this Complaint as if stated herein again in full.

138.   Defendants or agents acting on their behalf with apparent authority, knowingly and intentionally made false and harmful statements to Plaintiff Burk to further effort to investigate election fraud and use Plaintiff and her family employing fear, force, manipulation, intimidation, and coercion, in a manner that Defendants knew or should have known would be emotionally distressing to a reasonable person.

139.   Defendants and their agents knew or should have known disseminating fabricated false information would reasonably result in Plaintiff relying on such statements given the nature, circumstances, and context in which the information was presented, while repeatedly gaslighting and coercing Plaintiff to repeat such information alleging it was necessary to do so or else she, her family, or others were in danger of being killed.

140.   Defendant's actions were extreme and outrageous, as they and/or agents acting on their behalf with apparent authority, induced intentional terror and fear in Plaintiff and her family over an extended period to accomplish goals and objectives of Defendants and their associates including fundraising and political advancement.

141.   Defendant's intentional acts did in fact cause Plaintiff and her family members to suffer severe emotional distress.

142.   Plaintiff's emotional distress included physical manifestations in cardiac issues, migraines, high blood pressure, and exacerbation of chronic pain.

143.   As a direct and proximate case from Defendant's intentional acts, Plaintiff Burk suffered emotional harm from the psychological terror inflicted by Defendant's false statements resulting in general damages in an amount which shall abide by proof at trial, but which is in excess of the jurisdictional requirements of this Court. Plaintiffs have also incurred costs for psychological treatment expenses, loss of consortium, and upon such information and belief, allege that they may incur

additional expenses in the future for additional treatment. Plaintiff also requests punitive and special damages to deter such conduct in the future.

## COUNT FIVE – CIVIL CONSPIRACY

144.   Plaintiff incorporates herein by reference all allegations contained in this Complaint as if stated herein again in full.

145.   Defendant Townsend, Flynn, and Powell worked together with agents to push fabricated stories of election fraud and proof they claimed to have of such to Plaintiff to pressure and coerce Plaintiff into signing an affidavit the group planned to use to obtain a FISA warrant to seize election centers before certification of the votes in the implicated States. When Plaintiff refused to sign such an affidavit without knowing more about Koch, who turned out to be an associate of Defendant's network, Defendants engaged co-Defendants Hartwig and Logan, along with agents to engage in an extensive gaslighting, manipulation, intimidation, and coercion campaign to convince Plaintiff the effort was legitimate at the outset, while holding Plaintiff and her family hostage with a heavily armed paramilitary team of former law enforcement and military officers.

146.   Defendants Townsend, Powell, and Flynn directly told Plaintiff they had evidence of election fraud, and the 2020 election was stolen as they and their agents backed up Koch's fabricated story while Townsend claimed she was a direct witness and Powell's team claimed to have corroborating evidence. When contradictory evidence surfaced, Defendants directly or through proxies or agents, continued with targeted manipulation and coercion of Plaintiff alleging the fabrications were true and criticizing contradictory claims in furtherance of the conspiracy.

147.   As a direct and proximate cause of Defendant's intentional acts, Plaintiff Burk suffered emotional harm from the psychological terror inflicted by Defendant's false statements resulting in general damages in an amount which shall abide by proof at trial, but which is in excess of the jurisdictional requirements of this Court. Plaintiffs have also incurred costs for psychological treatment expenses, loss of

consortium, and upon such information and belief, allege that they may incur additional expenses in the future for additional treatment. Plaintiff also requests punitive and special damages to deter such conduct in the future.

**CONCLUSION**

**WHEREFORE**, Plaintiff requests judgment against Defendants as follows:

E.  For general damages and losses already incurred, and to be incurred in the future, in an amount reasonable and proper to be proven at trial;

B. For special damages in an amount to be proven at trial.

C. For past and future medical expenses and other economic losses incurred by Plaintiff in an amount to be proven at trial;

D. For punitive damages in an amount to be proven at trial;

E. For such additional relief as the Court may deem just and proper in the premises.

I, Staci Burk, hereby declare under penalty of perjury the above facts are true and correct to the best of my knowledge.

Dated this 21st day of August, 2023 by;

*Staci Burk*
_____
Staci Burk

**CERTIFICATE OF SERVICE**

I, Staci Burk, hereby certify that on August 21, 2023, I filed the foregoing document to the Clerk of the Court copy of the foregoing sent via e-filing to:

Dennis I. Wilenchik, #005350
John "Jack" D. Wilenchik, #029353

Jordan C. Wolff, #034110 admin@wb-law.com
*Attorneys for Defendant Kelly Townsend*          By: *SB* _____